ROSS, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

ORENSTEIN, M.J.

UNITED STATES OF AMERICA

- against -

MARK NORDLICHT,
DAVID LEVY,
URI LANDESMAN,
JOSEPH SANFILIPPO,
JOSEPH MANN,
DANIEL SMALL and
JEFFREY SHULSE,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. **CR16- 640**

(T. 15, U.S.C., §§ 78j(b), 78ff, 80b-6
and 80b-17; T. 18, U.S.C., §§ 371,
981(a)(1)(C), 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

2016 DEC 14 PM 4: 28

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Corrupt Hedge Fund and Related Entities

      1.    Platinum Partners ("Platinum") was a hedge fund founded in or about

2003 and based in New York, New York. Since approximately September 2011, Platinum,

through Platinum Management (NY) LLC and its affiliated relying advisers (collectively,

"Platinum Management"), was registered with the United States Securities and Exchange

Commission ("SEC") as an investment adviser. Platinum managed several hedge funds, but the

vast majority of its assets were invested through Platinum Partners Value Arbitrage Fund, L.P.

("PPVA") and Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"). Platinum

charged its investors a two percent management fee and a 20 percent incentive fee. In March

2016, Platinum reported in its Form ADV, the uniform form used by investment advisers to register with both the SEC and state securities authorities, that it had $1.7 billion in assets under management ("AUM"), including approximately $1.1 billion in gross asset value in PPVA and more than $590 million in PPCO.

2. PPVA, established in or about 2003, was Platinum's signature hedge fund and marketed itself as a "multi-strategy fund designed to achieve significant risk-adjusted returns irrespective of the direction of any broader market activity." PPVA was a master fund comprised of the following feeder funds: (i) Platinum Partners Value Arbitrage Fund (USA) L.P.; (ii) Platinum Partners Value Arbitrage Fund (International) Ltd.; and (iii) Platinum Partners Value Arbitrage Intermediate Fund Ltd. Beginning in or about 2012, PPVA held primarily illiquid and "Level 3" assets and its portfolio had a significant stake in exploration-stage and developmental-stage energy companies. In marketing materials sent to investors and prospective investors, Platinum reported that PPVA had returned profits of more than eight percent in 2015 and more than seven percent for the period from January 2016 through April 2016.

3. PPCO, established in or about 2008 and formerly known as Centurion Credit Management, L.P., was Platinum's credit fund and acted as a master fund comprised of the following four feeder funds: (i) Platinum Partners Credit Opportunities Fund International, Ltd.; (ii) Platinum Partners Credit Opportunities Fund International (A), Ltd.; (iii) Platinum Partners Credit Opportunities Fund (TE) LLC; and (iv) Platinum Partners Credit Opportunities Fund LLC. PPCO's stated primary investment strategy was to originate high-yield fixed income instruments, including notes, bonds and credit facilities. In marketing materials sent to investors and prospective investors, Platinum claimed that PPCO had returned profits of more than eight

percent in 2015 and an average annualized return of 10.25 percent for the period from August 2007 through December 2015.

4.      Platinum Partners Liquid Opportunity Master Fund L.P. ("PPLO"), established in or about 2009, was Platinum's liquid fund and acted as a master fund comprised of the following feeder funds: (i) Platinum Partners Liquid Opportunity Fund (USA) L.P.; and (ii) Platinum Partners Liquid Opportunity Fund (International) Ltd.  PPLO's stated primary investment strategy was to invest and trade in, among other things, U.S. and non-U.S. equity and debt securities (both public and private), currencies, futures, forward contracts, other commodity interests, options, swap contracts and other derivative instruments.

5.      Beechwood, established in or about 2013, consisted of a group of entities that was partially owned and controlled by the principals of Platinum.  At the end of 2015, Beechwood had approximately $2.4 billion in AUM and operated the following entities: (i) Beechwood Re, Ltd., a reinsurer that was licensed by the Cayman Islands Monetary Authority; (ii) Beechwood Bermuda International Ltd. ("BBIL"), a reinsurer that was licensed by the Bermuda Monetary Authority; (iii) Beechwood Bermuda Investment Holdings, a company that issued wealth management products; and (iv) B Asset Manager L.P. ("BAM"), a New York-based investment adviser that managed Beechwood's assets and liabilities.  Until approximately June 2016, the Platinum principals controlled approximately 68 percent of the voting power of BAM.

6.      Black Elk Energy Offshore Operations, LLC, together with Black Elk Energy Finance Corp. and its affiliates and subsidiaries (collectively, "Black Elk"), was formed in or about November 2007 in Houston, Texas.  Black Elk was an oil and natural gas company whose stated business plan was to engage in the exploration, development, production and

exploitation of oil and natural gas properties in the Gulf of Mexico. From approximately August 2010 through September 2015, Black Elk was controlled by Platinum. In or about November 2010, Black Elk raised $150 million in capital through a private placement of 13.75 percent senior secured notes due on December 1, 2015 (the "BE Bonds").

7.      Lafitte Energy Corp. was formed by Platinum in or about June 2014, and was converted in or about August 2014 to a limited liability company and renamed Northstar GOM Holdings Group LLC. In or about September 2014, PPVA, through Northstar GOM Holdings Group LLC, acquired 100 percent of the equity of Northstar Offshore Group, LLC ("Northstar"), an oil and natural gas company based in Houston, Texas that was also purportedly focused on acquisitions, development, and exploration in the Gulf of Mexico. In or about April 2015, several of Black Elk's remaining assets were acquired by Northstar. Platinum controlled Northstar from approximately September 2014 to December 2016.

8.      Golden Gate Oil LLC ("Golden Gate"), formed as a joint venture between Platinum and Amrich Energy Inc. in or about April 2012, was a mid-coast onshore oil and gas exploration and production company based in Santa Maria, California. Golden Gate's stated business plan was to "grow its onshore portfolio through acquisitions and organic prospect generation in the continental United States." Platinum controlled Golden Gate from approximately April 2012 to December 2016.

9.      Platinum Partners Northstar Equity and related offerings (collectively, "PPNE") were short-term note offerings issued by Platinum beginning in or about September 2014 at annual interest rates of 16 percent and, later, 12 percent. Platinum initially marketed PPNE as a capital raising vehicle for an investment by Platinum into Northstar, one of PPVA's largest portfolio companies. Platinum marketed PPNE to new investors, insiders, employees and

existing Platinum investors. From approximately September 2014 through January 2016, Platinum raised approximately $75 million through PPNE notes.

II.    Relevant Regulatory Principles and Definitions

10.    A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

11.    An "investment adviser" was any person who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as part of a regular business, issued or promulgated analyses or reports concerning securities.

12.    A "person associated with an investment adviser" was any partner, officer or director of such investment adviser (or any person who performed similar functions), or any person who directly or indirectly controlled or was controlled by such investment adviser, including any employee of such investment adviser, except persons associated with an investment adviser whose functions are clerical or ministerial.

13.    A private placement memorandum ("PPM"), also known as a private offering document and confidential offering memorandum, was a securities disclosure document used in a private offering of securities by a company or investment fund.

14.    A "related party" was any of the following: (i) a director (which term when used herein includes any director nominee); (ii) an executive officer; (iii) a person known by the company to be the beneficial owner of more than five percent of the company's common stock; or (iv) a person known by the company to be an immediate family member of any of the foregoing persons.

15. A "related party transaction" was any transaction directly or indirectly involving the company and any related party where the amount involved exceeded $120,000, and in which any related person had or would have a direct or indirect material interest.

16. "Debt" and "equity" were two means by which companies raised capital. Debt involved borrowing money to be repaid, plus interest, while equity involved raising money by selling interests in the company. Senior secured debt, frequently issued in the form of senior notes or bonds, was debt that took priority over unsecured debt and equity.

17. "Liquidity" of a fund was determined by the availability of cash and other assets that could be easily converted into cash by a fund without affecting the value of those assets.

18. A "Level 3" asset was an asset whose fair value could not be determined by using observable measures, such as market prices or models. Level 3 assets were typically very illiquid.

19. "EBITDA" or earnings before interest, tax, depreciation and amortization was a measure of a company's operating performance, excluding financing decisions, accounting decisions or tax environments.

