**quinn emanuel** trial lawyers | washington, dc

777 Sixth Street NW, 11th Floor, Washington, District of Columbia 20001-3706 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8120**

WRITER'S EMAIL ADDRESS
**williamburck@quinnemanuel.com**

April 7, 2017

**VIA ECF**

The Honorable Dora L. Irizarry
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Nordlicht, et al., 16-cr-640 (DLI)

Dear Chief Judge Irizarry:

We write on behalf of Defendant Mark Nordlicht regarding potential leaks of confidential grand jury information, which if done by government agents (which we believe there is a *prima facie* case for) would be a violation of Federal Rule of Criminal Procedure 6(e). As discussed at the March 27, 2017 status conference, a series of news articles published during the investigation that led to the Indictment in this case appears to disclose confidential details of the grand jury's investigation. Tr. 32:24–35:18. Further to our discussion at the March 27 conference, we have attempted to confer with the government about the potential leaks, and we submit this letter to update the Court on the status of this issue. *Id.* 36:24–37:1 ("We will discuss with the government their progress of their investigation, and we will come back to you in the course of the next month.").

**I.    OVERVIEW**

Rule 6(e) prohibits government attorneys and agents from disclosing any "matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," which encourages voluntary participation in investigations, enables witnesses to testify fully and frankly, safeguards the investigative process from undue outside influence, and spares uncharged investigatory targets from public ridicule. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19 (1979).

But there is evidence that government agents in this case may have defied these obligations and breached the grand jury's secrecy. As reflected in the articles discussed below, confidential information about the investigation into Platinum Partners and Mr. Nordlicht

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

repeatedly was leaked to various journalists. The leaker (or leakers), among other things, disclosed the targets of the investigation, the theories of wrongdoing that the government was presenting to the grand jury, and specific practices and investments that the grand jury was investigating. The results of these leaks were critical and misleading articles that caused damaging publicity and ultimately tainted the evidence available to the grand jury.

As discussed further below, the appropriate path forward on this issue depends on whether the government will contest that government agents were responsible for violations of grand jury secrecy. If it does, then the law is clear that the Court should hold an evidentiary hearing to resolve the dispute and determine an appropriate remedy. On the other hand, if the government concedes that it cannot rebut the *prima facie* case, then the Court can proceed directly to determining a remedy.

## II. LEAKS OF INVESTIGATIVE INFORMATION

The leaks in this case began at least as early as June 2016. On June 22, 2016, agents from the FBI and Postal Inspection Service executed a search warrant at Platinum Partners' office in Manhattan. A Bloomberg reporter, however, appears to have received advance warning of the search, enabling Bloomberg to publish an article containing a full rundown of the search within approximately two and a half hours of law enforcement agents' arrival at Platinum's office. *See* Christie Smythe & Zeke Faux, *Platinum Partners Said to Be Raided by FBI Amid Bribes Probe*, Bloomberg, June 22, 2016 (Exhibit A). The article cites "people [who] requested anonymity because they're not authorized to speak publicly on the matter," who were able to explain that the investigation "also involve[d] the U.S. Attorney's office in Brooklyn" and was "separate from" an investigation in the Southern District of New York. *Id.* The timing and content of the article support an inference that FBI agents tipped off reporters to their action, an all too common FBI tactic.[1] That same day, reporters from the *New York Post* also reported on the search at Platinum's office. *See* Kaja Whitehouse and Josh Kosman, *FBI raids hedge fund linked to union head's kickback probe*, N.Y. Post, June 22, 2016 (Exhibit B). Citing an anonymous source, the article reported that the investigation into Platinum "is expected to look at Platinum's valuation of its hard-to-value illiquid assets." *Id.*

Similar articles continued to appear throughout the summer. Citing anonymous sources "familiar with the probe," a July 25, 2016 *Wall Street Journal* article provided numerous details of the investigation that previously had not been disclosed. Among other things, the article reported that the investigation into Platinum (1) was a "fraud investigation"; (2) focused on Mr. Nordlicht personally, in addition to Platinum; (3) was looking into "whether . . . Platinum had been paying some reported investment gains to exiting investors with money from incoming ones"; and (4) was reviewing "whether Platinum misstated values of some holdings." Rob Copeland, *Fraud Probe Ricochets Through Platinum Partners, a Hedge Fund With Ties to Jewish Community*, Wall St. J., July 25, 2016 (Exhibit C). Three days later, the *New York Post*

---

[1] *See, e.g.*, *United States v. Skelos*, No. 15-cr-317, 2015 WL 6159326, at *10–*11 (S.D.N.Y. Oct. 20, 2015) (noting government's concession that a draft criminal complaint to be filed under seal was provided to reporters in advance of the arrest of former New York Senate Majority Leader Dean Skelos); Complaint ¶¶ 95–106, *Ganek v. Liebowitz*, No. 15-cv-1446 (WHP) (S.D.N.Y. Feb. 26, 2015) (Dkt. No. 1) (describing similar FBI conduct).

published an article containing similar allegations, albeit with a more inflammatory and prejudicial spin. Citing an anonymous "person briefed on the investigation," the article reported that "[f]ederal prosecutors in Brooklyn are investigating whether" Platinum Partners "was a Ponzi scheme," based on the allegation that "withdrawals requested were paid with cash coming in from new investors." Kevin Dugan, *Feds probing union scandal fund as a Ponzi scheme*, N.Y. Post, July 28, 2016 (Exhibit D).

