UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

16 CR 640 (DLI)

       - against -

MARK NORDLICHT,
DAVID LEVY,
DANIEL SMALL,
URI LANDESMAN,
JOSEPH SANFILIPPO,
JOSEPH MANN and
JEFFREY SHULSE,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
CERTAIN DEFENDANTS' MOTION ALLEGING DISCLOSURES
TO THE PRESS IN VIOLATION OF FED. R. CRIM. P. 6(e)

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ALICYN L. COOLEY
LAUREN H. ELBERT
SARAH M. EVANS
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT    1

FACTUAL BACKGROUND    2

   I.    The Government's Investigation    3

   II.    The Indictment    3

   III.    Relevant Events and Communications Involving Platinum and Nordlicht    4

      A.    The Creation of PPVA's Side Pocket    4

      B.    Journalists' Communications with Nordlicht in 2015 and 2016    5

      C.    Murray Huberfeld's Arrest and the Defendants' Investor Call in June 2016    7

ARGUMENT    8

THE DEFENDANTS HAVE NOT ESTABLISHED A PRIMA FACIE CASE OF A RULE 6(e) VIOLATION AND THEIR REQUESTS FOR AN EVIDENTIARY HEARING AND DISCOVERY SHOULD THEREFORE BE DENIED    8

   I.    Applicable Law    9

   II.    Discussion    11

      A.    The Cited Articles Did Not Disclose Matters Occurring Before the Grand Jury    11

      B.    The Source of the Disclosures Was Not an Attorney or Agent of the Government    14

THE MOTION SHOULD BE DENIED WITHOUT A HEARING BECAUSE THE DEFENDANTS HAVE NOT SHOWN — AND CANNOT SHOW — PREJUDICE    18

   I.    Applicable Law    18

   II.    Discussion    21

THE DEFENDANTS' SWEEPING REQUEST FOR DISCOVERY IN CONNECTION WITH THEIR MOTION IS CONTRARY TO LAW AND SHOULD BE DENIED    24

CONCLUSION    25

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to the joint motion of the defendants Mark Nordlicht, David Levy, Uri Landesman, Joseph SanFilippo and Joseph Mann (collectively, the "defendants") for an evidentiary hearing and other relief in the above-captioned case, as set forth in Nordlicht's letters filed on April 7, 2017 ("Apr. 7 Ltr.") and April 14, 2017 ("Apr. 14 Ltr.") (collectively, the "Motion").[1]  <u>See</u> ECF Nos. 107 & 112.

The Motion alleges that "government agents in this case may have defied [their] obligations" under Federal Rule of Criminal Procedure 6(e) ("Rule 6(e)"), citing specific news articles published between June 14 and August 11, 2016 (collectively, the "cited articles") and arguing in conclusory fashion therefrom that "confidential information about the investigation into Platinum Partners and Mr. Nordlicht repeatedly was leaked to various journalists."  Apr. 7 Ltr. at 1-2; <u>see</u> Exs. A-G to Apr. 7 Ltr.  The Motion claims that the disclosed information included the "targets of the investigation, the theories of wrongdoing that the government was presenting to the grand jury, and specific practices and investments that the grand jury was investigating," and resulted in the publication of "critical and misleading articles . . . that caused damaging publicity and . . . tainted the evidence available to the grand jury."  Apr. 7 Ltr. at 2.

For the reasons set forth below, the defendants have not established a <u>prima facie</u> case of a violation of Rule 6(e), as is required to justify a hearing.[2]  Even assuming <u>arguendo</u>

---

[1]  By letters filed on April 18 and 20, 2017, Mann, Landesman, SanFilippo and Levy joined in Nordlicht's motion.  <u>See</u> ECF Nos. 113, 115, 116 & 117.

[2]  The government is not restricted at this stage of motion practice to either "conced[ing] that it cannot rebut [the defendants'] <u>prima facie</u> case" or proceeding to "an evidentiary hearing to resolve the dispute and determine an appropriate remedy," as alleged by the defendants.  Apr. 7 Ltr. at 2.  The government may, and does here, challenge the adequacy of the defendants' initial showing and their entitlement to further proceedings and any relief on

that the alleged Rule 6(e) violation occurred, the Motion nevertheless fails for lack of prejudice. The claimed damage to Platinum Partners ("Platinum"), including its signature hedge fund, Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"), was of the defendants' own making and was set in motion well before the alleged "leaks" described in the Motion.

The defendants also seek "[d]iscovery from the government of all information in its possession, custody, or control concerning the leaks," prior to May 12, 2017, regardless of whether the government disputes that a prima facie case of a Rule 6(e) violation has been established.   Apr. 14 Ltr. at 1, 3.   The defendants further suggest that discovery is necessary "to enable Mr. Nordlicht to demonstrate prejudice from the leaks."   Id. at 1-2.   The defendants' sweeping request for discovery is contrary to law and should be denied.

Accordingly, the government respectfully submits that the Motion should be denied in its entirety.

FACTUAL BACKGROUND

As described in more detail below and as alleged in the indictment, PPVA was struggling with liquidity problems by 2014.   See, e.g., Indictment ("Ind.") ¶ 54.   The defendants acknowledged the severity of the crisis in communications with each other beginning no later than November 2015.   See, e.g., Ind. ¶¶ 66-67.   As these facts and Nordlicht's own words establish, PPVA was in crisis and in the process of being wound down prior to the June 22, 2016 search of Platinum's offices pursuant to a search warrant (the "Platinum Search") and the first of the alleged leaks described in the Motion.

Moreover, Nordlicht's communications with journalists — including those named in the Motion — and news articles predating the cited articles reflect that information the

---

their Motion.

defendants claim was derived from the grand jury investigation in fact was available to and being discussed by journalists well before June 2016.

I.  <u>The Government's Investigation</u>

The government's investigation in this case began in or about late February 2016. <u>See</u> Exhibit A, Declaration of Alicyn L. Cooley ("Cooley Declaration" or "Cooley Decl.") ¶ 4. On December 14, 2016, a federal grand jury sitting in the Eastern District of New York returned the indictment in the instant case.

