UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>MARK NORDLICHT,<br>DAVID LEVY,<br>URI LANDESMAN,<br>JOSEPH SANFILIPPO,<br>JOSEPH MANN,<br>DANIEL SMALL, and<br>JEFFREY SHULSE,<br><br>      Defendants. |

No. 16-cr-640 (DLI)

**DEFENDANT MARK NORDLICHT'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION REGARDING POTENTIAL VIOLATIONS OF RULE 6(E)**

# TABLE OF CONTENTS

                                                                           **Page**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ...................................................................................................................................2

I. INSTEAD OF OFFERING EVIDENCE TO REBUT THE LEAKS, THE GOVERNMENT SECOND-GUESSES THE COURT'S DECISION TO HOLD AN EVIDENTIARY HEARING. ..................................................................................2

II. THE GOVERNMENT'S ATTEMPT TO DECOUPLE LAW ENFORCEMENT ACTIONS FROM THE GRAND JURY PROCESS IS UNAVAILING. ...........................5

III. THE LEAKS PREJUDICED THE DEFENDANTS. ........................................................7

CONCLUSION ..............................................................................................................................10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Barry v. United States*,
  865 F.2d 1317 (D.C. Cir. 1989) ..................................................................................... 2, 3

*In re Grand Jury Subpoena*,
  103 F.3d 234 (2d Cir. 1996) ........................................................................................... 6, 7

*In re Grand Jury Subpoena*,
  920 F.2d 235 (4th Cir. 1990) ............................................................................................... 6

*In re Sealed Case No. 98-3077*,
  151 F.3d 1059 (D.C. Cir. 1998) ...................................................................................... 2, 7

*United States v. Pimental*,
  199 F.R.D. 28 (D. Mass. 2001) ............................................................................................ 7

*United States v. Skelos*,
  No. 15-cr-317, 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .......................................... 5, 6

**Rules**

Federal Rule of Criminal Procedure 6 ................................................................................ *passim*

Defendant Mark Nordlicht respectfully submits this reply memorandum of law in further support of his motion regarding potential violations of Fed. R. Crim. P. 6(e).

## PRELIMINARY STATEMENT

The government fails to recognize that the Court already found the record sufficient to warrant an evidentiary hearing, and, as a result, it devotes the bulk of its opposition to arguing what is already a settled issue. The government argues at length that the leaks *could have* been unrelated to the grand jury investigation and that the leakers *could have* been sources other than government agents. Dkt. No. 122 ("Opp."), at 8–18. But at this stage, in light of the Court's order to show cause, the government's burden is not to argue what *could have* happened. Instead, it must offer evidence demonstrating what *did*, as a matter of fact, happen. By failing to heed the Court's order, the government's opposition is inapt and insufficient to meet its burden.

Having failed to demonstrate the absence of leaks, the government attempts to distinguish between the investigation by the grand jury and the investigation by the FBI and U.S. Postal Inspectors. Opp. 11–14. But the distinction in this case is illusory. The limited evidence available demonstrates that, unlike the decisions to which the government cites, law enforcement in this case was not acting independently of the grand jury; it was acting to support it.

Finally, the government's argument that the leaks did not prejudice the defendants blinks reality. In a series of *non sequiturs*, the government posits that the leaks did not harm the value of Platinum's investments because the fund had pre-existing liquidity challenges. Opp. 22. But Platinum's alleged difficulty in paying redemptions has no logical connection to the value of its investments. By contrast, suggesting that Platinum was under investigation as a "Ponzi scheme"—the financial equivalent of yelling "fire" in a crowded theater—and for overvaluing investments improperly depressed the value of those assets. By distorting the performance of Platinum's investments, the leaks deprived the defendants of evidence that would have

1

corroborated the initial valuations that the government alleges were fraudulent. Such destruction of exculpatory evidence is the epitome of prejudice. This case thus represents a clear instance of Rule 6(e) violations that cause demonstrable prejudice to the defendants.

Mr. Nordlicht notes that he has prepared this reply without having seen the redacted and sealed information in the government's opposition, which is the subject of a limited unsealing request that is currently pending, Dkt. No. 125. If the Court grants that request, Mr. Nordlicht respectfully requests an opportunity to address the matters currently under seal in a supplement.

## ARGUMENT

### I. INSTEAD OF OFFERING EVIDENCE TO REBUT THE LEAKS, THE GOVERNMENT SECOND-GUESSES THE COURT'S DECISION TO HOLD AN EVIDENTIARY HEARING.