20. The "par value" of a bond was the face value of a bond. Par value of a bond was typically $100 or $1,000 and informed the investor about the bond's maturity value as well as the dollar value of interest or "coupon" payments. The market price of a bond might be above or below par, depending on factors such as the level of interest rates and the bond's credit status.

21. A "trust indenture" or "indenture agreement" was an agreement in the bond contract made between a bond issuer and a trustee. The trustee represented the

bondholder's interests and was responsible for highlighting the rules and responsibilities of the parties.

22. A "management fee" was a periodic payment based on the fund's AUM that was paid by a fund to the fund's investment adviser for advisory and administrative services.

23. An "incentive fee" was a fee paid to a fund manager by investors based on the fund's performance over a given period of time.

24. A "redemption" was the partial or full return of an investor's principal investment.

III. The Defendants and Relevant Co-Conspirators

25. The defendant MARK NORDLICHT was one of Platinum's founding partners and its Chief Investment Officer. Beginning in or about 2011, NORDLICHT had primary responsibility for Platinum's investment decisions and the valuation of its assets for all funds, including PPVA and PPCO. In or about 2013, NORDLICHT became a significant stakeholder in Beechwood.

26. The defendant DAVID LEVY was a senior executive at Platinum. Among other things, from approximately 2011 to 2014, LEVY served as Platinum's co-portfolio manager for Black Elk. In or about 2013, LEVY became a minority partner in Beechwood. In or about 2014, LEVY also served as BAM's Chief Investment Officer. In or about 2014, LEVY became Platinum's co-Chief Investment Officer.

27. The defendant URI LANDESMAN was the Managing Partner and President of PPVA. From at least 2012 through 2016, LANDESMAN was heavily involved in marketing Platinum's funds, particularly PPVA, and served as the primary investor contact for a number of PPVA's investors.

7

28.    The defendant JOSEPH SANFILIPPO was employed by Platinum as PPVA's Chief Financial Officer from approximately 2005 through 2016. SANFILIPPO was a member of Platinum's valuation committee and played a pivotal role in determining PPVA's AUM, management fees and incentive fees.

29.    The defendant JOSEPH MANN was employed by Platinum in its marketing department from approximately 2013 through 2016. MANN's responsibilities included soliciting investments for the Platinum funds, and he often served as the contact for a number of Platinum's investors.

30.    The defendant DANIEL SMALL was employed by Platinum from approximately 2007 to July 2015. SMALL was a managing director at Platinum and a co-portfolio manager for Black Elk.

31.    The defendant JEFFREY SHULSE was employed by Black Elk from approximately January 2014 to April 2015. From approximately January 2014 through September 2014, SHULSE served as Black Elk's Chief Financial Officer, and from approximately September 2014 through April 2015, as Black Elk's Chief Executive Officer.

32.    Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was one of Platinum's principal partners. Co-Conspirator 1 held leadership positions at Platinum, which involved, among other things, participating in management decisions and investor recruitment. In or about 2013, Co-Conspirator 1 also became a significant stakeholder in Beechwood.

33.    Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was one of Platinum's principal partners. Co-Conspirator 2 held leadership positions at Platinum, which involved, among other things, participating in management decisions and

investor recruitment. In or about 2013, Co-Conspirator 2 also became a significant stakeholder in Beechwood.

34.     Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was employed by Platinum in its finance department from approximately 2008 to 2016.

35.     Co-Conspirator 4, an individual whose identity is known to the Grand Jury, was employed by Platinum in its marketing department from approximately 2013 to 2016.

36.     Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was employed by Platinum in its finance department in or about 2015.

37.     Co-Conspirator 6, an individual whose identity is known to the Grand Jury, was employed by Platinum in its operations and finance departments from approximately 2006 to 2016.

38.     Co-Conspirator 7, an individual whose identity is known to the Grand Jury, was employed by Platinum as an analyst and portfolio manager from approximately 2009 to 2016.

39.     Co-Conspirator 8, an individual whose identity is known to the Grand Jury, was employed by Platinum as a portfolio manager from approximately 2011 to 2016.

40.     Co-Conspirator 9, an individual whose identity is known to the Grand Jury, was employed by Platinum as a portfolio manager from approximately 2009 to 2016.

IV.    The Fraudulent Schemes

41.    In or about and between 2011 and 2016, the defendants MARK

NORDLICHT and DAVID LEVY, together with others, engaged in two separate schemes: (i) a

scheme to defraud investors and prospective investors in funds managed by Platinum; and (ii) a

scheme to defraud third-party holders of the BE Bonds.

A.    The Fraudulent Investment Scheme

42.    In or about and between November 2012 and December 2016, the

defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO

and JOSEPH MANN, together with others, engaged in a scheme to defraud investors and

prospective investors in Platinum through material misrepresentations and omissions relating to,

among other things: (i) the performance of some of PPVA's Level 3 assets; (ii) PPVA's

liquidity; (iii) the purpose of PPNE and the use of PPNE's proceeds; (iv) PPVA's preferential

redemption process; and (v) related party transactions involving PPVA and PPCO.  Specifically,

Platinum fraudulently overvalued some of PPVA's Level 3 assets in order to, among other

things, boost performance numbers, attract new investors, retain existing investors and extract

high management and incentive fees.  Platinum's overvaluation of some of its Level 3 assets

precipitated a severe liquidity crisis, which Platinum initially attempted to mitigate through high-

interest loans between its hedge funds (the "inter-fund loans").  When the inter-fund loans

proved insufficient to resolve PPVA's liquidity problems, Platinum began selectively paying

some investors ahead of others, contrary to the terms of its governing documents.  In furtherance

of this fraudulent scheme, as set forth below, NORDLICHT, LEVY, LANDESMAN,

SANFILIPPO, MANN and others made and caused to be made material misrepresentations and

omissions to investors and prospective investors.

(i)     The Overvaluation of PPVA's Level 3 Assets

43.     In or about 2012, PPVA was invested primarily in highly illiquid Level 3 companies despite representations to investors and prospective investors that PPVA was a relatively liquid fund. In fact, in or about 2012, the defendants MARK NORDLICHT and URI LANDESMAN, together with others, solicited investments in PPVA through representations that 50 percent of PPVA's assets were liquid. As an additional sign of its purported liquidity, PPVA offered redemptions on a quarterly basis upon 60 days' notice.

44.     Platinum reported to its auditors that, as of December 31, 2012, PPVA had approximately $727 million in AUM. In the same report, Black Elk, which was managed by the defendants DAVID LEVY and DANIEL SMALL, was listed as PPVA's largest asset, accounting for approximately 39 percent of its AUM, and valued by Platinum at more than $283 million. In fact, by approximately December 2012, Black Elk was under severe stress and lacked the necessary cash flow and profits to justify Platinum's $283 million valuation. Specifically, on or about November 16, 2012, an explosion on one of Black Elk's oil production platforms in the Gulf of Mexico resulted in the death of three workers, the injury of others and an oil spill. This catastrophic event put a severe strain on Black Elk's operations and production, which were already facing challenges. Even prior to the November 16, 2012 explosion, Black Elk was not a profitable company and PPVA was struggling to find the liquidity to pay redemptions, in large part, due to the overvaluation of Black Elk.

45.     For example, on or about November 6, 2012, upon learning that PPVA's investors had sought $27 million in redemptions that were due at the end of the year, the defendant MARK NORDLICHT sent an email to the defendant URI LANDESMAN that stated, in part: "If we don't exceed [the $27 million in redemptions] in [subscriptions] for dec 1 and jan

1[,] we are probably going to have to put black elk in side pocket." That same day,

NORDLICHT sent another email to LANDESMAN that stated, in part: "It's just very daunting.

It seems like we make some progress and then [redemptions] are relentless almost. It's tough to

get ahead in [subscriptions] if u have to replace 150-200 a year." Contrary to this internal

outlook, the defendants NORDLICHT, LANDESMAN, DAVID LEVY, JOSEPH SANFILIPPO

and JOSEPH MANN, together with others, led investors to believe that PPVA was performing

extremely well and had little to no liquidity concerns. In fact, in early 2013, Platinum informed

PPVA's investors that PPVA profited 11.60 percent in 2012 and took 20 percent in incentive

fees based on that performance.