The articles continued into August. On August 11, 2016, the same Bloomberg reporter who received advance notice of the search at Platinum's office published an article explaining that, according to a person with "direct knowledge" of the investigation, "[w]hether Platinum properly accounted for hard-to-value assets, including" Golden Gate oil fields in California, "is at the center of a probe by federal prosecutors in Brooklyn . . . ." Zeke Faux, *Platinum's California Oil Fields Said to Be Subject of Probe*, Bloomberg, Aug. 11, 2016 (Exhibit E).

In addition to these articles,[2] a United States District Court has already found, and the government has already admitted, that in a different case a supervisory agent for securities fraud investigations in the FBI's New York Field Office made numerous unauthorized disclosures of confidential grand jury information to members of the media. *See* Mem. & Order at 1, *United States v. Walters*, No. 16-cr-338 (S.D.N.Y. Mar. 1, 2017) (Dkt. No. 104) (Exhibit H); *Ex Parte* Submission, *Walters*, 16-cr-338 (PKC) (S.D.N.Y. Jan. 4, 2017) (Dkt. No. 65) (Exhibit I). Coordinating Supervisory Special Agent David Chaves admitted to making numerous unauthorized disclosures to reporters from multiple media outlets, including the *Wall Street Journal*. *See* Ex. I at 3–4. As the supervisor for securities fraud investigations in the FBI's New York Field Office, Agent Chaves would have been aware of and participated in the investigation in this case. And as reflected in the government's submission in *Walters*, Agent Chaves's practice was to leak information regarding investigations he supervised. *Id.* Moreover, the government suspects that he was actually responsible for additional leaks to which he did not admit. *Id.* at 10.

### III. BASED ON THIS RECORD, MR. NORDLICHT IS ENTITLED TO AN EVIDENTIARY HEARING

These facts establish a *prima facie* case that government agents violated Rule 6(e). "[A] *prima facie* case of a violation of Rule 6(e)(2) is made when . . . media reports disclose[] information about "matters occurring before the grand jury" and indicate[] that the sources of the information include[] attorneys and agents of the Government." *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989) (citations and quotation marks omitted). News articles sufficiently

---

[2] A number of other articles and incidents reflect confidential investigative information. *See, e.g.*, Rob Copeland & Rebecca Davis O'Brien, *Platinum Partners Plans to Unwind Main Hedge Fund Amid Kickback Probe*, Wall St. J. June 14, 2016 (Exhibit F) (citing anonymous "people familiar with the matter" who described the "previously unreported investigation" by a "second group of federal prosecutors" at "the U.S. attorney's office in Brooklyn" into Platinum that was unrelated to the bribery allegations against Mr. Huberfeld); Kevin Dugan, *Hedge fund tied to kickback probe used 'checkered' valuation firm*, N.Y. Post, July 31, 2016 (Exhibit G) (citing an anonymous "source familiar with the investigation by the Brooklyn US attorney" and reporting that "[p]rosecutors are now probing whether" Platinum employed disreputable valuation experts in furtherance of a scheme to overvalue its assets).

indicate reliance on a government source when "the nature of the information" provided by the source reveals a connection to the government. *Id.* at 1325 (quoting *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 (5th Cir. 1980)).

The articles described above make clear that reporters from the *Wall Street Journal*, Bloomberg, and the *New York Post* got a preview of the grand jury's investigation, including at least the following:

- Mr. Nordlicht was a target of the grand jury investigation;
- The grand jury was looking at potential securities fraud, not public corruption;
- Prosecutors in the Eastern District of New York, not the Southern District, were leading the grand jury's investigation;
- The grand jury was investigating Platinum's use of new investor subscriptions in part to satisfy redemption requests;
- The grand jury was investigating Platinum's valuation methods;
- The grand jury was looking specifically at Platinum's investment in Golden Gate; and
- The grand jury was investigating whether Platinum used unreliable outside valuation experts.

*See, e.g.*, Indict. ¶¶ 43–52 (alleging Platinum's assets, including Golden Gate, were overvalued), 55–56, 62 (discussing use of new investor subscriptions in part to satisfy redemption requests). Such leaks regarding "the nature of the crimes which would be charged" or "the strategy or direction of the investigation" violate "the secrecy requirements codified in Rule 6(e)." *Lance*, 610 F.2d at 218; *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998).