In addition to information obtained pursuant to the grand jury's investigation in this case, <u>see generally</u> Cooley Decl. ¶¶ 5-10, the government has obtained plentiful information and evidence from a variety of other sources, including but not limited to: (1) several witnesses who provided information to the government in voluntary interviews, including whistleblowers and other individuals; (2) documents provided to the government voluntarily by individuals and entities; (3) the Securities and Exchange Commission ("SEC"), which conducted a parallel regulatory investigation of, <u>inter alia</u>, Platinum and individuals associated with Platinum that began prior to February 2016 and culminated with the filing of the civil action captioned <u>SEC v. Platinum Management (NY) LLC, et al.</u>, No. 16-CV-6848 (DLI); (4) publicly available information; and (5) voluminous materials seized during the Platinum Search.   <u>See</u> Cooley Decl. ¶ 5.

II.  <u>The Indictment</u>

The indictment alleges, in pertinent part, that, in or about and between November 2012 and December 2016, the defendants engaged in a scheme to defraud investors and prospective investors through material misrepresentations and omissions relating to, among other things: (i) the performance of some of PPVA's assets; (ii) PPVA's liquidity; (iii) the purpose of

certain short-term, high-interest-rate note offerings issued by Platinum and the use of the funds raised therein; (iv) PPVA's preferential redemption process; and (v) related party transactions involving PPVA and another Platinum fund, Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO").   See Ind. ¶ 42.   The indictment further alleges that the defendants fraudulently overvalued some of PPVA's assets in order to, among other things, boost performance numbers, attract new investors, retain existing investors and extract high management and incentive fees, and that such overvaluation precipitated a severe liquidity crisis, which Platinum initially attempted to mitigate through high-interest loans between Platinum's funds.   Id.   In addition, the indictment alleges that, when such inter-fund loans proved insufficient to resolve PPVA's liquidity problems, Platinum began selectively paying some investors ahead of others, contrary to the terms of its governing documents.   Id.   The foregoing scheme is charged in Counts One through Five of the indictment.[3]

## III.   Relevant Events and Communications Involving Platinum and Nordlicht

As summarized below, there were public indications of PPVA's demise well before the first of the cited articles.   Further, journalists' statements to Nordlicht in emails, along with other news articles published prior to June 2016, demonstrate the availability of substantially the same information contained in the cited articles from non-grand jury sources.

### A.   The Creation of PPVA's Side Pocket

As is alleged in the indictment, in or about November 2015, as investor complaints mounted due to unpaid redemptions, Nordlicht, Levy, Landesman, SanFilippo and Mann, together with others, agreed that they could no longer conceal PPVA's insolvency.   Ind. ¶

---

[3]        The indictment also alleged a second scheme by defendants Nordlicht, Levy, Daniel Small and Jeffrey Shulse, charged in Counts Six through Eight of the indictment, which is not in issue for purposes of the Motion.

66.   On or about November 23, 2015, Mann sent an email from Nordlicht to PPVA's investors informing them, among other things, that Platinum was going to revise the private placement memorandum so that it could "segregate certain illiquid assets (and related liabilities) from the remainder of the assets in the portfolio (the "Special Investments") in the interest of protecting investors and maximizing returns."   Platinum commonly referred to PPVA's illiquid portfolio as the "side pocket."   Ind. ¶ 66.

As the indictment further alleges, news of PPVA's side pocket was incredibly troubling to a number of investors who expressed anger and frustration and, at times, despair. Ind. ¶ 69.   Further, in or about and between January 2016 and June 2016, Platinum was unable to fulfill the vast majority of redemption requests in PPVA.   Ind. ¶ 71.   In fact, as of approximately January 29, 2016, Platinum owed more than $106 million to PPVA's investors, among other substantial debts.   Ind. ¶ 72.

B.      Journalists' Communications with Nordlicht in 2015 and 2016

On or about October 16, 2015, months before the government began its investigation, Zeke Faux — the journalist who wrote two of the cited articles, see Exs. A & E to Apr. 7 Ltr. — sent Nordlicht an email with the subject, "Return numbers."   See Exhibit C. Faux's email stated the following about Platinum's valuations of Black Elk and Golden Gate Oil, specifically (subjects discussed in certain of the cited articles, which the defendants claim had to have derived from law enforcement sources):

> believe it or not, my editors have been asking me quite insistently whether we can believe Platinum's numbers. what would you point to on that front? also golden gate oil must be down a lot, no? (valuation report from 2014 says the price is based on $96/barrel) together with black elk that's a good chunk of the portfolio.

Id.   The next day, on or about October 17, 2015, Nordlicht responded and changed the subject line of his email to "on background."   Nordlicht wrote, in pertinent part, the following

pertaining to valuation generally and Black Elk and Golden Gate Oil specifically:

> Where are u getting "valuation" reports from by the way? Black elk has been in wind down for some time with substantially all of the value already off our books before price meltdown (though not all). The last two years and change have been a struggle for us in ppva by historical standards with asset based energy positions accounting for 20 percent net worse performance than we would have had otherwise . . . . If not for that, our numbers would have been closer to our historical standards. Golden gate is included in that but we have other assets as well.

Exhibit C.

On or about October 21, 2015, still months before the government's investigation began, Faux published an article about Platinum. <u>See</u> Exhibit D, Faux, Zeke, "No Blow Up Is Big Enough To Tarnish Platinum Partners' Returns," Bloomberg (Oct. 21, 2015), <u>available</u> <u>at</u> https://www.bloomberg.com/news/articles/2015-10-21/no-blow-up-is-big-enough-to-tarnish-platinum-partners-returns. In that article, Faux wrote about "red flags" about Platinum's investments described by a named, non-law-enforcement source. Faux also cited Platinum's "valuation report, dated March 2014," which "show[ed] that illiquid, hard-to-value assets make up much of Platinum's portfolio." <u>Id.</u> Faux also wrote, in a reference to Golden Gate Oil, that "[t]he second-biggest holding is a group of oil fields in California." <u>Id.</u>

On or about April 13, 2016, Reuters published an article that reflected poorly on PPVA's health, stating that Platinum's "logic" about being able to "manage mass redemptions":

> didn't hold up last year, as oil prices plummeted and volatility wracked markets. In response, Platinum extended the redemption notice from three to six months for the Value Arbitrage fund. Then, in December, it put about half the capital of the fund — much of it from the energy sector — in a so-called side pocket, meaning investors can't take out their money on the normal schedule. When they can isn't clear.