As explained in Mr. Nordlicht's April 14, 2017 letter, the necessary predicate of the Court's order to show cause was that Mr. Nordlicht had met the "relatively light" burden to establish a *prima facie* case of Rule 6(e) violations. Dkt. No. 112, at 1; *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1067–68 & n.7 (D.C. Cir. 1998) (burden to make *prima facie* case and obtain evidentiary hearing "is relatively light"). As a result of the Court's order, the government was required "to come forward with evidence to negate the *prima facie* case." Dkt. No. 112, at 1 (citing *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989)). That is, the government was obligated to put forth evidence that the grand jury material was not leaked by government agents.

The government does not dispute these principles, *see* Opp. 9 (citing *Barry*), yet it devotes the bulk of its opposition to arguing that the Court was wrong to order an evidentiary hearing because Mr. Nordlicht has not set out a *prima facie* case. *See id.* at 8–18 ("[T]he defendants have failed to establish a prima facie case of a Rule 6(e) violation, [so] there is no basis for holding a hearing on the Motion."). Indeed, the government's primary arguments are (1) the information in the articles *could have* related to the FBI's and Postal Inspectors'

2

investigation, as opposed to the grand jury investigation (an imaginary distinction discussed below in Section II), Opp. 12; and (2) the source of the leaks *could have* been sources other than government agents, *id.* at 14. But at this stage, in light of the Court's order to show cause, it is not sufficient for the government to argue what *could have* happened; its burden now is to come forward with evidence that shows what *did* happen. Dkt. No. 112, at 1; *Barry*, 865 F.2d at 1321.

To the extent the government does offer evidence, it falls woefully short of meeting its burden at this stage. The only evidence the government has offered is the Declaration of Assistant United States Attorney Alicyn L. Cooley, which includes her representation that the prosecutors and agents directly involved in the case denied leaking grand jury information to the press. Cooley Decl. ¶¶ 11–13, Dkt. No. 122-1. But much like the government's initial declaration in *United States v. Walters*, which included denials only from people with day-to-day responsibility for the investigation but no one from the senior ranks of the FBI or the U.S. Attorney's Office, the Cooley Declaration "confine[s] itself to denials from limited sources." *See id.*; Dkt. No. 107-8, at 20. The Cooley Declaration does not extend beyond the prosecutors directly responsible for the investigation and the day-to-day case agents and their direct supervisors. Cooley Decl. ¶¶ 11–13. Similar "denials from limited sources" did not suffice in *Walters* to avoid an evidentiary hearing, and they certainly do not suffice here to demonstrate, as a matter of fact, the absence of Rule 6(e) violations.

The superficiality of the Cooley Declaration is particularly remarkable given that (1) the government has now admitted that Special Agent David Chaves, who admitted to leaking in the *Walters* case, was a member of the FBI team responsible for this case, *id.* ¶ 4;[1] (2) Special Agent

---

[1] The Cooley Declaration states that Special Agent Chaves was a supervisor during "at least some of the investigation." *Id.* ¶ 4. In fact, he held his supervisory position until only days before the Indictment in this case. *Compare* Dkt. No. 107-9, at 1 (Special Agent Chaves did not reveal his conduct until Dec. 6, 2016) *with* Indict., Dkt. No. 1 (dated Dec. 14, 2016).

3

Tracie Razzagone, the "direct supervisor" in this case, *id.*, was also part of the *Walters* team, *see* Bharara News Conference: Gambler Charged in Insider Case, Bloomberg (May 19, 2016), https://goo.gl/8DQ4zd (at 10:56: "I would also like to thank and congratulate the investigative team . . . including: . . . Supervisory Special Agents David Chaves and Tracie Razzagone."); and (3) the government represented at the March 27, 2017 conference that it was conducting an internal investigation, Tr. 35:21–36:5 ("[W]hen we received counsel's letter [regarding potential violations of Rule 6(e)], we obviously took it seriously and we began a process of looking into it, which is ongoing. We have begun that process, and it continues."). But the Cooley Declaration stands in stark contrast to prosecutors' investigation in *Walters*, where they:

- "[C]ollected and reviewed thousands of emails and text messages, and records of phone calls sent or received by" (1) the individuals "involved in the [i]nvestigation" of Mr. Walters, (2) "the individuals likely to have had contact with the press regarding" that investigation, and (3) "the individuals to whom they reported";
- "After collecting and reviewing that material," interviewed seven individuals from the U.S. Attorney's Office during the relevant time period, including, among others, the United States Attorney, the Deputy United States Attorney, the Chief Counsel to the United States Attorney, and the senior leadership of the relevant unit;
- And interviewed seven individuals from the FBI during the relevant time period, including, among others, the Assistant Director in Charge of the New York Field Office (the highest-ranking member of the New York Field Office), the Special Agent in Charge of the Criminal Division of the New York Field Office, and other supervisors including Special Agent Chaves (but not Special Agent Razzagone).