      46.    Similarly, Platinum reported to its auditors that, as of December 31, 2012,

Golden Gate was valued on PPVA's books at approximately $49 million, which accounted for

approximately seven percent of PPVA's AUM. PPVA owned approximately 48 percent of

Golden Gate's equity interest at the time. The defendant MARK NORDLICHT and others

reported this value despite knowing in or about November 2012 that Golden Gate's engineer and

local market specialist had in fact assigned Golden Gate a market value of $22 million and

despite knowing at the time that Golden Gate's oil production continued to be significantly

below expectations.

      47.    In or about 2013, oil production from Black Elk and Golden Gate did not

improve. Additionally, Platinum subjected both companies to high interest rate loans, typically

from related parties, that further diminished their finances. Nevertheless, the defendants MARK

NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH

MANN, together with others, concealed the true performance of these failing energy companies

from investors and prospective investors. Rather than reducing the valuations of Black Elk and

Golden Gate based on known actual results, Platinum increased each of their values on PPVA's books. Specifically, Platinum reported that, as of December 31, 2013, Black Elk remained PPVA's largest asset and its equity and debt were collectively valued on PPVA's books at more than $261 million, which accounted for approximately 37 percent of PPVA's AUM. Golden Gate was PPVA's second largest position at that time and its equity and debt were collectively valued on PPVA's books at more than $191 million, which accounted for approximately 25 percent of PPVA's AUM. As a result of Platinum's overvaluation of these assets, PPVA's stated AUM increased from approximately $727 million at the end of 2012 to $757 million at the end of 2013. Based in large part on the inflated performance of Black Elk and Golden Gate, Platinum informed PPVA's investors that PPVA returned profits of approximately 10.51 percent in 2013 and took 20 percent in incentive fees that year based on this purported performance. Following PPVA's 2013 audit, Platinum reduced its reported profits from approximately 10.51 percent to approximately 7.15 percent.

48.    In or about 2014, Platinum continued to overvalue Black Elk and Golden Gate despite clear evidence that the companies were unprofitable and in debt. For example, on or about March 27, 2014, the defendant MARK NORDLICHT sent an email to the defendants DAVID LEVY and JOSEPH SANFILIPPO, as well as to Co-Conspirator 8 and a Platinum employee, an individual whose identity is known to the Grand Jury, that stated, in part: "Attached find both golden gate and black elk yr end comps. As you will see, golden gate it's hard to come up with comps to suppress valuation except maybe that we're California or essentially very little current production. Black Elk more of a struggle the other way and can[']t use ebitda because of troubles during the year."

49.     When investors questioned the high valuations of Black Elk and Golden Gate, Platinum focused on the companies' few positive characteristics and failed to disclose the significant negative developments affecting both companies. For example, on or about April 28, 2014, a PPVA investor ("Investor 1"), an individual whose identity is known to the Grand Jury, sent an email to the defendant URI LANDESMAN and Co-Conspirator 4 that stated, in part: "From the monthly reports it follows that Asset Based Finance Energy contributed very significantly to the Q1 2014 return. This does surprise me because of the downgrading of Black Elk by Moody's . . . though it seems the valuation of [] Black Elk in PPVA has been increased during Q1?" In response, LANDESMAN stated, "All this will be covered on the call, we can talk earlier, if you like." On or about May 1, 2015, during the investor call, NORDLICHT assured investors that NORDLICHT was positive about Black Elk and its future performance.

50.     Platinum reported to its auditors that, as of December 31, 2014, Golden Gate was PPVA's largest asset and was valued on PPVA's books at more than $149 million, which accounted for approximately 19.40 percent of PPVA's AUM. In the same report, Platinum stated that Northstar had replaced Black Elk as PPVA's second largest position and was valued on PPVA's books at more than $143 million, which accounted for approximately 18 percent of PPVA's AUM. In reality, Golden Gate and Northstar, which together accounted for 37 percent of PPVA's AUM, were unprofitable companies that owed substantial debt. Additionally, there had been a precipitous drop in the price of oil from approximately $105 per barrel in or about December 2013 to approximately $60 per barrel in or about December 2014. As a result of Platinum's overvaluation of Golden Gate and Northstar, PPVA's stated AUM increased from approximately $757 million at the end of 2013 to approximately $770 million at the end of 2014. Based in large part on the inflated performance of those assets, Platinum

14

informed PPVA's investors that PPVA returned profits of approximately 10.75 percent in 2014 and took 20 percent in incentive fees that year.

51.     By the end of 2014, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, knew that Black Elk and Golden Gate were highly leveraged, unprofitable and failing companies. Rather than reducing these companies' valuations based on known actual results, NORDLICHT set forth a plan to obscure the true values of these companies by: (i) causing Northstar to purchase many of Black Elk's remaining assets; and (ii) combining Golden Gate and Northstar (including the Black Elk assets) under a new name called "PPVA Oil & Gas," to be valued as one asset. Specifically, on or about February 5, 2015, in response to an email showing the breakdown of Platinum's valuations for Black Elk, Golden Gate and Northstar, NORDLICHT sent an email to LEVY, SANFILIPPO and two Platinum employees, individuals whose identities are known to the Grand Jury, that stated: "David- let's move golden gate into northstar with jan 1 effective date ASAP. Thx." A few days later, on or about February 11, 2015, SANFILIPPO sent an email to NORDLICHT, LEVY, Co-Conspirator 3 and Co-Conspirator 5 that stated: "We have to attribute separate values as of year-end to [Golden Gate] and Northstar as they were 2 separate assets as of year-end. The auditors will be looking at the underlying financials and reserves of each." In response, NORDLICHT stated, in part: "What were the separate values in November? If u absolutely must have value, I can try to extrapolate from there . . . THEY ARE ONE ASSET AS OF YEAR END (even though technically we only did merge as of Feb 1 for strategic reasoning)." A few minutes later, SANFILIPPO replied: "Mark- just tried your cell. Please call me to discuss."

52.     Combining Northstar and Golden Gate into PPVA Oil & Gas did not change the reality of these unprofitable and highly leveraged companies.  In or about 2015, oil production at Northstar and Golden Gate continued to be significantly lower than what Platinum's valuations suggested.  For example, on or about February 23, 2015, the defendant DAVID LEVY sent an email to a PPVA portfolio manager ("PPVA PM 1"), an individual whose identity is known to the Grand Jury, about Northstar's daily oil production that stated: "Every day is worse than the one b4 what the hell."  As another example, on or about March 13, 2015, PPVA PM 1 sent an email to a distribution list named "PositionUpdates" that stated, in part: "Nstar: producing 800 [barrels of oil per day] on average this week, with down time due to weather being a factor, however the creole assets are struggling. . . . We are running into an issue where bills are coming due on the Black Elk properties and Northstar is not receiving revenue."  In the same email, PPVA PM 1 also stated, in part: "[Golden Gate]- We are moving the accounting and land functions over to Northstar to save some costs and improve reliability of information and efficiency of operation."  Golden Gate and Northstar were further negatively affected by the falling oil price that dropped even farther from approximately $60 per barrel in December 2014 to $36 per barrel in December 2015.  Nevertheless, as of December 31, 2015, Platinum had valued PPVA Oil & Gas at between approximately $184 million and $245 million and Platinum reported to investors that PPVA returned approximately 8.75 percent in 2015.

(ii)     PPVA's Liquidity Crisis

53.     Based in large part on Platinum's consistent overvaluation of PPVA's largest Level 3 assets, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN and JOSEPH SANFILIPPO, together with others, extracted significant management and incentive fees from PPVA.  In fact, from approximately 2012 through 2014,

16

Platinum Management received more than $91 million in management fees and incentive fees. In or about 2015, Platinum's management fees totaled approximately $20 million, and it accrued but deferred more than $11.8 million in incentive fees. The significant fees charged by Platinum based on the overvalued Level 3 assets, coupled with redemptions by certain PPVA investors, caused a liquidity crisis at the fund.