Most telling is the way in which the articles describe the sources of the leaks—for example, people "with direct knowledge" of, "briefed on," "familiar with," or otherwise informed of the grand jury's investigation, though "***not authorized to speak***" about it. *E.g.*, Exs. A (emphasis added), C, E. This last language, in particular, strongly suggests that the sources may have been subject to the requirements of Rule 6(e)(2)(B). And it is implausible that any other person could have known this kind of sensitive information about the grand jury's "strategy or direction." *Dow Jones*, 142 F.3d at 500. Because "the nature of the information disclosed furnishes the connection" to an individual bound to secrecy, the articles alone satisfy Mr. Nordlicht's *prima facie* burden to show the disclosures violate Rule 6(e)(2). *Lance*, 610 F.2d at 218; *see also United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996).

These facts demonstrate that Mr. Nordlicht is entitled to an evidentiary hearing. *Barry*, 865 F.2d at 1321 (where "a *prima facie* case of a violation of Rule 6(e)(2)" has been set forth, a court "must conduct a 'show cause' hearing to determine whether" a violation occurred). Alternatively, if the government does not believe it can rebut the *prima facie* case of leaks, it can concede them, and the Court can proceed to determining the appropriate remedy for this conduct. Indeed, that is precisely the procedure the government requested and the Court adopted in the *Walters* case. *See* Ex. I at 2 (conceding that the government could not rebut the *prima facie* case and stating, as a result, that the Court should "proceed to consider the issue of remedy"); Tr. 34:4–20, *Walters*, No. 16-cr-338 (S.D.N.Y. Dec. 21, 2016) (Dkt. No. 61) (ordering parties to

proceed to briefing on remedy) (excerpts Exhibit J).³  Remedies can include, for example, dismissal of indictment, *Rioux*, 97 F.3d at 662; suppression of grand jury material, *United States v. Coughlan*, 842 F.2d 737, 740 (4th Cir. 1988); contempt, Fed. R. Crim. P. 6(e)(7); and other equitable relief, *Barry*, 865 F.3d at 1321.  If, however, the government wishes to contest that the leaks occurred, the law is clear that Mr. Nordlicht is entitled to a hearing.  *Id.*

### IV.   MR. NORDLICHT HAS ATTEMPTED TO RESOLVE THESE ISSUES WITHOUT BURDENING THE COURT

As discussed at the March 27 status conference, we alerted the government on February 27, 2017 to the evidence of grand jury leaks and asked that the government produce information and documents related to this misconduct.  Following the March 27 status conference, as we indicated we would, we attempted to meet and confer with the government regarding its internal investigation into the leaks and to establish a timetable for production of responsive information.  The government, however, indicated it would not confer with us by phone and would only communicate in writing.  As a result, we reiterated our request again in writing that the government produce information and documents related to potential violations of Rule 6(e).

To date, despite being on notice of these leaks for months, the government has not produced any information regarding the potential violations, nor conceded that they occurred.  As a result, unless the government will concede that it cannot rebut the *prima facie* case of leaks, Mr. Nordlicht will request at the status conference scheduled for May 12 that the Court set a briefing schedule for Mr. Nordlicht's motion for an evidentiary hearing.⁴

Respectfully submitted,

/s/ William A. Burck
William A. Burck

cc: All counsel of record

---

[3]  Even if the government concedes the leaks, however, an evidentiary hearing may still be appropriate to ascertain the prejudice and determine the appropriate remedy.  *See, e.g.*, *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1076–77 & n.21 (D.C. Cir. 1998) (if "the district court determines that a violation of Rule 6(e)(2) has occurred . . . [t]he movants may then participate in determining the appropriate remedy," at which point an "adversarial presentation may be appropriate, since what appears to be harmless to a district judge may be prejudicial if seen in light of a defense counsel's special familiarity with a given prosecution" (quotation marks and alteration omitted)).  As Mr. Nordlicht will demonstrate at the appropriate time, the prejudice in this case is significant, including tainting the evidence available to the grand jury and preventing Platinum's investments from realizing their full value, which harms the investors and deprives Mr. Nordlicht of evidence that would have contradicted accusations in the Indictment.  In fact, the leaks themselves have caused much of the damage for which the government now seeks to blame the defendants.

[4]  There was a suggestion at the March 27 status conference that any briefing on this issue be consolidated with other motions to dismiss the Indictment.  *See* Tr. 35:24–36:5.  To be clear, however, Mr. Nordlicht is not yet moving to dismiss.  Rather, at this stage, Mr. Nordlicht is only seeking an evidentiary hearing regarding whether Rule 6(e) was violated, in order to assess whether there is a basis to seek a remedy.