Exhibit E, Delevingne, Lawrence, "The Top-Performing Hedge Fund Manager That's Too Hot for Big Money To Handle," Reuters (Apr. 13, 2016), <u>available</u> <u>at</u> http://www.reuters.com/investigates/special-report/usa-hedgefunds-platinum.

On or about April 20, 2016, Rob Copeland — the author of two of the cited articles, see Exs. C & F to Apr. 7 Ltr. — and Nordlicht emailed each other about issues regarding Platinum's valuation, performance and SEC scrutiny, among other topics.   See Exhibit F. Copeland wrote, in pertinent part:

> As you requested on the phone, here are some questions in writing. . . .
> Please describe Platinum's valuation practices.
> Do you or any other Platinum employee have input on valuation, or is it solely determined by a third-party firm?  Did the SEC conduct an audit of your firm recently? . . . Did the SEC ask you about the following topics:
> -Valuation
> -Related party transactions (colloquially defined as lending from one fund to another)
> . . . .
> After the audit was completed, did you receive any formal indication that the SEC would refer the case for further investigations or enforcement?. . .
> Has Platinum's flagship Value Arbitrage fund ever reported a down year?
> . . . .
> Did Platinum institute a side pocket in the Value Arbitrage Fund late last year?
> Is that side pocket related to distressed, or beaten-down, energy investments? . . .

Id. at 1-3.

C.      Murray Huberfeld's Arrest and the Defendants' Investor Call in June 2016

Prior to the Platinum Search and the first of the cited articles, Platinum sustained negative publicity relating to the arrest of Murray Huberfeld, one of Platinum's partners.   On June 8, 2016, Huberfeld and Norman Seabrook were arrested by law enforcement agents in the case captioned United States v. Seabrook et al., No. 16-CR-467 (ALC) (S.D.N.Y. 2016).

Approximately one week later, on or about June 14, 2016, Nordlicht and Landesman held a conference call with Platinum investors to discuss, inter alia, the news of Huberfeld's arrest.   See Exhibits G & H (a recording of the June 14, 2016 investor conference call, and a draft transcript of that recording, respectively).   During the call, in addition to discussing Huberfeld's recent arrest, Nordlicht stated that PPVA was "winding down."

Pertinent portions of Nordlicht's statements on that conference call are excerpted below:

> . . . I think this headline [about Huberfeld] in itself was one headline too far maybe?
> . . . Based on that, on the same day, we started to receive a lot of questions from
> two separate regulatory agencies related to Platinum—related a lot to the tickets
> and different, different things with Murray and Da-- and uh, Murray, but also some
> more general questions about Platinum.     Primarily actually a lot of questions that
> were already in the press and really just very, very general questions which we're
> very, very comfortable with.     Um, you know we are very comfortable with how
> we conduct Platinum, and we feel very, very strongly that the likelihood is that
> nothing will come out of these questions.     But, it is a distraction . . . .
> . . . .
> [M]y gut right now is to, certainly in regards to PPVA, is to unwind the fund in an
> ordinary fashion.
> . . . .
> You know, to the extent that we're winding down certainly PPVA, we're winding
> down, we're not closing down. . . . I want to not just get the money back, I want to
> produce nice returns on the way out. . . . I really want to, you know, do a bang-out
> job on the way out, certainly in terms of PPVA . . . .
> . . . .

See Exhibits G & H.   The press quickly learned of Nordlicht's statements on the foregoing

conference call and both contacted Nordlicht about and reported on them.   See Ex. B. to Apr. 7

Ltr., at 3 ("Platinum . . . said last week that it would wind down its main fund after spooked

investors demanded their money."); Exhibit I, at 2 (in June 14, 2016 email to Nordlicht with

subject line, "Platinum closing?", journalist Zeke Faux asked Nordlicht: "[d]o you have a

statement about what's going on at platinum?   Wsj is reporting you are unwinding main fund").

## ARGUMENT

## THE DEFENDANTS HAVE NOT ESTABLISHED A PRIMA FACIE CASE OF A RULE 6(e) VIOLATION AND THEIR REQUESTS FOR AN EVIDENTIARY HEARING AND DISCOVERY SHOULD THEREFORE BE DENIED

The information in the cited articles did not reveal matters occurring before the

grand jury, and the cited articles did not reference or suggest a government source for the

information.   Either of these omissions is fatal to an allegation of a Rule 6(e) violation.   The

defendants thus have not established a <u>prima facie</u> case of such a violation and the Motion should be denied without a hearing or discovery.

I.    <u>Applicable Law</u>

Rule 6(e)(2) bars the disclosure of any "matter occurring before the grand jury" by, among others, attorneys for the government and law enforcement agents privy to such grand jury material.   Fed. R. Crim. P. 6(e)(2)(B)(iv).   A defendant seeking relief based on an alleged Rule 6(e) violation must first establish a <u>prima facie</u> case of such a violation by demonstrating that (1) there has been disclosure of a matter occurring before the grand jury, and (2) the source of the disclosure was an attorney or agent of the government.   <u>See, e.g.</u>, <u>United States v. Skelos</u>, No. 15-CR-317 (KMW), 2015 WL 6159326, *9 (S.D.N.Y. Oct. 20, 2015) (holding that defendant did not make <u>prima facie</u> showing to warrant a hearing or discovery) (citing <u>Barry v. United States</u>, 865 F.2d 1317, 1321 (D.C. Cir. 1989)).   If the defendant can meet both requirements, then the burden shifts to the government to rebut the defendant's allegations.   <u>Id.</u> Courts can consider an affidavit from the government in assessing whether a hearing is necessary.   <u>See</u> <u>United States v. Rioux</u>, 97 F.3d 648, 662 (2d Cir. 1996) (citing cases); <u>In re Grand Jury Investigation (Lance)</u>, 610 F.2d 202, 219 (5th Cir. 1980).