Dkt. No. 107-9, at 2–3. It thus appears that the government does not take this matter "seriously" enough to follow the practice it adopted just a few months ago in investigating potential violations of Rule 6(e) in *Walters*, notwithstanding the involvement of the same FBI supervisors, including one who has admitted to leaking to the press.

Indeed, far from demonstrating the absence of government leaks, the government's opposition actually provides further evidence of such leaks. The government submitted an email from Zeke Faux of Bloomberg to Mr. Nordlicht at 10:17 a.m. on June 22, 2016 asking about the government's search of Platinum's office. Opp., Ex. I (Mr. Faux: "Was the FBI at platinum

4

today / Hearing they were / What did they take what are they looking for"). This email demonstrates the remarkable fact that Mr. Faux was aware of the search mere *minutes* after the agents arrived. Given, among other things, that it is standard FBI practice to secure mobile phones and computers when conducting a search and seizure of such media, *see id.*, Ex. B, at 3–4 (listing computers and mobiles phones as items to be seized), it is implausible that a Platinum employee could have alerted Mr. Faux to the government's presence. Indeed, as the subsequent email correspondence in Exhibit I demonstrates, Mr. Faux knew about the raid even before Mr. Nordlicht, whom Platinum employees surely would have contacted before tipping off a Bloomberg reporter. *Id.*, Ex. I (Mr. Nordlicht: "Not aware anyone showed up today . . . ."). This timing confirms that government agents gave Mr. Faux advance notice of the search.

## II. THE GOVERNMENT'S ATTEMPT TO DECOUPLE LAW ENFORCEMENT ACTIONS FROM THE GRAND JURY PROCESS IS UNAVAILING.

Faced with the strong evidence of leaks in the articles and in its own submission, the government attempts to argue that the disclosures related to a separate law enforcement investigation, rather than the grand jury. The government makes much of *United States v. Skelos*, No. 15-cr-317, 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015), which dealt with leaks that, for example, pre-dated the convening of the grand jury[2] and related to a pre-indictment "draft … criminal complaint being prepared by the Government" to support a court-issued arrest warrant. *Id.* at *10–*11; Opp. 10. Such materials plainly do not implicate the grand jury. *Skelos* thus stands for the unremarkable proposition that information regarding a government investigation that is independent of and predates the grand jury does not become Rule 6(e) material, "even if the same information might later be presented to the grand jury." 2015 WL 6159326, at *10.

In its opposition, however, the government extends this principle to argue that

---

[2] *See* Opp. to Pretrial Mots. at 80, *Skelos*, No. 15-cr-317 (S.D.N.Y. Sept. 25, 2015) (Dkt. No. 27) ("no grand jury was hearing evidence as of" date of report that defendants argued reflected leaks).

5

information does not constitute a grand jury matter so long as it "*could have* derived … from sources other than the grand jury's investigation." Opp. 12 (emphasis added). Of course, the government's burden at this stage is to show that the information, as a matter of fact, *did* derive from a source other than the grand jury, not that it theoretically *could have* done so. *See supra* at 2–3. But in any event, not all alternative sources are outside Rule 6(e)'s purview. To be sure, where a government investigation is "*truly independent* of the grand jury proceedings," *In re Grand Jury Subpoena*, 920 F.2d 235, 242 (4th Cir. 1990) (emphasis added), and the disclosures relate to such an independent investigation, there is no Rule 6(e) violation. *Skelos* involved leaks that were "truly independent" of the grand jury in that they predated the grand jury and related to a draft criminal complaint. But where "governmental investigations … [a]re not so separate from the grand jury process as to be considered unrelated to or not to affect the process," they are subject to Rule 6(e). *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996).