54.     In or about early 2014, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with Co-Conspirators 1 through 4 and others, devised a scheme to use the significant liquid assets held by Beechwood, a related party, to address PPVA's liquidity problems, which included PPVA's inability to timely satisfy redemptions by PPVA's investors that were due on December 31, 2013. Indeed, on or about February 5, 2014, SANFILIPPO sent an email to NORDLICHT and LANDESMAN, copying Co-Conspirator 6, that attached a "December 31 Redemption Summary" revealing that PPVA was late on paying more than $14 million in redemptions. NORDLICHT, LEVY, LANDESMAN, SANFILIPPO, MANN and others failed to disclose to investors and prospective investors the true reason for the Beechwood transactions which, in reality, were designed to conceal PPVA's liquidity problems. To the contrary, in or about 2014, NORDLICHT, LEVY, LANDESMAN, SANFILIPPO, MANN and others informed investors and prospective investors that PPVA was performing exceptionally well and continued to highlight PPVA's purported, very liquid redemption terms, even though, at the time, PPVA was relying on undisclosed high interest loans from related parties such as PPCO and Beechwood.

55.     Beginning in at least early 2014, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, began relying almost exclusively on new investments and inter-fund loans to pay

redemptions to PPVA's investors. For example, on or about April 29, 2014, when Investor 1 asked LANDESMAN when he would receive his redemption requested on April 1, 2014, LANDESMAN forwarded the email to SANFILIPPO and stated: "What can I tell [Investor 1]?" Later that day, NORDLICHT sent an email to SANFILIPPO, copying Co-Conspirator 6, that stated, in part: "Start paying down [redemptions] as [you] can. Between [a new investor] and [Platinum Partners Black Elk Opportunities Fund LLC ("PPBE")] (additional 10 million), [should] have decent short term infusion. Hopefully some may 1 [subscriptions] show up as well. Have a few more outflows to discuss but this is obviously the priority." The previous month, in or about March 2014, Platinum had begun marketing PPBE as a "one-off fund" yielding a 20 percent annual rate of return that would be used to "purchase senior secured publicly traded bonds" in Black Elk.

56.     Platinum never disclosed to investors and prospective investors that it was using new investments to pay redemptions and that it was using proceeds from PPBE, which had a 20 percent interest rate, to pay redemptions. To the contrary, throughout 2014, Platinum continued to inform investors and prospective investors that PPVA had a very positive outlook. For example, on or about August 12, 2014, Investor 1 sent an email to Co-Conspirator 4, copying the defendant URI LANDESMAN, that asked, among other things, about the reliability of the performance numbers. In response, LANDESMAN stated, in part: "The numbers are all kosher, they have had verbal input every month." LANDESMAN failed to disclose to Investor 1 and other investors PPVA's dire liquidity situation and the fraudulent manner in which Platinum was managing the crisis. For example, in an investor call on or about January 14, 2015, the defendant MARK NORDLICHT, in LANDESMAN's presence, stated, in part: "If we look historically, we've been very very fortunate . . . we're running about a billion four between all

18

our different entities . . . I think we've returned about double that in cash to investors, so that is really an indication of . . . being very very liquid and nimble . . . in terms of 2015 for PPVA, we are targeting much higher returns than normal."

        (iii)     PPNE and Other Notes

        57.     In or about September 2014, PPVA's liquidity problems could no longer be obscured by new investments in PPVA and inter-fund loans. To conceal this liquidity crisis, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, caused PPVA to incur loans at interest rates as high as 16 percent from new funds or entities that were directly or indirectly controlled by Platinum. For example, in or about October 2014, Platinum created PPNE initially to raise approximately $50 million at a 16 percent interest rate from select investors, which included Platinum insiders and employees. In or about 2015, the PPNE notes were extended and the funds raised exceeded $75 million. Although certain PPNE investors were told that the PPNE funds were being raised to invest in Northstar, in reality, the PPNE funds were used primarily to satisfy PPVA's general obligations, including the payment of redemptions. Some of the PPNE investors who were also PPVA investors would not have invested in PPNE had they known that their funds were being raised to conceal PPVA's liquidity problems. Platinum did not disclose to PPVA's investors that it was using high interest loans to pay redemptions and for general obligations.

        58.     In or about and between 2014 and 2016, the defendant JOSEPH SANFILIPPO approved inter-fund loans at interest rates ranging from 10 percent to 16 percent that were detrimental to PPVA's overall finances. SANFILIPPO approved these loans even when PPVA's investors sought to redeem their funds and transfer them to PPCO. For example,

in or about December 2014, a PPVA investor ("Investor 2"), an entity the identity of which is known to the Grand Jury, submitted a request to redeem $15 million of its $60 million investment in PPVA and transfer the $15 million to PPCO. At this time, PPVA did not have the necessary funds to effectuate this redemption and transfer the redeemed funds to PPCO. To overcome this liquidity problem, Platinum treated the redemption from PPVA and the investment into PPCO as a $15 million loan from PPCO to PPVA, with a 16 percent interest rate. Thus, PPVA was subjected to paying a 16 percent interest rate to PPCO on the $15 million partial redemption by Investor 2. Platinum did not disclose the details of this transaction to PPVA's or PPCO's investors.

59.     In or about and between 2013 and 2016, Platinum moved money among PPVA, PPCO and PPLO to meet liquidity demands in the three funds. The defendant MARK NORDLICHT referred to this undisclosed and troubling movement of funds, which at times was encumbered with a high interest rate, as a "big stew."

(iv)   <u>PPVA's and PPNE's Preferential Redemptions</u>

60.     In furtherance of the fraudulent investment scheme, beginning in or about October 2014, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, agreed to selectively pay some investors ahead of others, contrary to the specific terms of PPVA's PPM and Platinum's disclosures to investors and prospective investors. NORDLICHT directed such preferential redemptions, often for arbitrary reasons such as hardship, distress and litigation risk. For example, in or about October 2014, although PPVA was struggling to make timely redemption payments, it made an exception for Investor 1. Specifically, on or about October 15, 2014, when Investor 1 asked LANDESMAN if Platinum could pay out the proceeds of Investor 1's

September 30, 2014 redemption, which was not due to be paid until October 30, 2014,

LANDESMAN forwarded the request to SANFILIPPO and stated: "Joe, please try your best."

The next day, when SANFILIPPO asked NORDLICHT if he should pay Investor 1's

approximately $640,000 partial redemption, NORDLICHT replied, "If uri [LANDESMAN] told

him this week he must have been in distress. Ok." Platinum did not grant such requests from all

investors.

   61. On or about December 31, 2014, PPVA had received approximately $50

million in requests for redemptions, including a $6 million redemption request by the defendant

URI LANDESMAN. These redemptions were not due to be paid until January 30, 2015. As the

deadline approached, the defendants MARK NORDLICHT, DAVID LEVY, URI

LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, attempted

to convince investors to cancel their requests or defer their investments. For example, on or

about January 23, 2015, when a PPVA investor ("Investor 3"), an individual whose identity is

known to the Grand Jury, requested a full redemption of $19 million, LANDESMAN sent an

email to Co-Conspirator 4 that stated: "Communicated today, will try to avert [sic], directly tied

into lack of November statements."

   62. In or about and between December 2014 and March 2015, PPVA received

a flurry of requests for redemptions that exceeded $84 million. Under these circumstances,

Platinum was incapable of fulfilling the redemptions that would be due on or about April 30,

2015. In an effort to conceal the reality that PPVA was essentially insolvent, the defendants

MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and

JOSEPH MANN, together with others, embarked on a marketing campaign to bring in new

investors and also to convince existing investors who had submitted requests for redemptions to

defer their redemptions to the next quarter because PPVA was expected to have an approximately eight percent profit in April 2015. On or about March 3, 2015, NORDLICHT sent an email to LANDESMAN that stated, in part: "I'm forwarding you [Investor 4's, an individual whose identity is known to the Grand Jury] number. I don't trust myself, I feel I came off really defensive with [another investor]. I think you give us [the] best possibility to try and keep him." In response, LANDESMAN stated: "I'll handle it." On or about March 4, 2015, LANDESMAN informed NORDLICHT that he was unsuccessful in his attempts and that Investor 4 was proceeding with seeking a large redemption.