Although Rule 6(e) does not define when a matter is one "occurring before the grand jury," past decisions have construed that phrase to include, <u>inter alia</u>, the following categories of information: revelations of the identity of either grand jurors or expected witnesses; information about expected testimony of witnesses or likely questions; information that reveals the strategy or direction of a grand jury investigation (distinct from any outside investigations); or the date when a grand jury will return an indictment.   <u>Skelos</u>, 2015 WL 6159326, at *10 (citing <u>United States v. Rosen</u>, 471 F. Supp. 2d 651, 655 (E.D. Va. 2007) (citing cases)); <u>see also</u>

<u>In re Sealed Case No. 99-3091</u>, 192 F.3d 995, 1001-02 (D.C. Cir. 1999) (stating that Rule 6(e) does not require that a "veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury" (citation omitted)).

Notably, Rule 6(e) protections "do[] not apply to disclosures of information obtained independently of the grand jury process, even if the information might later be presented to the grand jury." <u>Skelos</u>, 2015 WL 6159326, at *10 (citing <u>In re Grand Jury Subpoena</u>, 103 F.3d 234, 238-39 (2d Cir. 1996)); <u>see also</u> <u>In re Sealed Case No. 99-3091</u>, 192 F.2d at 1002; <u>United States v. Eastern Air Lines, Inc.</u>, 923 F.2d 241, 244 (2d Cir. 1991) (search warrant affidavit derived from investigation independent of grand jury was not "a matter occurring before the grand jury" even if it might someday be presented to grand jury); <u>Blalock v. United States</u>, 844 F.2d 1546, 1551 (11th Cir. 1988) (per curiam) (grand jury secrecy rule "does not protect from disclosure information obtained from a source other than the grand jury, even if the same information is later presented to the grand jury"); <u>In re Grand Jury Matter</u>, 682 F.2d 61, 64-65 (3d Cir. 1982) (products of FBI investigation, including tape recordings and transcripts of consensually monitored conversation, were not "matters occurring before a grand jury" because they were generated separately from grand jury process, even if they might ultimately be used there). Moreover, "the disclosure of information coincidentally before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury is not prohibited." <u>In re Sealed Case No. 99-3091</u>, 192 F.3d at 1002 (quotation marks and citations omitted).

The second showing a defendant alleging a Rule 6(e) violation must make in order to establish a <u>prima</u> <u>facie</u> case is that the challenged disclosure was made by an attorney or agent for the government. <u>Barry</u>, 865 F.2d at 1321; <u>Skelos</u>, 2015 WL 6159326, at *11.

Although, to meet this standard, it is not required that a media report expressly reference a government official if the nature of the information furnishes a connection, Barry, 865 F.2d at 1325 (citing In re Grand Jury Investigation, 610 F.2d at 218), a defendant must establish such a connection between a law enforcement official and the alleged disclosure of Rule 6(e) material. Id. at 1320 (excluding from basis for finding of prima facie case articles that "either do not explicitly mention 'law enforcement officials' in connection with information disclosed about the grand jury proceedings, or they mention law enforcement officials only in connection with 'investigations' underway that were not explicitly linked to the grand jury proceeding").

Evidentiary hearings are not compulsory upon a defendant's mere allegation of a Rule 6(e) violation. Rather, "[b]efore a court will order a hearing on a possible breach of the Grand Jury Secrecy Rule, the defendant must establish a prima facie case of a violation of Federal Rule of Criminal Procedure 6(e)." Rioux, 97 F.3d at 661 (denying hearing); see Skelos, 2015 WL 6159326, at *12 (concluding that "Defendants have failed to make a prima facie showing of a Rule 6(e) violation and therefore are not entitled to discovery or a hearing on this issue").

II. Discussion

Unlike the cases on which the defendants rely, here, the defendants' allegations fail to satisfy either of the two prongs necessary to establish a prima facie case of a Rule 6(e) violation.

A. The Cited Articles Did Not Disclose Matters Occurring Before the Grand Jury

First, the cited articles did not disclose "matters occurring before the grand jury." Notwithstanding Nordlicht's insertion of "grand jury" into every bullet point in his list of information disclosed in the cited articles, see Apr. 7 Ltr. at 4, the phrase "grand jury" is absent

in every article referenced in the Motion and, significantly, all of the information contained in the cited articles — including that: (1) the investigation was being led by the U.S. Attorney's Office for the Eastern District of New York, pertained to fraud rather than public corruption and related to Platinum's valuation methods, which involved the use of an external valuation firm; (2) Platinum's investment in Golden Gate Oil was under scrutiny; and (3) Nordlicht was under investigation in addition to Platinum — could have derived just as plausibly from sources other than the grand jury's investigation.   See Skelos, 2015 WL 6159326, at *10 (finding no prima facie case where details in cited news reports "do not clearly pertain to the secret aspect of the inner workings of the grand jury" and noting that, "[d]uring this same time, the Government was conducting its own investigation outside the grand jury, based on materials obtained through wiretaps, search warrants, and interviews with witnesses not expected to appear before the grand jury") (internal quotation marks omitted); cf. Barry, 865 F.2d at 1320 (articles disclosed movant's "statements to the grand jury" about cocaine use, what "federal grand jury" was investigating, and that another witness had refused to testify in grand jury); In re Grand Jury Investigation (Lance), 610 F.2d at 207-17, nn.1-4 (16 articles referenced "grand jury," and disclosed, inter alia, that "grand jury would hear testimony in the following week about Lance's relationship with a New York bank" and "that Lance had declined to accept an invitation by the Justice Department to testify before the grand jury," and "contents of documents presented to the grand jury").