Here, the government has not made the requisite factual showing that its investigation in this case was independent of the grand jury. Indeed, the search warrant itself, which the government's own submission demonstrates was the subject of a leak, *see supra* at 4–5, illustrates how the investigations were intertwined. In the affidavit offered in support of the warrant, FBI Special Agent Craig Minsky explained that the grand jury had subpoenaed Platinum, but the government appeared to be concerned that Platinum would not respond. *See* Declaration of William A. Burck, Ex. A, ¶ 6. Special Agent Minsky explained that although Platinum had "informed the government that they will respond to the subpoena," Platinum had also announced to investors (but not to the government) that it "intend[ed] to unwind its main hedge fund." *Id*. As a result, the government sought a warrant to "seiz[e] the information called for by the June 8, 2016 subpoena . . . ." *Id.* Indeed, the property to be seized was nearly identical to the materials

6

subpoenaed by the grand jury itself. *Compare* Opp., Ex. B, at 2–3 ¶ 1 (including, among other things, "performance and valuation summaries"; "records, including communications to investors and auditors, concerning Platinum's assets under management, the investments in its portfolios, the valuation of assets, and the performance of the investments"; and "audit reports and valuation reports, concerning Platinum's investments") *with* Burck Decl., Ex. B, at 3 (same, except audit and valuation reports limited to six specific investments). In other words, the June 22 search was specifically designed to obtain the same evidence subpoenaed by the grand jury.

The government's attempt to distinguish between the grand jury's and law enforcement's investigations thus is unavailing. Far from conducting a "truly independent" investigation, the evidence suggests that law enforcement was acting as an adjunct of the grand jury. "[D]isclosure of a search warrant affidavit . . . where it was obtained independently from the grand jury and did not disclose matters occurring before the grand jury" does not violate Rule 6(e). *Grand Jury Subpoena*, 103 F.3d at 238–39. The search warrant in this case, however, was, on its face, designed to obtain evidence for use by the grand jury. Leaking it to the press violated Rule 6(e). *Id.*

## III. THE LEAKS PREJUDICED THE DEFENDANTS.

As explained in Mr. Nordlicht's April 14, 2017 letter, it is difficult at this stage to fashion an appropriate remedy while the government continues to stonewall on discovery about the potential leaks. *See* Dkt. No. 112, at 2–3; *Sealed Case 98-3077*, 151 F.3d at 1076–77 & n.21 (if "the district court determines that a violation of Rule 6(e)(2) has occurred . . . [t]he movants may then participate in determining the appropriate remedy," at which point an "adversarial presentation may be appropriate, since what appears to be harmless to a district judge may be prejudicial if seen in light of a defense counsel's special familiarity with a given prosecution" (quotation marks and citations omitted)); *United States v. Pimental*, 199 F.R.D. 28, 37 (D. Mass. 2001) (defendants "entitled to discovery to determine the scope and possible impact of the Rule

7

6(e) violations"). The government argues it should not be compelled to produce discovery because (1) Mr. Nordlicht has not made a *prima facie* showing of a violation of Rule 6(e) and (2) discovery would be a "strategic windfall." Opp. 24–25. Both arguments reflect the government's second-guessing of the Court's decision. First, the Court has already found that Mr. Nordlicht made a *prima facie* case by ordering a show cause hearing. *See supra* at 2–3. Second, the Court has not ordered an *ex parte*, *in camera* hearing, which is the fundamental premise of the principle on which the government relies, *see* Opp. 24, but instead, the kind of evidentiary hearing contemplated in *Walters*, *see* Burck Decl., Ex. C, at 2.

In any event, the government is mistaken when it argues that Mr. Nordlicht is not entitled to a remedy because the leaks did not cause prejudice. Opp. 21–22. The central conceit of the first five counts of the Indictment is that Platinum overvalued its investments. Indict. ¶¶ 43–52. According to the government, the alleged overvaluations "caused a liquidity crisis at the fund," *id.* ¶ 53, leading to further alleged frauds as the defendants attempted to manage those liquidity problems, *id.* ¶¶ 54–72. The first five counts thus all derive from the alleged overvaluations. As a result, government misconduct that affected the value of Platinum's investments prejudiced the defendants by impairing their ability to demonstrate the valuations were reasonable. Inflammatory articles reporting that, for example, Platinum was under investigation as a "Ponzi scheme" and for overvaluing investments distorted the assets' market values and prevented them from performing as expected when Platinum initially assessed the valuations. In other words, the leaks deprived the defendants of exculpatory evidence that would corroborate the accuracy of the valuations.