63. On a number of occasions, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, through material misrepresentations and omissions about, among other things, liquidity, performance and related party transactions, succeeded in convincing investors to defer their redemptions to the following quarter. For example, on or about March 17, 2015, LANDESMAN convinced Investor 2 to cancel his $7 million redemption from PPVA.

64. As part of the scheme to defraud, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, also agreed to selectively pay some PPNE investors ahead of others, contrary to the specific terms of the PPNE notes, and often did so with new investments into PPVA. For example, on or about April 2, 2015, NORDLICHT sent an email to SANFILIPPO, Co-Conspirator 3 and Co-Conspirator 5 that stated: "Has any new subs cleared today. Next uses of capital for ppva shd be ppne payback to [an investor] 2 million, [Platinum Partner 1, an individual whose identity is known to the Grand Jury] 1 million, Uri Landesman 1 million." In furtherance of the scheme to defraud, NORDLICHT and SANFILIPPO executed the $2 million

22

buyout of two Platinum principals' PPNE investments at a time when there were more than $30 million in redemptions that had not been paid to PPVA investors. As early as approximately April 2015, MANN was responsible for tracking all investor activity and maintaining a "capital activity report" that he circulated to SANFILIPPO and others on a weekly basis.

65.     In or about and between 2011 and 2015, the defendant JOSEPH SANFILIPPO served as PPVA's primary point person for its auditors. In his dealings with PPVA's auditors, SANFILIPPO concealed PPVA's liquidity problems and its practice of preferentially paying redemptions. For example, on or about December 26, 2014, SANFILIPPO sent an email to the defendant DAVID LEVY and Co-Conspirator 3 that stated: "In addition to asking for all of the loan documents (which we are providing) [Accounting Firm A, an entity the identity of which is known to the Grand Jury] is asking for an explanation as to why PPVA took loans from these lenders. Please let me know how you want to respond." A few minutes later, Co-Conspirator 3 responded: "The regular loans payable was for general liquidity needs at that time. The PPNE loans David [LEVY] needs to respond to as it relates to our purchase of Northstar." Approximately 45 minutes later, LEVY initially replied: "Liquidity to complete a transaction." One minute later, LEVY sent another email, apparently revising his answer, that stated: "Ppne is a general obligation of PPVA taken for liquidity." Notwithstanding this information, approximately 30 minutes later, SANFILIPPO sent an email to representatives of Accounting Firm A that stated: "The purpose of the PPNE loans was for liquidity to complete a specific transaction and the July 1st loan was for general liquidity purposes." Consequently, PPVA's 2014 audited financial statements referenced PPNE, collectively with other notes, as follows: "During 2014, [PPVA] entered into multiple financing transactions with lenders . . . in order to complete multiple investment transactions."

(v)    PPVA's Side Pocket

66.    PPVA's preferential redemption payments continued into late 2015 and 2016. In or about November 2015, as investor complaints mounted due to unpaid redemptions, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, agreed that they could no longer conceal PPVA's insolvency. On or about November 23, 2015, MANN sent an email from NORDLICHT to PPVA's investors informing them, among other things, that Platinum Management was going to revise the PPM so that it could "segregate certain illiquid assets (and related liabilities) from the remainder of the assets in the portfolio (the "Special Investments") in the interest of protecting investors and maximizing returns." Any such change in the terms of the PPM required consent by a majority of the investors. As a result, the email also encouraged investors to consent to the revisions in the PPM. Platinum commonly referred to PPVA's illiquid portfolio as the "side pocket."

67.    On or about December 13, 2015, the defendants MARK NORDLICHT and URI LANDESMAN, as well as Co-Conspirator 1, engaged in an email exchange that contemplated NORDLICHT and Co-Conspirator 1 fleeing from the United States and illustrated their knowledge and awareness of the fraudulent scheme perpetrated on Platinum's investors and prospective investors. Specifically, Co-Conspirator 1 sent an email to NORDLICHT that stated: "Don't forget books. Assume we are not coming back to ny[.] Just to be safe. Depends on Miami[.] We can fly straiggt [sic] to europe from miami on Tuesday[.] Take passport." In response, NORDLICHT asked for $2.5 million to pay Platinum's brokers and noted that he was ready to take $7.5 million from a second mortgage on his house to deal with the liquidity crisis. A few hours later, NORDLICHT sent another email to Co-Conspirator 1 that stated, in part: "Am

on my way to jfk with kids for their 6 pm flight to Israel. [Co-Conspirator 2] ducking my calls . . . [My wife] is literally making me get on Israel flight if we don't connect and agree what we are doing." NORDLICHT then forwarded his email exchange with Co-Conspirator 1 to LANDESMAN. Shortly thereafter, LANDESMAN responded: "You should get on the flight if there is no bridge [loan], probably even if there is, [Co-Conspirator 1] didn't set up any meetings for this week? We need to go through the *mehalech* of how we are going to share this with clients and employees, going to be very rough, big shame . . . it was nice seeing you, hopefully the girls will reacclimate [sic] quickly."

       68.    Notwithstanding the above email exchange, on or about February 7, 2016, the defendant URI LANDESMAN sent an email to a PPVA investor ("Investor 5"), an individual whose identity is known to the Grand Jury, copying the defendant JOSEPH MANN that stated, in part: "Fund is sound, I believe, new structure ideal. Mark [NORDLICHT] is really energized. Hope to be beyond liquidity concerns forever by end of May, we welcome your further investment."

       69.    News of PPVA's side pocket was incredibly troubling to a number of investors who expressed anger and frustration and, at times, despair. On or about January 15, 2016, a PPVA investor ("Investor 6"), an individual whose identity is known to the Grand Jury, sent an email to Co-Conspirator 6, Platinum Partner 1 and a Platinum employee, an individual whose identity is known to the Grand Jury, that stated, in part: "I have asked already about a dozen times about money due to me from PPVA . . . I have others who are invested with me. On the one hand you would like to remain with the fund but you have not paid me money that is due now for 75 days. Every time I ask I am told a few more days. I am stuck with trying to explain to these people why they should remain in the fund while they do not get payments that are due

to them." Later that day, in a subsequent email, Investor 6 added: "Nothing makes investors more jittery than not paying in a timely fashion . . . I have reached the end of my rope and I am out of excuses . . . In total we have more than 6 million dollars tied up in PPVA and PPCO . . . I don't know who is in charge now but I do know that this [is] unacceptable." Co-Conspirator 6 then forwarded this email exchange to the defendants MARK NORDLICHT and DAVID LEVY.

70.     In an effort to gain consent from a majority of investors to the aforementioned modification of the terms of PPVA's PPM, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, entered into side agreements with some large investors whereby they agreed to buy out the illiquid portion of the investors' investments in exchange for the investors' consent to the revised PPM that authorized the side pocket.

71.     In or about and between January 2016 and June 2016, Platinum was unable to fulfill the vast majority of redemption requests in either PPVA, PPCO or PPNE. By approximately March 2016, Platinum was unable to make interest payments to the vast majority of PPNE's investors. To further the fraudulent scheme, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, continued their practice of paying redemptions and interest payments on a preferential basis, contrary to the terms of the PPNE notes. For example, on or about May 2, 2016, NORDLICHT, LANDESMAN and SANFILIPPO paid Investor 1 part of the money owed to him. However, Platinum was unable to pay the rest of the money owed to Investor 1.

72.     In fact, as of approximately January 29, 2016, Platinum owed more than $106 million to PPVA's investors; more than $84 million to PPCO's investors; more than $7.5

million to PPLO's investors; more than $45 million to PPNE's investors; and more than $140 million to Beechwood.

B.   The Black Elk Bond Scheme

73.   In or about and between November 2011 and December 2016, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, engaged in a scheme to defraud third-party holders of the BE Bonds (the "Bondholders") and to deprive the Bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over the BE Bonds.

(i)   The Origins of the Fraudulent Scheme

74.   Beginning in or about July 2009, PPVA entered into various financing agreements and transactions with Black Elk that eventually led to Platinum's ownership of a majority of Black Elk's common equity and control over Black Elk's operations. In or about November 2010, Black Elk raised $150 million through the issuance of the BE Bonds, which were privately held. In or about and between May 2011 and August 2011, through a series of registration statements filed with the SEC, the BE Bonds became public and registered under the Securities Act of 1933.