      For example, most of the foregoing information is contained on the face of the search warrant and its attachments, pursuant to which the June 22, 2016 Platinum Search (patently not a matter "occurring before the grand jury") was executed and a copy of which was served on counsel for Platinum that same day.   See Exhibit B at 3-4 (listing the fraud offenses

under investigation, stating that those violations involved "Mark Nordlicht," among others, and listing records to be seized relating to those violations, including: "performance and valuation summaries or reports for Platinum," including PPVA; "records, including communications to investors and auditors, concerning Platinum's assets under management, the investments in its portfolios, the valuation of assets, and the performance of the investments"; and "audit reports and valuation reports, concerning Platinum's investments"). As to Golden Gate Oil specifically, as noted above, it was publicly known and reported prior to the cited articles' publication that that investment was one of PPVA's largest, and its valuation was suspiciously high after the price of oil plummeted. See, e.g., Exhibit C (Oct. 16, 2015 email from Zeke Faux to Nordlicht casting doubt on valuation of "golden gate oil"); Exhibit D (Oct. 21, 2015 Bloomberg article noting PPVA's "second-biggest holding is a group of oil fields in California"). Further, the identity of the prosecutorial office leading an investigation is not itself grand jury material, see In re Grand Jury Investigation (Lance), 610 F.2d at 217 n.5 (no violation of Rule 6(e) could be found based on disclosure in article of "actions taken by the Justice Department," including "that the Justice Department would not decide whether to seek an indictment against Lance until after the November election," which did not describe action of "the grand jury").

Although the June 14, 2016 cited article described "an investigation of Platinum itself . . . led by the U.S. Attorney's Office in Brooklyn," and stated, "the Brooklyn office has sent subpoenas in connection with the probe," Ex. F to Apr. 7 Ltr., at 3, the article is silent on who was subpoenaed, when the subpoenas were served and what the subpoenas requested. Accordingly, this article, too, does not disclose "matters occurring before the grand jury." Cf. United States v. Walters, Mem. & Order dated Nov. 17, 2016, No. 16-CR-338 (PKC), ECF No. 46 (S.D.N.Y.) (noting specifically two articles that referenced subpoenas for documents from

U.S. Attorney's Office for Southern District of New York ("SDNY") to food and beverage company Dean Foods as "suggestive of a government leak").

        B.      <u>The Source of the Disclosures Was Not an Attorney or Agent of the Government</u>

The Motion also fails on the second prong of the <u>prima facie</u> case test: none of the cited articles specifies that the reporters' source was the government or a federal agent, and all of the information in the articles could just as likely have come from non-governmental sources. <u>Cf.</u> <u>Barry</u>, 865 F.2d at 1320 (articles cited "law-enforcement officials familiar with [Mayor Barry's] testimony" in grand jury, and "knowledgeable law enforcement official"). The Motion ignores this requirement, emphasizing instead the phrases the journalists used to describe their sources: "with direct knowledge of the matter," Ex. E to Apr. 7 Ltr., at 3,[4] "briefed on the investigation," Ex. D to Apr. 7 Ltr., "familiar with the probe," Ex. C to Apr. 7 Ltr., and "not authorized to speak publicly on the matter [the June 22, 2016 search]," Ex. A to Apr. 7 Ltr., at 2; <u>see</u> Apr. 7 Ltr. at 4. None of these phrases describes law enforcement exclusively, a point reinforced by the October 13, 2015 email attached hereto as Exhibit J in which a journalist offered to describe Nordlicht himself in a forthcoming profile as an unnamed "person familiar with the matter." <u>See</u> Exhibit J at 1. Further, although Nordlicht equates the phrase "not authorized to speak publicly on the matter" of the Platinum Search with the source's being "bound to secrecy," that conclusion is based on pure speculation. <u>See, e.g.</u>, <u>Barry</u>, 865 F.2d at

---

[4] Notably, this same article reported that "a spokeswoman for Brooklyn prosecutors" "declined to comment for this story." Ex. E to Apr. 7 Ltr., at 3. Another of the cited articles included a nearly identical statement. <u>See</u> Ex. D to Apr. 7 Ltr., at 2 ("spokeswoman for the US Attorney in Brooklyn[] declined to comment"). <u>See</u> <u>Skelos</u>, 2015 WL 6159326, at *11 (holding that defendants had not established a prima face case where "[N]one of the news articles . . . indicates that a government attorney or agent was the source of the information, and at least one explicitly states that the U.S. Attorney's Office and FBI representatives declined to comment.").

1320 (failing to base prima facie case on cited articles that "refer[] to no federal sources as having provided [the relevant] information" or in which "only 'sources,' not 'Government sources' are listed as providing such information"); In re Grand Jury Investigation (Lance), 610 F.2d at 219 n.14 (where movant seeks to dismiss indictment on basis of alleged Rule 6(e) violation, and government supplies rebuttal affidavit, "courts have been reluctant to find that references by newspaper articles to general sources, such as 'officials,' 'informed sources,' or 'sources close to the investigation,' sufficiently implicated persons associated with the government to warrant such relief"). Nordlicht also argues that "it is implausible that any other person" besides, presumably, the government or federal agents, "could have known this kind of sensitive information about the grand jury's 'strategy or direction,'" Apr. 7 Ltr. at 4 (citing Dow Jones, 142 F.3d at 500), but fails to specify what he means by "this kind of sensitive information about the grand jury's strategy or direction." These conclusory claims, untethered to specific language in the cited articles, are insufficient to establish a prima facie case.