For example, the leaks caused demonstrable harm to Platinum's investment in Northstar Offshore Group, which is discussed in the Indictment, *see* Indict. ¶¶ 51–52, 57. In the summer of 2016, Platinum had devised and was implementing a plan that would have addressed ongoing

difficulties at Northstar by, among other things, selling it to a New York Stock Exchange-listed company in a deal that would have generated significant returns for Platinum's investors. However, the incendiary Ponzi scheme leak in the July 28, 2016 New York Post article, Dkt. No. 107-4, made it all but impossible to implement Platinum's recovery strategy. Following the article, Northstar's creditors reacted swiftly by filing for liens on the company's assets and threatening other litigation. Burck Decl., Ex. D, at 1. When the Bloomberg article two weeks later discussed the investigation into Platinum's valuations, Dkt. No. 107-5, it pushed Northstar over the edge. The very next day, Northstar creditors placed it in bankruptcy. Involuntary Pet., *In re Northstar Offshore Group, LLC*, No. 16-34028 (Bankr. S.D. Tex. Aug. 12, 2016) (Dkt. No. 1).

This kind of prejudice requires dismissal of Counts One through Five. Government misconduct that alters the facts available to the grand jury and deprives defendants of exculpatory evidence can be remedied only through dismissal of the charges premised on the distorted facts. Nor would such dismissal confer a windfall on Mr. Nordlicht, who would still face Counts Six through Eight. Rather, partial dismissal simply ensures that the government does not benefit from misconduct during the course of the charged conspiracy that changed the facts and eliminated exculpatory evidence.

Notably, the government does not dispute that misconduct that suppresses valuations is prejudicial. Instead, it argues that the leaks did not affect valuations because Platinum was struggling to pay redemptions in cash and had decided to unwind its main fund by the time the leaks began. Opp. 22. But unlike inflammatory news articles claiming Platinum was under investigation for being a "Ponzi scheme" and engaging in other alleged criminal conduct, there is no logical connection between ability to pay redemptions and the value of the investments.

Puzzlingly, the government even reverts to the familiar canard that Mr. Nordlicht

9

"contemplated fleeing with his family to Israel" as evidence that the leaks did not prejudice the defendants. *Id.* (citing Indict. ¶ 67). Aside from having no discernible connection to asset values, the government's persistence in making this accusation is unconscionable in light of its awareness since at least June 8, 2016 (the day the grand jury subpoenaed Platinum) that Mr. Nordlicht and his family **lived in Israel**. *See, e.g.*, Gov't Mem. of Interview of Daniel Small (June 8, 2016) ("NORDLICHT moved to Israel in or around August 2015 . . . NORDLICHT moved his entire family to Israel . . . because he always wanted to live there for a short while and because he is very religious.").[3] Indeed, in its zeal to distort evidence to create a false narrative of Mr. Nordlicht fleeing to Israel, the government presumes it must have been a typo when Defendant Uri Landesman stated he hoped Mr. Nordlicht's daughters would "reacclimate quickly." *See* Indict. ¶ 67 (inserting "[sic]" after "reacclimate"). Yet as the government was well aware, Mr. Nordlicht's daughters had been living in Israel for months and thus would indeed be *re*acclimating after a trip to New York over Hanukkah. *Compare id.* (email sent Dec. 13, 2015) *with* Jewish Calendar: December, 2015, Chabad.org, https://goo.gl/1QcjyY (Hanukkah ran from Dec. 7 to Dec. 14, 2015). As Mr. Nordlicht will address at the appropriate time, the government's resort to a knowingly false interpretation of evidence to support its case is improper, but for present purposes, it is sufficient to note that the government's invention of Mr. Nordlicht fleeing to Israel does not rebut the prejudice caused by the government's leaks.

## CONCLUSION

Mr. Nordlicht respectfully requests that the Court dismiss Counts One through Five of the Indictment or, in the alternative, order the government to produce discovery sufficiently in advance of the show cause hearing to afford the defense adequate time to prepare.

---

[3] *See also* Opp., Ex. D, at 4 (Oct. 21, 2015 Bloomberg article cited by the government: Mr. Nordlicht "recently started splitting his time between New York and Israel"); Dkt. No. 107-3, at 3 (July 25, 2016 Wall Street Journal article: Mr. Nordlicht "lives part time in Israel").

10

Dated:  Washington, D.C.  QUINN EMANUEL URQUHART
May 3, 2017  & SULLIVAN LLP

/s/ William A. Burck
William A. Burck
Daniel R. Koffmann
777 6th Street, N.W., 11th Floor
Washington, D.C. 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Mark Nordlicht*