75.   As early as November 2011, the defendants MARK NORDLICHT, DAVID LEVY and DANIEL SMALL, together with others, began devising a scheme to bypass the Bondholders' rights and misappropriate proceeds of Black Elk's asset sales for Platinum's benefit through deceptive means. For example, on or about November 14, 2011, Co-Conspirator 7 sent an email to NORDLICHT, LEVY and SMALL setting forth the relevant terms of the BE Bonds' trust structure and indenture agreement. The November 14, 2011 email

27

stated in part: "With this indenture there are always two issues, (1) the scenarios under which we have to make an offer to repurchase the bonds, and (2) things we simply are not allowed to do due to certain covenants." In response, that same day, NORDLICHT sent an email to LEVY, SMALL and Co-Conspirator 7 that stated: "I think if this option is plausible for us[,] we have to figure covenants can change if we need them to . . . Seem like there are bond[s] to be had out there and an additional 60 million is 24 down . . . We [would] have to figure it out . . . I'm sure we can get them in friendly hands if the covenants are going to be an obstacle."

76.    In or about the first quarter of 2013, Platinum invested $50 million into Black Elk in exchange for the vast majority of the Series E preferred stock, which paid interest in additional preferred stock at a rate of 20 percent escalating to 36 percent if the principal investment was not paid back on time (the "Preferred Equity"). Black Elk used these funds for an unsuccessful oil exploration program that left Black Elk in a precarious financial position.

(ii)    Control of the Black Elk Bonds

77.    In or about late 2013, faced with the fact that Black Elk was effectively insolvent but knowing that Black Elk still possessed certain valuable assets, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, pursued opportunities to sell Black Elk's assets while simultaneously pursuing a fraudulent strategy to divert the proceeds from any such asset sale to the Preferred Equity, which was controlled by Platinum, instead of the Bondholders. As Black Elk began negotiating the sale of its most lucrative assets to Company A, an entity the identity of which is known to the Grand Jury, for approximately $170 million, NORDLICHT, LEVY, SMALL, SHULSE and others were orchestrating a scheme to pay the Preferred Equity, which were almost exclusively owned by Platinum and its related parties, ahead of the Bondholders. Such a strategy was contrary to the

BE Bonds indenture agreement, which placed the Bondholders ahead of any equity holders, including the Preferred Equity, in the event of a significant asset sale. The timing of this strategy to usurp the proceeds from the sale of Black Elk's assets was vital to Platinum because PPVA was facing its own liquidity problems.

78.     In order to execute the scheme to defraud, in or about early 2014, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, caused Platinum to purchase BE Bonds, at times through related parties, at a price lower than par value through selective dissemination of negative information about Black Elk's finances and operations. Par value for the BE Bonds was $100. This strategy, first articulated by NORDLICHT in or about November 2011, was an effort to control the asset sale process and overcome Platinum's concerns that the Bondholders might intervene and take control of the proceeds when Black Elk, at Platinum's behest, sold Black Elk's most valuable assets. In planning for a telephone call with the Bondholders, on or about February 4, 2014, NORDLICHT sent an email to LEVY, SMALL and SHULSE, along with the then-Chief Executive Officer of Black Elk ("BE Officer 1") and a Platinum in-house lawyer, individuals whose identities are known to the Grand Jury, that stated, in part: "the move is going to be to inform bondholders we have sales lined up but we are going to use the proceeds for working capital and for drilling. That will lead to friendlies getting control of bonds at decent prices. Once friendlies have control of bonds, we can then execute with flexibility according to what we would like to do. Hopefully it leads to [BE Bonds] buyback at 85 or worst case 90."

79.     In furtherance of the scheme, on or about March 3, 2014, the defendant MARK NORDLICHT sent an email to the defendants DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, as well as BE Officer 1 and a Black Elk in-house lawyer ("BE Lawyer 1"),

an individual whose identity is known to the Grand Jury, that stated, in part: "Hold for a little. We have friendly buying 20 million." When SHULSE raised concern that the imminent Form 8-K SEC filing by Black Elk might cause the Bondholders to intervene and take control under the terms of the indenture agreement, NORDLICHT replied, copying LEVY, SMALL, BE Officer 1 and BE Lawyer 1, and stated: "[The Bondholders'] group is falling apart. [A bondholder] just sold their position. They still have 25 percent but likely we will have 50 percent in friendly hands relatively quickly in which case this is all academic." Shortly thereafter, on or about March 11, 2014, NORDLICHT sent an email to LEVY, SMALL, SHULSE and BE Officer 1 that stated, in part: "We are likely to have friendlies buy the bonds as of tomorrow." Two days later, on or about March 13, 2014, SMALL sent an email to NORDLICHT, LEVY and SHULSE, that stated, in part: "Attached is the list of the bondholder group we are negotiating with which represents $45.4MM face [value]."

       80.    Moreover, on or about March 19, 2014, Platinum and its related parties purchased an additional approximately $19 million of the BE Bonds. By approximately April 2014, Platinum owned and controlled approximately $98,730,500 of the $150 million of the BE Bonds. Indeed, on or about April 8, 2014, the defendant DANIEL SMALL sent an email to the defendant DAVID LEVY, attaching a table of BE Bond holdings owned and controlled by Platinum and its related parties, that stated, in part: "We need to transfer and get consents on $69.74MM not including BAM." The attached document revealed that Platinum and its related parties controlled $98,730,500 of the BE Bonds and contained the identity of each such Bondholder and the value of the bonds it held, as follows: (i) PPCO: $32,916,500; (ii) PPVA: $24,987,000; (iii) PPVA: $25,321,000; (iv) PPLO: $10,146,000; and (v) BAM: $5,360,000. In or about and between March 2014 and April 2014, Platinum and its related parties also

purchased the vast majority of the outstanding Preferred Equity that was owned by third parties to obtain nearly 100 percent ownership of the Preferred Equity.

        (iii)    The Consent Solicitation

       81.    By approximately May 2014, when alternative approaches failed, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, determined that the only path to getting the Preferred Equity paid ahead of the Bondholders was through a cash tender offer and consent solicitation process for the BE Bonds (the "Consent Solicitation"). To conceal Platinum's ownership of and control over the BE Bonds, NORDLICHT, LEVY, SMALL, SHULSE and others transferred some of the BE Bonds owned by PPVA to Beechwood. Specifically, on or about May 13, 2014, NORDLICHT sent an email to Co-Conspirator 7 and a Beechwood employee, an individual whose identity is known to the Grand Jury, that stated, in part: "Beechwood is buying 8 million black elk from PPVA. What is the best way to cross? Can we do it today please?" The following month, on or about June 23, 2014, NORDLICHT sent an email to a Platinum employee who handled trading and two Beechwood employees, individuals whose identities are known to the Grand Jury, that stated: "I want to move/sell 10 million of black elk bonds to bbil . . . Please take care of it today." In subsequent emails, NORDLICHT confirmed that BBIL would be buying the bonds from PPVA. On or about July 1, 2014, NORDLICHT sent an email to the same Platinum employee who handled trading and one of the two Beechwood employees referenced above that stated: "How much black elk bonds still at [] ppva? 7 million? Trade them over to bbil [] please." Notably, at the time of these emails, Platinum's principals and LEVY collectively

owned approximately 50 percent of Beechwood and LEVY was serving as Beechwood's Chief Investment Officer and had been since approximately February 2014.