Moreover, there were multiple other potential sources of the information contained in the cited articles than Rule 6(e)-protected information. See Skelos, 2015 WL 6159326, at *12 (finding that "the scope and nature of this case undermines the assumption that information included in the articles could only have come from the Government" and noting that, "[i]n the months leading up to the grand jury, the Government issued subpoenas to more than 100 individuals and entities, interviewed approximately 20 individuals in connection with the investigation, and had been in conversation with legal counsel representing many of those parties"). First, as noted above and in the Cooley Declaration, the government conducted voluntary interviews of several individuals, including whistleblowers. The questions asked of individuals with whom the government met necessarily revealed the nature and direction of the

government's own investigation.   Such individuals and, in many cases, their attorneys therefore knew of the existence of the U.S. Attorney's Office for the Eastern District of New York's fraud investigation of Platinum and individuals associated with it, including Nordlicht.   ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████   All of the foregoing individuals, none of whom was bound by Rule 6(e)'s secrecy requirement, and anyone with whom they discussed the subpoena, knew of and could have supplied the information contained in the news articles.

In addition, the attachments to the search warrant left with counsel at Platinum's offices on June 22, 2016 indicated the focus of the government's investigation, including Platinum's valuation of its assets, its audit process and financial transactions involving its funds. The first name in the list of individuals identified in the warrant's attachments was Nordlicht, which undercuts the defendants' claim that Nordlicht's status as a target of the investigation could have derived only from protected Rule 6(e) material.   The formatting of the text in these documents alone could have revealed to someone familiar with the respective practices of the U.S. Attorney's Offices for the Eastern and Southern Districts of New York that the search warrant derived from the Eastern District.   Anyone who saw or was informed of these search warrant documents could have supplied the information contained in the news articles.

Finally, several of the cited articles themselves identify a range of sources for the information reported.   See also, e.g., Ex. C to Apr. 7 Ltr., at 5 ("This account of Platinum's affairs is based on audits and other documents reviewed by The Wall Street Journal and

interviews with more than a dozen current and former investors and employees of Platinum, as well as others familiar with the investigation."); Ex. E to Apr. 7 Ltr., at 5 (identifying, among its sources for the article, "three people involved with [Platinum's California oil fields] operation . . . who asked not to be named discussing the private business," Platinum's "audited financial statements," and "[a] person close to Platinum").

The news articles that predated those cited in the Motion, and Nordlicht's communications in 2015 and 2016 with reporters who wrote several of the cited articles, further undermine the defendants' argument that the information in those articles could only have been disclosed to the reporters in violation of Rule 6(e). As early as the October 2015 article of Zeke Faux and the April 2016 article of Lawrence Delevingne, those reporters were themselves investigating, or at least expressing skepticism about, Platinum's consistently high returns and valuation of its assets, and Faux's email to Nordlicht in October 2015 in particular focused on PPVA's investments in oil and energy companies including Black Elk and Golden Gate Oil. See Exhibits C-E. Even Nordlicht corresponded regularly with the relevant journalists on subjects including valuation of PPVA's largest investments. This evidence proves that the journalists who wrote the cited articles were far from restricted in receiving the relevant information to sources bound by Rule 6(e).

Because, for the reasons stated above, the defendants have failed to establish a prima facie case of a Rule 6(e) violation, there is no basis for holding a hearing on the Motion. The government respectfully submits that, upon consideration of both the fatal deficiencies in the defendants' Motion and the government's rebuttal evidence — including the contents of the Cooley Declaration and other evidence described herein and contained in the attached exhibits — the Court should find that the defendants have not made out the requisite prima facie showing

17

to warrant further proceedings on the Motion.   For the foregoing reasons, the Motion should be

denied in its entirety without a hearing.

THE MOTION SHOULD BE DENIED WITHOUT A HEARING BECAUSE<br>THE DEFENDANTS HAVE NOT SHOWN — AND CANNOT SHOW — PREJUDICE

Even assuming <u>arguendo</u> that the Rule 6(e) violations alleged in the Motion

occurred, the Motion nonetheless should be denied without a hearing because the defendants

have not established — and cannot establish — prejudice.

I.    <u>Applicable Law</u>

To the extent that a defendant seeks a remedy for an alleged violation of Rule

6(e), he must first be able to show that the error was not harmless and that he has been prejudiced

as a result of the alleged misconduct.   <u>See generally</u> Fed. R. Crim. P. 52(a) ("Any error, defect,

irregularity, or variance that does not affect substantial rights must be disregarded.").   The

Supreme Court has made clear that "a federal court may not invoke supervisory power to

circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)."

<u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250, 254 (1988) (rejecting defendant's request to

dismiss indictment based on Rule 6(e) violations, including public identification of targets and

subject matter of grand jury investigation, because such violations did not prejudice defendant).

In so doing, the Court reasoned that "it would be inappropriate to devise a rule permitting federal

courts to deal more sternly with non-constitutional harmless errors than with constitutional errors

that are likewise harmless."   <u>Id.</u> at 255; <u>United States v. Mechanik</u>, 475 U.S. 66, 71-72 (1986);

<u>accord</u> <u>United States v. Carter</u>, No. 04-CR-594 (NRB), 2005 WL 180914, at *4 (S.D.N.Y. Jan.

25, 2005).

Further, while a court may use its supervisory powers to fashion remedies for a

Rule 6(e) violation that results in prejudice to the defendant, those remedies should be tethered to

18

the alleged misconduct — and not simply result in "a windfall for the unprejudiced defendant." See In re United States of America, 441 F. 3d 44, 60 (1st Cir. 2006) (quoting Bank of Nova Scotia, 487 U.S. at 253). A court may not disregard the doctrine of harmless error "to chastise what the court view[s] as prosecutorial overreaching." Id. Indeed, when a knowing violation of Rule 6 is found, the remedy provided by the Rule is contempt as to the wrongdoer, not a "windfall" to any target of the investigation. See Fed. R. Crim. P. 6(e)(7) ("A knowing violation of Rule 6 . . . may be punished as a contempt of court"); see also United States v. Regan, 706 F. Supp. 1102, 1120 (S.D.N.Y. 1989) (appropriate sanction for Rule 6(e) violation was contempt, not suppression of fruits of warrant).