82.     Following the transfer of some of the BE Bonds from PPVA to Beechwood, on or about July 2, 2014, the defendant DANIEL SMALL forwarded an email from a Platinum trader to the defendants MARK NORDLICHT and DAVID LEVY that set forth the summary of the $98,631,000 of the BE Bonds controlled by Platinum, as follows: (i) PPCO: $32,917,000; (ii) PPVA: $18,321,000; (iii) PPLO: $17,046,000; (iv) BAM: $13,360,000; and (v) BBIL: $16,987,000. On or about July 7, 2014, after receiving by email the draft Consent Solicitation document from Black Elk's outside counsel ("BE Outside Counsel 1"), an individual whose identity is known to the Grand Jury, SMALL forwarded the email to NORDLICHT and LEVY and stated, in part: "Attached is the next turn of the consent which we are reviewing. The company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority. . . . Let's discuss asap in order to finalize and launch by Thursday." On or about July 9, 2014, SMALL sent an email to BE Outside Counsel 1, SHULSE, BE Officer 1, BE Lawyer 1 and others that stated, in part: "$18,321,000 bonds are controlled by PPVA and should be disclosed and excluded from the calculation. I believe this implies that $65,840,000 are required to obtain a majority consent." On or about July 14, 2014, two days before the Consent Solicitation was announced, SMALL confirmed this information to BE Outside Counsel 1 via email.

83.     On or about July 16, 2014, Black Elk announced that it had commenced a public offer for the BE Bonds. The Consent Solicitation and accompanying press release provided, among other things, that: (i) Black Elk had commenced a cash tender offer to purchase the outstanding BE Bonds at par value; (ii) Black Elk was soliciting Bondholders' consents to

32

modify certain of the restrictive covenants contained in the indenture agreement governing the BE Bonds; (iii) the Bondholders that tendered their BE Bonds would be considered to have validly delivered their consent to the proposed amendments to the indenture agreement; (iv) the Bondholders could also consent to the proposed amendments to the indenture agreement without tendering their BE Bonds; (v) the Consent Solicitation was being made in connection with the sale of assets to Company A and the net proceeds of the sale would be used by Black Elk to purchase the tendered BE Bonds; and (vi) the offer would expire at 5:00 p.m. New York time on August 13, 2014.

84.    Notably, the Consent Solicitation provided: "Pursuant to Section 316(a) of the Trust Indenture Act of 1939, Notes [a reference to the BE Bonds] owned by the Company or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company shall be disregarded for purposes of determining the majority." As set forth above, at the time the Consent Solicitation was announced, Platinum controlled $98,631,000 of the BE Bonds. Nonetheless, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, caused Black Elk to disclose in the Consent Solicitation that: "[PPVA] and its affiliates, which own approximately 85% of our outstanding voting membership interests, own[ed] approximately $18,321,000 principal amount of the outstanding Notes. Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any Notes."

85.    In furtherance of the scheme to defraud the Bondholders, who now owned approximately $52 million of the $150 million of the BE Bonds, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with

others, caused PPCO, PPLO, BAM and BBIL to consent to the proposed amendments to the indenture agreement but not tender their BE Bonds. On or about August 9, 2014, SHULSE sent an email to NORDLICHT, LEVY and SMALL that stated, in part: "It looks like we finished the week with the consents at 67%, so the new indenture passed!" As of the offer's expiration on August 13, 2014, Bondholders holding $11,333,000 of the BE Bonds validly had tendered and were paid. To the surprise of the remaining Bondholders who were unaware of Platinum's control of $98,631,000 or approximately 65 percent of the BE Bonds, the trustee revealed that the holders of $110,565,000 or approximately 73.71 percent of the bonds had validly consented to the Consent Solicitation, thereby causing an amendment to the indenture agreement and allowing the Preferred Equity to get paid from the proceeds of Black Elk's sale of assets to Company A.

86.     On or about August 18, 2014, the defendant DANIEL SMALL sent an email to the defendant JEFFREY SHULSE, copying Co-Conspirator 8, that stated: "Jeff, on behalf of [Co-Conspirator 8] and myself constituting a majority of the board of managers you are hereby authorized to wire $70MM in partial payment of the [Preferred Equity]." That same day, when SHULSE sent an email to SMALL, Co-Conspirator 8 and the defendants MARK NORDLICHT and DAVID LEVY forwarding an email from BE Outside Counsel 1 concerning "prohibited distribution to members," NORDLICHT sent an email to LEVY that stated: "David- get these wires out!!!!! Call him right now please!!!!" On or about August 20, 2014, an additional $24,600,584.31 was sent by wire transfer to PPCO.

87.     On or about August 11, 2015, Black Elk's creditors filed a petition to place the company into an involuntary Chapter 7 bankruptcy, which was converted on or about September 1, 2015 to a voluntary Chapter 11 bankruptcy. As of December 2016, a number of

Bondholders who did not tender their BE Bonds have yet to receive the principal amount of their holdings.

## COUNT ONE
(Conspiracy to Commit Securities Fraud and Investment Adviser Fraud
– The Investment Scheme)

88.     The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

89.     In or about and between November 2012 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, did knowingly and willfully conspire:

a.     to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and prospective investors in PPVA, PPCO and PPNE, in connection with the purchase and sale of investments in PPVA, PPCO and PPNE, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff; and

b.     to use the mails and other means and instrumentalities of interstate commerce, directly and indirectly: (i) to employ devices, schemes and artifices to defraud

35

Platinum Management's clients and prospective clients; (ii) to engage in transactions, practices and courses of business which operated as a fraud and deceit upon Platinum Management's clients and prospective clients; and (iii) to engage in acts, practices and courses of business which were fraudulent, deceptive and manipulative, contrary to Title 15, United States Code, Sections 80b-6 and 80b-17.

90.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, did commit and cause to be committed, among others, the following:

OVERT ACTS

a.     On or about February 3, 2014, NORDLICHT sent an email to SANFILIPPO that stated: "It does not look like we will be bringing in ggo into black elk. Black elk[']s value as of yr end was based on the expectation we [would] be exercising the option on golden gate. Given our current thinking, please correct the yr end values and add 125 to golden gate and deduct 125 from black elk."

b.     On or about February 4, 2014, NORDLICHT sent an email to a Platinum employee, an individual whose identity is known to the Grand Jury, that stated that BAM was a "separate management company I plan on leaving platinum for as of jan 1 2015. Just keep it quiet please!!"

c.     On or about March 17, 2014, NORDLICHT sent an email to the defendant DANIEL SMALL concerning PPVA's and PPCO's 2012 profit and loss margins that stated, in part: "This is also the week I need to figure out how to restructure and raise money to pay back 110 million of [Preferred Equity] which if unsuccessful, [would] be the end of the fund.

36

This 'liquidity' crunch was caused by our mismanagement – yours David and I – of the black elk position so I will multitask and also address your concerns but forgive me if I am a little distracted."

        d.     On or about March 28, 2014, MANN sent an email to a PPVA investor ("Investor 7"), an individual whose identity is known to the Grand Jury, attaching summaries regarding Black Elk and Golden Gate and PPVA's marketing report, that stated, in part: "Thank you for your call today. I just spoke to our CFO (Joseph SanFilippo) and our CRO []; they started working on the Marketing Report for 2/28/2014 and have completed the first page, which I have attached."

        e.     On or about April 14, 2014, SANFILIPPO sent an email to Co-Conspirator 3, attaching Black Elk's 2013 valuation analysis, which was sent to PPCO's auditors.

        f.     On or about June 16, 2014, NORDLICHT sent an email to LANDESMAN that stated, in part: "I think we need to revamp the strategy on PPVA and figure out what to do. It can't go on like this or practically, we will need to wind down. I think we can overcome but this is code red, we can't go on with status quo. We need to be very aggressive if we want to stay open. We can't pay out 25 million in [redemptions] per quarter and have 5 [million] come in."

        g.     On or about June 27, 2014, NORDLICT sent an email to BE Officer 1, copying LEVY, SMALL and the defendant JEFFREY SHULSE, that stated, in part: "Unfortunately, at this moment, the equity in black elk is not worth that much because of debt overhang and payables overhang."

h.      On or about June 30, 2014, LEVY's administrative assistant, an individual whose identity is known to the Grand Jury, sent an email to LEVY containing talking points on Black Elk and another position that provided, in part: "As of today, [Black Elk] has assets that are very sellable, well in excess of coverage on bonds. It's a very misvalued asset in the marketplace . . . Over the past 18 months, the company has surpassed analysts with the success of its asset sales."

i.      On or about September 8, 2014, LANDESMAN sent an email to Co-Conspirator 6 and another Platinum employee, an individual whose identity is known to the Grand Jury, that stated: "Please have on file for me a redemption request of $6 mil. in PPVA, and the entirety of my positions in PPLO and PPCO."