As the Supreme Court explained in its seminal decision on this issue, Bank of Nova Scotia, the same rationale that underlies the "harmless error" standard for trials applies to grand jury proceedings, namely: (1) it is not necessary to dismiss an indictment where "the [indictment] would have been obtained notwithstanding the asserted error[;]" (2) deterrence is "an inappropriate basis" for dismissal of an indictment where more "narrowly tailored" means can address the misconduct; and (3) concerns about the integrity of the process carry less weight absent a showing of prejudice. 487 U.S. at 255-56 (internal quotation marks omitted). Thus, the Supreme Court held that a district court "exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." Id. at 255; see also United States v. Eisen, 974 F.2d 246, 261 (2d Cir. 1992) (holding that "defendant seeking reversal or a hearing regarding alleged grand jury abuse must show prejudice or bias" (emphasis added)); United States v. Friedman, 854 F.2d 535, 583-84 (2d Cir. 1988) (in the absence of showing of prejudice, district court's refusal to grant post-trial relief for alleged grand jury leaks without a hearing was not error).

The Bank of Nova Scotia Court also articulated the standard for assessing prejudice: "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." 487 U.S. at 255 (quoting Mechanik, 475 U.S. at 78). That prejudice standard is a high one. In Bank of Nova Scotia, the Court determined that the standard was not met even though the trial court had affirmatively found violations of Rule 6(e) — including improperly instructing grand jury witnesses that they could not reveal the substance of their grand jury testimony; allowing simultaneous appearances by two Internal Revenue Service ("IRS") agents before the grand jury; violating the witness immunity statute through the use of "pocket immunity"; and causing IRS agents to mischaracterize testimony in prior proceedings. Id. at 257-58. Notwithstanding all of the above, the Supreme Court concluded:

> In considering the prejudicial effect of the foregoing instances of alleged misconduct, we note that these incidents occurred as isolated episodes in the course of a 20-month investigation, an investigation involving dozens of witnesses and thousands of documents. In view of this context, those violations that did occur do not, even when considered cumulatively, raise a substantial question, much less a grave doubt, as to whether they had a substantial effect on the grand jury's decision to charge. Errors of the kind alleged in these cases can be remedied adequately by means other than dismissal.

Id. at 263.

The defendants cite no case — and the government is aware of none — in which a court found the foregoing standard met, and dismissed the indictment, on the basis of a Rule 6(e) violation. As set forth above, the Supreme Court denied such a motion in Bank of Nova Scotia, 487 U.S. at 259-60 ("[I]t is plain that these alleged breaches [of Rule 6(e)] could not have affected the charging decision."), as did the Second Circuit (albeit on a motion raised post-trial) in Friedman, 854 F. 2d at 582, 584 ("[A]ssum[ing] arguendo that the government persistently

leaked information about grand jury proceedings to the press in an unethical and unlawful campaign . . . appellants simply cannot show resultant prejudice from the publicity surrounding the grand jury proceedings."). Further, most recently in the Walters case,[5] Judge Castel denied the defendant's motion to dismiss the indictment despite the existence of a Rule 6(e) violation because he found that the defendant was not prejudiced. See United States v. Walters, Mem. & Order dated Mar. 1, 2017, No. 16-CR-338 (PKC), ECF No. 104 (S.D.N.Y.) ("Walters Mem."), at 13 ("While Walters has made an unrebutted prima facie case of grand jury leaks, he has failed to show, despite efforts, that he was prejudiced."); id. at 15-16 ("[T]he FBI's investigation into Walters' allegedly illegal activities has been long and complex, involving many FBI agents and many targets. The necessarily limited effect of the leaks on such a complex investigation that required gathering a wealth of evidence weighs against dismissal.").

II.    Discussion

        Even assuming arguendo that Rule 6(e)-protected information was disclosed to the press as alleged in the Motion, the Motion nevertheless fails for lack of prejudice. In a series of conclusory assertions, the defendants claim that the cited articles "sow[ed] doubt in the marketplace about Platinum's investments and artificially suppress[ed] valuations," "unavoidably" "tainted" the "grand jury's deliberations" with "evidence that would not exist but for the articles," and "prevented Platinum's investments from ever realizing their full value, which harm[ed] investors and depriv[ed] Mr. Nordlicht of evidence that would have contradicted accusations in the Indictment." Apr. 14 Ltr. at 2. On these grounds, and because the news

---

[5]        In Walters, the defendant alleged disclosures of, inter alia, telephone and trading records obtained by grand jury subpoena and details relating to the service of subpoenas on specific individuals and entities, along with disclosures of a Title III wiretap.

articles "poison[ed] the jury pool," the defendants contend that dismissal of Counts One through Five of the indictment is the only "adequate remedy" for the alleged Rule 6(e) violation.   Id.

The defendants fail to allege how the cited news articles "suppressed valuations" of any of Platinum's funds, and they identify no specific assets that were "prevented from realizing their full value."   Nor could the defendants make such a showing.   As noted above, the signs of PPVA's imminent demise were public well before the cited articles were published. By late 2014, as the indictment alleges, PPVA was struggling to meet investors' redemption requests, and Platinum increasingly paid redemptions late, if at all, a problem that became progressively worse as more and more investors sought to pull their money out of the fund in 2015 and 2016.   See, e.g., Ind. ¶¶ 58, 60-63.   Investors were openly complaining about not being paid their past-due redemptions.   PPVA instituted its side pocket in late 2015, causing investors additional distress.   In Nordlicht's and Landesman's own emails, their mounting concerns about the condition of the fund were explicit, to the point that Nordlicht contemplated fleeing with his family to Israel in mid-December 2015 and Landesman encouraged him to do so. Ind. ¶ 67.   Most tellingly, the week before the execution of the search warrant at Platinum's offices on June 22, 2016, Nordlicht told PPVA investors himself that he was winding down PPVA.   This call occurred before the first of the cited articles was published; in fact, Nordlicht's statements on the call are quoted in the article.   See Ex. F to Apr. 7 Ltr., at 2-4.