j.      On or about November 25, 2014, MANN sent an email to SMALL and Co-Conspirator 4 concerning Investor 7 that stated, in part: "I sorted out the discrepancy with [Investor 7] regarding Black Elk's Valuation, but [Investor 2] still wants to know more about Black Elk after reading the 10-Q and seeing that their website hasn't been updated in a while."

k.      On or about December 8, 2014, MANN sent an email to Investor 7 that stated, in part: "I have received the value of Black Elk in PPVA and it is $84,101,065.34 as of 9/30. . . I will try to get [the marketing report and the transparency & exposure report] to you as soon as my CFO has it."

l.      On or about January 30, 2015, NORDLICHT sent an email to Co-Conspirator 6, who had provided NORDLICHT with a list of pending redemptions from investors, that stated, in part: "I [would] like to start getting set amounts out. Pay [four investors]. Those are the ones that are not insiders."

m.      On or about March 17, 2015, Co-Conspirator 4 sent an email to Investor 2, copying Investor Relations and LANDESMAN, that stated, in part: "Per your conversation with Uri yesterday, please send an email confirming the cancellation of the 3/31 $7,000,000 redemption/transfer/subscription from PPVA."

n.      On or about March 24, 2015, SANFILIPPO sent an email to NORDLICHT, LANDESMAN, MANN, Co-Conspirator 3, Co-Conspirator 4, Co-Conspirator 5 and another Platinum employee, an individual whose identity is known to the Grand Jury, and attached PPVA's oil and gas valuations for 2013 and 2014.

o.      On or about May 7, 2015, LANDESMAN sent an email to Investor 1 that stated, in part: "we had every intent of sending you a wire last week, two large payments we were expecting from significant borrowers are late, applying maximum pressure, should be resolved by next week, we are truly sorry for the delay."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Wire Fraud – The Investment Scheme)

91.      The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

92.      In or about and between November 2012 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and prospective investors in PPVA, PPCO and PPNE, and to obtain money and property from them by means of materially false and fraudulent

pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Securities Fraud – The PPVA Scheme)

93.     The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

94.     In or about and between November 2012 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and prospective investors in PPVA, in connection with the purchase and sale of

investments in PPVA, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Securities Fraud – The PPNE Scheme)

95. The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

96. In or about and between September 2014 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more noteholders and prospective noteholders in PPNE, in connection with the purchase and sale

of investments in PPNE, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FIVE
(Investment Adviser Fraud – The Investment Scheme)

97.     The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

98.     In or about and between November 2012 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO and JOSEPH MANN, together with others, did knowingly and willfully use the mails and other means and instrumentalities of interstate commerce, directly and indirectly: (a) to employ a device, scheme and artifice to defraud Platinum Management's clients and prospective clients; (b) to engage in a transaction, practice and course of business which operated as a fraud and deceit upon Platinum Management's clients and prospective clients; and (c) to engage in an act, practice and course of business which was fraudulent, deceptive and manipulative, contrary to Title 15, United States Code, Sections 80b-6 and 80b-17.

(Title 15, United States Code, Sections 80b-6 and 80b-17; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT SIX
(Conspiracy to Commit Securities Fraud – The Black Elk Bond Scheme)

99.     The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

100.    In or about and between November 2011 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon the Bondholders, in connection with the purchase and sale of BE Bonds, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

101.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

a.      On or about January 17, 2014, in response to an email forwarding questions from an analyst who participated in a Black Elk conference call, SMALL sent an email to LEVY and SHULSE that stated, in part: "We should work through these questions in light of our most plausible strategy in preparation of our call next week with bond holders and we should consider what we want to disclose publicly."

b.    On or about March 7, 2014, SHULSE sent an email to LEVY wherein SHULSE requested that he be selected to take over as Black Elk's Chief Executive Officer, set forth his compensation requests, and stated, in part: "I would like $1m of the [Preferred Equity] . . . if the right answer for Platinum is to keep the preferred and the high PIK, then I want to participate . . . if the right answer is to roll into the bond facility, then my restricted stock would do the same.  If the right answer is that part of it becomes common equity[,] then my restricted stock follows.  Again, I want to be aligned with Platinum and friends of Platinum, what is good for them is good for me."

c.    On or about May 12, 2014, SHULSE sent an email to NORDLICHT, LEVY, SMALL and BE Officer 1 regarding the second amendment to the BE Bond indenture agreement that stated, in part: "I sort of like the idea of slipping the announcement in with the 10Q filing so it has a chance to get lost and not seem like such a big deal."

d.    On or about May 20, 2014, in response to an email from SHULSE discussing a $6 million financial shortfall at Black Elk, NORDLICHT sent an email to SHULSE, LEVY and SMALL, copying BE Officer 1 and adding BE Lawyer 1, wherein NORDLICHT changed the subject line to "atty client privilege" and stated, in part: "U inadvertently did not label your last tirade as atty client privilege.  I personally think we can get out of rent . . . and a lot of other payables as well . . . but give us hard numbers as to how we are doing.  Real ebitda numbers instead of sending hysterical email when it really [shouldn't] have been a surprise based on production."

e.    On or about June 2, 2014, in response to opposition by NORDLICHT to abiding by the terms of the indenture agreement and the trustee's requirements,

44

SHULSE sent an email to NORDLICHT, LEVY and SMALL that stated: "Why are we afraid of an open solicitation? Probably going to avoid a lawsuit and if we have the bonds we say we do, the process ends as soon as we get over the number?"

       f.      On or about June 3, 2014, after SHULSE informed his co-conspirators at Platinum and Beechwood that the trustee had determined that Black Elk had not followed the appropriate process necessary to amend the indenture agreement, NORDLICHT responded in an email to SHULSE, LEVY and SMALL, and stated, in part: "There is a disconnect here. No more talking to lawyers. David, u f'd this one up bad for no reason. We will have one pager signed by 51% of bondholders, no trustee necessary. It[']s fine. We don't need any process. Bondholders are being taken out, this is all moot."

       g.      On or about June 16, 2014, SHULSE sent an email to NORDLICHT that stated, in part: "I got to spend some time fishing over the weekend, which gave me a lot of quiet time to think and reflect (which can be good or bad) . . . You even said in our meetings that the equity holders are getting 'crammed down' by paying off the preferred with the proceeds of the [Company A] transaction."

       h.      On or about August 18, 2014, SMALL sent an email to SHULSE, copying Co-Conspirator 8, that stated: "Jeff, on behalf of [Co-Conspirator 8] and myself constituting a majority of the board of managers you are hereby authorized to wire $70MM in partial payment of the [Preferred Equity]."

       i.      On or about September 11, 2014, SMALL sent an email to SHULSE, copying Co-Conspirator 8, that stated: "Jeff, you are authorized to pay your bonus of $275,000."

      (Title 18, United States Code, Sections 371 and 3551 et seq.)

45

## COUNT SEVEN
(Conspiracy to Commit Wire Fraud – The Black Elk Bond Scheme)

102.    The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

103.    In or about and between November 2011 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Bondholders, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT EIGHT
(Securities Fraud – The Black Elk Bond Scheme)

104.    The allegations contained in paragraphs one through 87 are realleged and incorporated as though fully set forth in this paragraph.

105.    In or about and between November 2011 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARK NORDLICHT, DAVID LEVY, DANIEL SMALL and JEFFREY SHULSE, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations,

Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon the Bondholders, in connection with the purchase and sale of BE Bonds, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH EIGHT

106.    The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One through Eight, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses.

107.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

48

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*MARK NORDLICHT, DAVID LEVY, URI LANDESMAN, JOSEPH SANFILIPPO, JOSEPH MANN, DANIEL SMALL AND JEFFREY SHULSE,*

Defendants.

## INDICTMENT

(T. 15, U.S.C., §§ 78j(b), 78ff, 80b-6 and 80b-17; T. 18, U.S.C., §§ 371, 981(a)(1)(C), 1349, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

_A true bill._

_____
                                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                              *Clerk.*

Bail, $ _____

*Winston Paes, Alicyn Cooley, Lauren Elbert and Sarah Evans, Assistant U.S. Attorneys (718) 254-7000*