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

In light of the foregoing facts, some of which Nordlicht conceded in his own statements on a call with investors, the defendants have not demonstrated that the alleged Rule 6(e) violation substantially influenced the grand jury's decision to indict, or established grave doubt that the decision to indict was free from the substantial influence of such a violation. <u>See</u> 487 U.S. at 255-56;[6] <u>United States v. Bellomo</u>, 944 F. Supp. 1160, 1168 (S.D.N.Y. 1996) (despite finding Rule 6(e) violation, denying motion to dismiss indictment because "there is no evidence that the [disclosure] influenced the grand jury's decision to indict"). Because the defendants failed to show prejudice, their motion to dismiss Counts One through Five of the indictment should be denied.[7]

---

[6] The defendants also suggest, as an alternative basis for dismissing Counts One through Five, that the Court should find that "leaks by government agents are an increasingly common and vexing problem," Apr. 14 Ltr. at 2 n.1, and that there has been "recurring government misconduct spanning several cases," <u>id.</u> (citing <u>Bank of Nova Scotia</u>, 487 U.S. at 259 (stating in dicta, "we note that we are not faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process that resulted in the indictment")). The defendants cite to no case in which an indictment was dismissed on the foregoing theory, and in any event, they have failed here to allege misconduct "so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process" that resulted in the instant indictment. <u>Id.</u>

[7] The defendants seek, in the alternative, "[s]uppression of evidence collected during the June 22, 2016 search of Platinum's office and other evidence that was leaked, and preclusion of government arguments that rely on such evidence." Apr. 14 Ltr. at 3 (citing <u>United States v. Coughlan</u>, 842 F.2d 737, 740 (4th Cir. 1988)). Evidence seized pursuant to a search warrant does not constitute "matters occurring before the grand jury" under Rule 6(e). As to any actually protected Rule 6(e) evidence, as argued above, the defendants have failed to point to any Rule 6(e) material contained in the cited news articles that would be subject to suppression. Moreover, in <u>Coughlan</u>, where a transcript of a grand jury witness's testimony was attached to a public filing by the government in a civil forfeiture proceeding, the appellate court did not even hold that suppression of the disclosed testimony was required. <u>See</u> 842 F.2d at 740. Finally, to the extent the defendants also seek trial-related remedies, <u>see</u> Apr. 14 Ltr. at 3 & n.2, as the district court found in <u>United States v. Myers</u>, 510 F. Supp. 323, 324 n.1 (E.D.N.Y. 1980) (denying motion to dismiss indictment on basis of pre-indictment press), the defendants' concerns regarding trial are "both speculative and premature" and there is "no need to address [them] at the present time."

## THE DEFENDANTS' SWEEPING REQUEST FOR DISCOVERY IN CONNECTION WITH THEIR MOTION IS CONTRARY TO LAW AND SHOULD BE DENIED

Finally, the defendants' broad discovery request should be denied because the defendants have not made out a prima facie case of a Rule 6(e) violation.  See, e.g., Skelos, 2015 WL 6159326, at *12 ("[T]he Court concludes that Defendants have failed to make a prima facie showing of a Rule 6(e) violation and therefore are not entitled to discovery or a hearing on this issue.").  The sole case cited in the Motion in support of their discovery request granted the movants' discovery request relating to their allegation of a Rule 6(e) violation after the district court had concluded that, on both the facts and the law, a violation of Rule 6(e) had occurred.  See United States v. Pimental, 199 F.R.D. 28, 31 (D. Mass. 2001).   In Pimental, the government conceded the relevant disclosures had been made but merely argued that the party to whom disclosures had been made — a private investigative agency — fell within the definition of "government personnel" for whom an exception to Rule 6(e)'s non-disclosure requirement applied under Rule 6(e)(3)(A)(ii).  Id.

Even if the Court found a prima facie case of a Rule 6(e) violation, the defendants may not use discovery as a sword to achieve a strategic windfall.   Rather, the government's "evidence should be submitted ex parte and in camera for the district court's review."   In re Sealed Case No. 98-3077, 151 F.3d 1059, 1075-77 (D.C. Cir. 1998) (holding that "show cause hearing in this instance should not proceed in a fully adversarial manner when only a prima facie case has been made[;]" and noting that "[t]he procedure we have outlined is designed to 'allow the court to focus on the culpable individual rather than granting a [discovery] windfall to the movants'") (quoting Bank of Nova Scotia, 487 U.S. at 263) (brackets in original); see also In re Grand Jury, 103 F.3d 1140, 1145 (3d Cir. 1997) ("Ex parte in camera hearings have been held proper in order to preserve the ongoing interest in grand jury secrecy."); In re

<u>Grand Jury Investigation (90-3-2)</u>, 748 F. Supp. at 1206 ("The evidentiary hearing in the end

may subvert the interests Rule 6 is designed to protect.").

Accordingly, the defendants' discovery request should be denied in full.

CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court

should deny the defendants' Motion in its entirety without a hearing.[8]

Dated: Brooklyn, New York
      April 26, 2017

                                  Respectfully submitted,

                                  BRIDGET M. ROHDE
                                  Acting United States Attorney
                                  Eastern District of New York

                                    /s/
                                  Alicyn L. Cooley
                                  Lauren H. Elbert
                                  Sarah M. Evans
                                  Assistant U.S. Attorneys
                                  (718) 254-6389 (Cooley)

Cc:    Clerk of the Court (DLI)
        All Counsel (By ECF)

---

[8]    The government respectfully requests that it be permitted to file and provide to
the defendants, through counsel, redacted versions of the instant memorandum and the Cooley
Declaration that accord with the restrictions of Rule 6(e)(2)(B)(vi).   The government also
respectfully requests that the Court enter an order pursuant to Rule 6(e)(3)(E)(i) directing the
government to file or provide to the defense unredacted copies of these documents in the event
that the Court deems it appropriate to do so.   <u>See</u> Fed. R. Crim. P. 6(e)(3)(E)(i) ("The court may
authorize disclosure — at a time, in a manner, and subject to any other conditions that it directs
— of a grand-jury matter . . . preliminarily to or in connection with a judicial proceeding[.]").