**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16-cr-00640-DLI |
| | ) | |
| - against - | ) | ECF Case |
| | ) | |
| MARK NORDLICHT, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR REQUEST FOR A BILL OF PARTICULARS AND DISCLOSURES

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.  THE COURT SHOULD GRANT THE DEFENDANTS' REQUEST FOR A BILL
    OF PARTICULARS ...................................................................................................... 2

    A.  Legal Standard ................................................................................................... 2

    B.  The Indictment's Deficiencies Paired with the Voluminous Discovery Render
        the Defendants Unable to Effectively Prepare for Trial ................................... 4

        1.  The Indictment ...................................................................................... 4

            a.  *Alleged misrepresentations regarding the value of PPVA's assets
                (Black Elk and Golden Gate)* .............................................. 6

            b.  *Alleged misrepresentations about PPVA's liquidity* ........................... 7

            c.  *Alleged misrepresentations about certain high interest loans* ............. 7

            d.  *Alleged misrepresentations relating to redemptions* ........................... 8

            e.  *Allegations regarding Black Elk bonds* ................................................ 8

            f.  *Other missing information* .................................................................... 9

                i.  Identification of Co-Conspirators .......................................... 10

                ii.  Identification of Overt Acts ................................................... 11

        2.  The Government Cannot Satisfy Its Obligations by Drowning the Defendants
            in Documents ........................................................................................ 11

II.  REQUESTS FOR DISCLOSURES ............................................................................... 14

    A.  Requests 1, 3, 4, 7, 18-23 ................................................................................ 16

    B.  Requests 24-39, 40-44 .................................................................................... 17

    C.  Request 5 .......................................................................................................... 18

    D.  Request 6 .......................................................................................................... 19

    E.  Requests 8-17 .................................................................................................. 19

CONCLUSION ...................................................................................................................... 20

## INTRODUCTION[1]

At its core, this case is about purportedly false or fraudulent statements made by defendants in connection with the Platinum funds and the Black Elk bonds.  For forty-nine pages, the Government attempts to lay out various schemes that it alleges the defendants used to trick investors and enrich themselves.  Nowhere in this almost fifty page Indictment, however, does the Government provide the basic information substantiating each of its charges – including what each defendant purportedly lied about, when those supposed lies occurred, or to whom those alleged lies were supposedly told – that would allow the defendants to prepare to meet the Government's accusations at trial.  The Indictment – which covers a *five year period* during which the defendants as well as other Platinum and Black Elk employees engaged in *millions* of communications with investors and potential investors – instead provides only a handful of "examples" that the Government contends are fraudulent.[2]  Moreover, the examples include statements (or omissions) made by only a subset of the defendants.  If the "examples" actually identified in the Indictment represent the specific statements the Government will rely upon to seek to prove the defendants' guilt at trial, then this request for particulars is moot – all the Government needs to do is tell the defense and the Court that the "examples" are in fact the statements that will be at issue at trial.  On the other hand, if the Government will ask the jury to find any of the defendants guilty based on other statements or omissions, which at this time remain unidentified, basic fairness (and the law)

---

[1] This reply memorandum of law is in further support of Defendant Levy's July 5, 2017 letter (Dkt. No. 166), which was joined by the other defendants.  Per the Court's August 10, 2017 order, defendants Nordlicht, Landesman, SanFilippo, Mann, Small and Shulse are permitted to file a statement addressing individualized issues by August 18, 2017.

[2] To date, the Government has disclosed approximately 15 million pages of documents, and has indicated that it intends to provide additional voluminous discovery comprised of auditor work papers and privileged communications. Significantly, the discovery "indexes" to which the Government refers, *see* Gov. Br. at 5, generally contain only the Bates number ranges and the identity of the custodian rather than specific detail regarding the content of the document.

dictate that the Government must identify those other statements and omissions so that the defendants can prepare for trial.  In the absence of such disclosures, the defendants cannot possibly divine from the more than fifteen million pages of documents that the Government has said it will produce in this case, what conduct they will be required to defend at the trial.

As explained below, the defendants do not seek to improperly obtain a strategic advantage, as the Government reflexively contends.  The defendants seek only the basic information they need to prepare for trial.  This is, of course, information the Government should have readily available, as it has already charged the defendants with these serious crimes – crimes rooted in the defendants' purportedly false statements.  The information should be disclosed to defendants now, and, to the extent necessary, the Government can supplement its disclosure in advance of trial with good cause and leave of the Court.

## ARGUMENT

## I.     THE COURT SHOULD GRANT THE DEFENDANTS' REQUEST FOR A BILL OF PARTICULARS

### A.     Legal Standard

The purpose of a bill of particulars is "to apprise the defendant of the essential facts of the crime for which he has been charged."  *United States v. Scully*, 108 F. Supp. 3d 59, 125 (E.D.N.Y. 2015) (citation omitted).  For a case such as this, where there are multiple defendants facing multiple charges, each defendant must be advised of the "specific acts of which he is accused."  *See United States v. Luna*, Case No. 3:05cr58 (SRU), 2006 WL 1688028, at *1 (D. Conn. May 9, 2006) (citing *United States v. Torres*, 901 F.2d 205, 235 (2d Cir. 1990) *overruled on other grounds*); *see also United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987) ("Where a defendant is named in only one count and particular information as to him has not been provided, his request for the time,

-2-

location and persons present at the time of the alleged transaction may be granted . . . .") (citations

omitted).  Moreover, "[c]ertain charges, such as the fraud charges alleged here, by their nature carry

a greater potential for causing unfair surprise at trial due to their complexity[,]" and thus justify a bill

of particulars.  *See United States v. Kahale*, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009).

Where, as here, the charges are premised on false statements, courts have granted requests to

identify the allegedly false statements.  *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL

8356, at *6 (S.D.N.Y. Jan. 2, 2001); *see also United States v. Siddiqi*, No. 06 CR. 377, SWK, 2007

WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007) ("where defendants have prepared multiple statements

or documents, the Government should specify which of these are being called into question, lest

defendants be forced to review all of the statements or documents in order to prepare a defense of the

veracity of each"); *United States v. Upton*, 856 F. Supp. 727, 753 (E.D.N.Y. 1994) (ordering

government to identify alleged falsified documents that were "buried in thousands of documents

already produced" to ensure that the defendants would not be "unduly hampered in the preparation

of their defense" and to avoid unfair surprise); *United States v. Trie*, 21 F. Supp. 2d 7, 21–22

(D.D.C.1998) ("The government must provide information as to exactly what the false statements

are, what about them is false, who made them, and how Mr. Trie caused them to be made."); *accord*

*United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000); *United States v. Bortnovsky*,

820 F.2d 572, 574-75  (2d Cir. 1987).[3]

---

[3] The importance of identifying specific deceptive statements is particularly acute in the context of a conspiracy charge
because, as the Supreme Court has recognized, "a conspiracy case carries with it the inevitable risk of wrongful
attribution of responsibility to one or more of the multiple defendants."  *Dennis v. United States*, 384 U.S. 855, 873
(1966).  Thus, courts have repeatedly required the government, in the context of a conspiracy, to particularize the false or
deceptive statements that the government intends to rely on at trial.  *See, e.g.*, *United States v. Recognition Equip., Inc*.,
711 F. Supp. 1, 10 (D.D.C. 1989) (*overruled on other grounds*); *United States v. Yetman*, 196 F. Supp. 569, 570 (D.
Conn. 1961); *United States v. Nomura Trading Co*., 213 F. Supp. 704, 708 (S.D.N.Y. 1963).

The Government cannot fulfill its obligations "by providing mountains of documents to defense counsel who [are] left unguided" in determining which documents are relevant. *Bortnovsky*, 820 F.2d at 574-75; *see also United States v. Mahaffy*, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) ("Where such burdensome discovery exists, the defendant may be unfairly 'buried with paper,' and unable to discern from the massive discovery production what part of his conduct was allegedly unlawful. . . . [A] large volume of discovery warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial."). While a bill of particulars may not be used to gain a preview of the prosecution's evidence or legal theories, "it is of no consequence that the requested information [requires] the disclosure of evidence or the theory of the prosecution." *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).

### B.   The Indictment's Deficiencies Paired with the Voluminous Discovery Render the Defendants Unable to Effectively Prepare for Trial

#### 1.   The Indictment

Contrary to the Government's characterization, the Indictment is not "detailed" and does not provide "far more" than the approximate "time and place" of the crime. *See* Gov. Br. at 4-5. Instead, the Indictment contains broad allegations spanning multi-year periods, provides only a handful of piecemeal examples of allegedly false statements or omissions without delineating the conduct of each individual defendant, and fails to provide the information that would allow each defendant to prepare his defense and avoid unfair surprise at trial.

Rather than identify the specific statements and/or omissions by each defendant, the Government contends that notice has been provided through the identification of various "categories of misstatements," each addressed below, that are attributed broadly to all of the defendants. Gov. Br. at 8-9. These categories are so broad as to encompass virtually every facet of Platinum's

-4-

business over multi-year periods, and thus do almost nothing to apprise the defendants of the specific charges against them.[4]  For instance, as described further *infra*, the pertinent "categories" include alleged misrepresentations and omissions were made regarding "PPVA's liquidity" and "the performance of some of PPVA's Level 3 assets" over a ***four year*** span.  Indictment at ¶¶ 53-57. Illustrating the inadequacy of these "categories," a search for emails produced by the Government that were written by the Platinum defendants to individuals outside Platinum during this four-year time period yields close to ***300,000 documents***.[5]

The Indictment's use of limited "examples" fails to remedy the problem.  The examples fail to inform each individual defendant of his alleged role in the distinct conspiracies charged, or of the false statements or omissions allegedly made by him purportedly supporting each of the substantive charges, and are prefaced by open-ended terms like "among other things," "and others," and "for example" – providing virtually no limit to the universe of statements and omissions that the Government may seek to prove at trial.  Moreover, the allegations repeatedly attribute conduct and statements to "Platinum," rather than a specific defendant.  *See, e.g.*, Indictment at ¶ 56 ("*Platinum* never disclosed…*Platinum* continued to inform investors…"); ¶ 57 (*Platinum* did not disclose ....") (emphasis added).  Further, as explained *infra*, the "examples" for each "category" involve only a varying subset of the defendants – providing no indication of what involvement, if any, the remaining defendants allegedly had in that particular broad "category" of wrongdoing.

---

[4] *See United States v. Bin Laden*, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) (ordering particulars for allegations "which are described in general terms that refer to so broad a class of activity that they would require an exceedingly extensive investigation by defense counsel").

[5] Given the fact that the defendants' business necessarily entails communicating with investors and potential investors numerous times each day, even if the allegations covered a more limited time period, there would be thousands upon thousands of communications for which the Government may – or may not – allege is fraudulent.  Indeed, the Platinum defendants corresponded with investors or potential investors over ***124,000 times in 2015 alone***.

a. *Alleged misrepresentations regarding the value of PPVA's assets (Black Elk and Golden Gate)*

After charging the defendants with overvaluation of assets, the Government refuses to disclose *which* of Platinum's assets were overvalued.  Given that the Platinum funds invested in hundreds of positions, including complex assets whose values fluctuated on a monthly basis, the defendants plainly cannot prepare a defense without knowing which assets were allegedly overvalued, and when.  Black Elk and Golden Gate are cited only as "examples" of such purportedly overvalued assets, thus leaving open the possibility that the Government may seek to prove some other unspecified assets were overvalued at trial.  The consequences of these generalities cannot be overstated.  Evidence regarding the veracity of the valuations will undoubtedly involve expert testimony.  It would materially and unfairly prejudice the defendants if their experts were expected to respond to testimony related to the valuation of previously unidentified investments, or to prepare to respond to valuation testimony regarding every one of the hundreds of companies in which Platinum funds invested.  *See Bortnovsky*, 820 F.2d at 574-75 (government's failure to identify the alleged fraudulent documents hindered the defendants in preparing their defense as they were "forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending").

Moreover, the allegations regarding overvaluation repeatedly refer to actions taken by "Platinum" without identifying any particular defendant.  For example, Paragraph 47 of the Indictment alleges that "*Platinum* subjected both companies to high interest rate loans," "*Platinum* increased each of their values on PPVA's books," "*Platinum* reported that…Black Elk remained PPVA's largest asset," and "*Platinum* informed PPVA's investors that PPVA returned profits." Indictment at ¶ 47 (emphasis added).  Similarly, the Indictment alleges that "*Platinum* reported to its

auditors that . . . Golden Gate was PPVA's largest asset." *Id.* at ¶ 50 (emphasis added).  To the

extent that this section of the Indictment identifies any specific statements made to investors or

auditors, such statements relate to only ***two*** defendants, *see id.* at ¶¶43-52, despite the fact that the

Government has charged five defendants with securities fraud related to the "PPVA scheme."  *Id.* at

¶¶ 93-94.

### b.   *Alleged misrepresentations about PPVA's liquidity*

The allegations surrounding PPVA's liquidity provide similar challenges.  They cover the

same broad time period (*id.* at ¶¶ 53-56) and set forth only limited "examples" of alleged falsehoods.

*Id.* at ¶¶ 55-56.  In fact, the examples contain statements made by ***only one*** defendant to investors or

potential investors, albeit "in the presence" of another defendant, and fails to identify to whom the

alleged misrepresentations were made.  *Id.* at ¶¶ 53-56.  Instead, the Indictment seemingly provides

the Government with a limitless universe of statements the defendants allegedly made – or failed to

make – to unidentified "investors and prospective investors" (*id.* at ¶ 54) – encompassing hundreds

or thousands of individuals.  Requiring the defendants to wade through the approximately 700,000

documents produced in discovery that reference PPVA does not solve the problem.

### c.   *Alleged misrepresentations about certain high interest loans*

Contrary to the Government's assertions, the Indictment does not identify all of the "high-

interest loans" to which it broadly refers. *See* Gov. Br. at 9.  Instead, the Indictment lists only "PPNE

and Other Notes" and "inter-fund loans" generally. *See* Indictment at ¶¶ 57-59.  Moreover, this

section of the Indictment fails to identify any specific statements or material omissions made to

investors or potential investors by ***any*** of the defendants presumably involved in these loans.  *See id.*

at ¶¶ 57-59.  Compounding the problem is the fact that the high-interest loans are alleged to have

occurred over a four-year time period, *see id.* at ¶59, and there are approximately ***one million***

documents that reference PPNE, PPVA, PPCO, and PPLO during that time period. Determining the alleged statements or omissions upon which the Government intends to rely from these documents is simply an impossible task that renders the defendants unable to adequately prepare a defense.

### d. *Alleged misrepresentations relating to redemptions*

The Government's final category of alleged misrepresentations, relating to redemptions, is equally flawed. Like the other categories, these allegations cover a broad time period and are based on examples that relate to only three of the five defendants. *See id.* at ¶¶ 60-65. Paragraph 63 exemplifies the problems with this category:

> **On a number of occasions**, the defendants…, together with others, through **material misrepresentations and omissions about, among other things**, liquidity, performance and related party transactions, succeeded in convincing investors to defer their redemptions to the following quarter. For example, on or about March 17, 2015, LANDESMAN convinced Investor 2 to cancel his $7 million redemption from PPVA.

*Id.* at ¶ 63 (emphasis added). While this paragraph helpfully identifies one allegedly relevant transaction, it still fails to clarify whether it was an alleged misrepresentation or omission at issue or the subject matter of said misrepresentation/omission. Additionally, alleging that "on a number of occasions" the defendants made "material misrepresentations and omissions about, among other things" does absolutely nothing to apprise the defendants of the charges and paves the way for a trial marked by unfair surprises. *Id.*

### e. *Allegations regarding Black Elk bonds*

The Government gives short shrift to the allegations surrounding the alleged Black Elk scheme. For example, the Indictment contends that Nordlicht, Levy, Daniel Small, and Jeffrey Shulse used the "selective dissemination of negative information about Black Elk's finances and operations" in order to drive the bond price below par. *See* Indictment at ¶ 78. The charges related to the sale of Black Elk bonds span a five-year period, from November 2011 to December 2016. *See*

*id.* at ¶ 100.  Yet the sole "negative" statement referenced in the 49-page Indictment occurred in

February 4, 2014, and even then the Government does not allege either that the statement was

misleading or that it was actually made to any investor.  *See id*. at ¶ 78.  Rather, the Government

relies upon a single email from Nordlicht to Levy, Small, Shulse, a Black Elk employee, and a

Platinum in-house attorney.  *See id*.  The Indictment does not provide any further information

regarding the alleged "selective dissemination of negative information," perhaps expecting the

defendants to glean such evidence – to the extent it exists – from amongst the millions of pages of

discovery.

Additionally, despite the fact that the Black Elk Counts are alleged to have occurred between

November 2011 and December 2016, the overt acts listed in the Indictment span only an eight-

month period from January 2014 to September 2014.  *See id.* at ¶ 101.  In fact, other than one

conversation that allegedly took place in November 2011, *see id.* at ¶ 78, the first "event" related to

the charge occurred in "late 2013," *see id.* at ¶ 77, and the last in August 2014, *see id.* at ¶ 86,

begging the question of why the charges span a five-year period.  The breadth of the charged period

and the dearth of information regarding the alleged "negative statements," including the substance of

such statements and to what investors, if any, they were made, once again, leave the defendants in

the precarious position of having to guess at basic information regarding the charges against them.

f.   *Other missing information*

The Government has also failed to confirm that the list of unindicted co-conspirators it

previously provided is complete and that the overt acts on which it intends to rely have been fully

disclosed.

i.   Identification of Co-Conspirators

Courts examine the following factors when determining whether the government must identify unindicted co-conspirators: "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to coconspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the government's investigation." *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015) (citations omitted).  An analysis of these factors makes clear that defendants are entitled to this basic information.

First, contrary to the Government's assertion that the "universe of potential co-conspirators is self-limiting," *see* Gov. Br. at 10, the number of unindicted co-conspirators could be quite large given that there are seven defendants, the allegations span five years, and the events allegedly underlying the Indictment took place at varying geographic locations and involved companies beyond the Platinum funds.  Second, although the Government has disclosed the names of the nine co-conspirators listed in the Indictment, the term "with others," as contained in the Indictment at paragraphs 45, 54, and 89, suggest that there may have been other individuals allegedly involved in the charged offenses.  *See* Gov. Br. at 9-10.  Third, the Government has produced millions of documents in discovery thus far.  Finally, there is no legitimate concern that disclosure would compromise the safety of the unindicted co-conspirators or harm the Government's ongoing investigation.  Taken together, these factors weigh in favor of disclosure of this information to the defendants.  *See Kahale*, 789 F. Supp. 2d at 372-73 ("[T]he defendants are charged with having conspired with 'others'. . . This fact, considered in the context of an alleged conspiracy spanning a large number of years and involving an unknown number of co-conspirators and geographic locales, reveals that in order to adequately prepare for trial and avoid unfair surprise, the defendants must be

-10-

able to ascertain which primary actors they are accused of having conspired with.") (citation omitted); *Nachamie*, 91 F. Supp. 2d at 573 (granting bill of particulars for unindicted co-conspirators where government produced more than 200,000 pages of documents).

ii.   Identification of Overt Acts

Courts in this Circuit have recognized that particulars for overt acts may be necessary where, as here, the alleged conspiracy occurred over a long period of time and the allegations "provide too little information to the Defendants and their counsel to permit them reasonably to focus their trial preparations, especially in light of the voluminous amount of material that has been produced in discovery to date." *Bin Laden*, 92 F. Supp. 2d at 236; *see also United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008) (the "rationale for requiring disclosure of unindicted co-conspirators applies with equal force" to a request for overt acts and ordering the government to provide particulars concerning any acts that the government intends to prove at trial).  The defendants thus respectfully request that the Court direct the Government to provide this information here.

2.   <u>The Government Cannot Satisfy Its Obligations by Drowning the Defendants in Documents</u>

Rather than informing the defendants of the essential facts that form the basis of the charges against them, the Government attempts to rely on its vast productions to avoid a bill of particulars. *See* Gov. Br. at 5-6.  Discovery in this case has included nearly five million documents, many of which are hundreds of pages in length – and the Government has not yet completed its productions.[6]

---

[6] The vast majority of the documents produced in this case resulted from the execution of a search warrant on Platinum Partners in June 2016.  Despite Platinum's cooperation with government requests, the Government chose to collect the entire contents of the company's servers as well as hard copies from the defendants' offices and other locations.  As a result, the Government has re-produced to the defendants almost every email sent or received by anyone using a Platinum email address.  The defendants will address the impropriety of this practice at the appropriate time, but

-11-

The Government cannot fulfill its obligation to apprise the defendants of the charges against them –
and, in fact, prevents them from adequately preparing a defense – by burying them in tens of
millions of pages of documents.[7]  *See supra* pp. 3-4.   The immense volume of documents in this
case paired with the murkiness of the Indictment compound the need for a bill of particulars.  *See
Bin Laden*, 92 F. Supp. 2d at 234 ("[T]he large volume of material disclosed is precisely what
necessitates a bill of particulars.").[8]

In an effort to escape these principles, the Government disingenuously states that defendants
were provided with "indices" so that defendants can "efficiently locate documents of interest…and
determine how they relate to the relevant charges" (Gov. Br. at 5).  The Government has in fact
provided virtually no information other than the name of the producing party or custodian.  As an
illustrative example, the Government produced more than 33,000 pages that are identified solely as

---

for now it is sufficient to note that, given that the defendants were in the business of corresponding with prospective and actual investors about investing in the Platinum fund, this set of documents alone contains **millions** of "statements" made by the defendants.

[7] The Government's reliance on *United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) is misguided.  In *Walsh*, the request for a bill of particulars was denied precisely because, "at the time of the District Court's decision to deny the bill of particulars, the government provided Walsh with details that allowed him to differentiate the charges sufficiently and, therefore, present his defense adequately, rendering a bill of particulars unnecessary." *Id.* at 47.  In particular, the government: "(1) identified the names of each witness to each count [of the alleged assault]; (2) explained the rationale for each given date range for the alleged events; and (3) specified the location of each alleged incident, and the fact that Counts I and II allegedly occurred in the same cell, but Count III occurred in a different cell." *Id.* at 41.  Likewise, defendants here are requesting details regarding the specific acts – that is, the allegedly false and fraudulent statements, representations, and omissions – that form the basis of the fraud.

[8] *See also Nachamie*, 91 F. Supp. 2d at 571 (ordering bill of particulars where government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2000 Medicare claims" but had not informed the defendants "which of these claims were false and in what way they were false"); *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) (defendants were entitled to a bill of particulars regarding alleged insider trading conspiracy given the complexity and fact intensive nature of the case, which involved a six year conspiracy period and seven separate conspiracies, even though the government had produced a large amount of information to the defendants regarding the charges at issue in the substantive counts); *Upton*, 856 F. Supp. at 753 (concluding it would be unfair to allow government to introduce alleged false records that it buried in thousands of documents without notice to the defendant; without a bill of particulars regarding allegedly falsified documents defendants would be unable to properly mount their defense); *United States v. Savin*, No. 00 CR. 45 (RWS), 2001 WL 243533, at *4 (S.D.N.Y. Mar. 7, 2001) (given the broad allegations in the indictment and volume of discovery, defendant was entitled to a bill of particulars).

-12-

materials seized from "*various generally accessible cubicles and filing cabinets*" of Platinum, and more than 1.7 million pages merely identified as materials "*obtained from . . . the SEC Office of Compliance Inspections and Examinations*."  Such "indices" provide no help in locating pertinent documents or determining their relevance to the charges.

The Government also seeks to downplay the immense volume of discovery by misleadingly cherry-picking one particular search term, "PPNE" – which is relevant to only one specific category of alleged misstatement – stating that a search of the documents produced "yields a few thousand" documents (Gov. Br. at 6).  In actuality, a search for "PPNE" results in *over 22,000 documents* – each of which likely contain a multitude of statements which the Government may (or may not) allege are fraudulent.  In any event, the Government's decision to pick PPNE as the example in its brief is utterly self-serving, as searches for other "schemes" alleged in the Indictment return far more documents: more than 350,000 for PPVA, and nearly 150,000 for Black Elk.[9]

Furthermore, despite the Government's contention to the contrary, *see* Gov. Br. at n.3, *United States v. Ahmed*, 1:14-cr-277 (DLI) (E.D.N.Y. 2014), supports the issuance of a bill of particulars in this case.  In *Ahmed*, there were approximately 18,000 potential false claims at issue. The defendant sought – and received – guidance as to those claims the Government intended to rely upon at trial.  This enabled the defendant to adequately prepare to defend against each alleged wrongdoing.  Here, the Government has produced *four million emails*, any one of which it

---

[9] The Government helpfully cites to *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987), where the Second Circuit held that "[defendants] were hindered in preparing their defense by the district court's failure to compel the [g]overnment to reveal crucial information" not available from the indictment, including specifying which particular events and documents were at issue in the defendants' alleged fraud scheme.  *Id.* at 574.  Indeed, defendants in the present case face the same issue, wherein they are unable to distinguish the allegedly fraudulent statements, representations, or omissions from those that were not fraudulent.  Furthermore, defendants in this case must deal with a much more voluminous production from the Government, vastly more than the 4,000 documents – which was voluminous enough to warrant a bill of particulars in *Bortnovsky*.

presumably could rely upon in attempting to prove its case. The fact that this case involves a conspiracy does little to alter the analysis. The defendants here are equally entitled to sufficient specificity to apprise them of the charges, allow the preparation of a meaningful defense, and to avoid unfair surprise.

*    *    *

In short, the Government has failed to give the defendants the required level of detail to apprise them of the charges with a sufficient degree of specificity, allow the defendants to adequately prepare a defense, and to avoid unfair surprise at trial. As such, the defendants respectfully submit that a bill of particulars is warranted under the circumstances of this case.

## II.     REQUESTS FOR DISCLOSURES

*Brady* and its progeny reflect a settled principle in criminal jurisprudence: "that the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." *See United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985) (citation and alteration omitted); *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (*Brady* "implements the prosecution's 'special role' in the search for truth in criminal trials.") (citations omitted).

As indicated below, the Government seemingly misunderstands its *Brady* obligations.[10] That is, in its brief, the Government represents that it "has reviewed each of the defendants' specific

---

[10] The Government's attempt to distinguish *Brady* and *Giglio* in an effort to avoid production of *Giglio* material now contravenes Your Honor's directive at the status conference and should be rejected. *See* July 7, 2017 Status Conference Tr. at 31:12-20 ("*Brady* doesn't say that the government has to start looking at their evidence for any potentially exculpatory information, or any *Giglio* information, when the defendant asks for it or when directed by the Court to look for it. You have an ongoing obligation from the time you bring the case. This case was brought in December of last year. We're seven months into the case.").

-14-

requests" and that it has either "produced information" within each category or has not identified any information within the category subject to *Brady*.[11] *See* Gov. Br. at 15, 18-20.

 The Government's "Brady" production is thus far limited to high-level summaries covering the statements of four individuals – from amongst millions of documents disclosed and dozens of likely interviews conducted – that it explains have been produced in "an abundance of caution" lest they fall within the scope of *Brady*.  The law makes clear, however, that the Government "cannot hide Brady material as an exculpatory needle in a haystack of discovery materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013).  Such evidence is effectively unavailable to the defense, even if it has technically been produced.  *See also United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998) ("The government cannot meet its Brady obligations by providing [the defendant] with access to 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack.").  As Your Honor noted, the Government's assertion that it is unaware of any other potentially exculpatory material is perplexing under the circumstances in this case.  July 7, 2017 Status Conference Tr. at 26:12-27:3.  Viewed even in the most positive light, it is apparent that the Government that it has failed to meet its *Brady* obligations by reviewing all of the material in its custody.

---

[11] Based on the Government's statement on June 30, 2016, the Government claims to have reviewed "reports of interviews generated in the government's investigation" and "the U.S. Securities and Exchange Commission's (the "SEC's") documentation of interviews conducted in the SEC's parallel enforcement investigation, as well as interviews conducted as part of the examination of Platinum Partners by the SEC's Office of Compliance Inspections and Examinations," and provided the defendants with the resulting *Brady* materials.  *See* Dkt. No. 164 at 1.

### A.      Requests 1, 3, 4, 7, 18-23[12]

Among other things, the defendants have asked for "any and all statements to…the SEC reflecting doubt that any scheme alleged in the Indictment occurred" or that any of the defendants failed to participate in any such scheme.  *See* July 5 Letter at 3 (Dkt. No. 166).  After direction by Your Honor, the Government certified that these materials had been reviewed prior to June 30, 2017 (*see* Dkt. No. 164) and eventually produced summaries of the SEC's interviews with various employees that occurred as part of the SEC's 2014 investigation into Platinum.  *See* Dkt. No. 184. In doing so, the Government did not identify ***any*** *Brady* material in the over 200 page production. Yet upon conducting their own review of the documents, defendants have identified statements that indisputably constitute *Brady*.  For example, while the Indictment alleges that defendants Nordlicht, Levy, Landesman, SanFilippo, and Mann "agreed to selectively pay some investors ahead of others" (Indictment at ¶ 60), the Government production of SEC interviews contains the statements of the former Director of Financial Reporting for Platinum Credit Management who stated that "[h]e doesn't know of situations where one investor got paid out but another didn't." OCIE 000000060. This statement plainly should be construed as *Brady* because it undermines the assertion that the defendants selectively paid some investors ahead of others.[13]

---

[12] These requests generally seek information, in any form, that: (i) is exculpatory, may lead to exculpatory evidence, or that tends to negate guilt or would reduce punishment, (ii) reflects doubt that the defendants participated in the alleged schemes or that the schemes occurred; or (iii) reflects the accuracy of the defendants' statements concerning the performance of the Level 3 assets or the defendants' beliefs that the statements were accurate.

[13] *See Mahaffy*, 693 F.3d at 133 (where government had to prove that brokerage firms considered squawked information to be confidential, SEC testimony suggesting "that senior employees and management . . . did not bar the transmission of squawks or take steps to maintain exclusive control of pending block order information" was *Brady*). Moreover, it is irrelevant for *Brady* purposes whether portions of the interview notes are consistent with the Government's theory of the case. *Id*. at 130 ("Where suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character harmonizes with the theory of the defense case,' a *Brady* violation has occurred.") (citation and alteration omitted).

-16-

The Government's failure to identify the above as *Brady* establishes the validity of the defendants' concerns. Indeed, this failure is particularly troubling given that much of this material has been in the Government's possession **since 2014** and the Government certified to Your Honor that they had reviewed all of these materials for *Brady*. Dkt. No. 164. As Your Honor noted at the July 7, 2017 Status Conference, the Government's *Brady* obligations are ongoing. Thus, it should have not only disclosed, but also identified the above information with particularity at a much earlier date.

Accordingly, the defendants respectfully request that Your Honor direct the Government to provide defendants with the reports and notes from each and every interview it has conducted, and access to grand jury testimony, so that the defendants may discover the potentially exculpatory material for themselves in advance of trial.[14] [15]

**B.     Requests 24-39, 40-44**[16]

The Government's response to these Requests – that the defendants are improperly seeking its witness list and *Giglio* material (Gov. Br. at 18-20) – is a poorly veiled attempt to avoid providing a substantive response by narrowly interpreting the word "witness." The defendants do not seek the Government's witness list, but rather statements made during interviews that are reasonably likely to

---

[14] While this would alleviate some of the defendants' concerns regarding *Brady* material, it cannot resolve them all because it would of course not capture those instances where the Government chose not to record the statements made.

[15] The defendants expressly reserve the right to make an application at a later date concerning disclosure of grand jury testimony, like that of Mr. Grenville, whose testimony was summarized by the Government in its *Brady* letter of June 23, 2017.

[16] These Requests broadly seek information, in any form, concerning: (i) prior convictions, misconduct, or inconsistent statements made by a witness or declarant; (ii) any witness's motivation, bias or credibility; or (iii) any potential witness's prior inconsistent statements, or past testimony or statements to pretrial services or probation related to the defendants or this case, and a list of all other judicial proceedings in which they participated.

lead to exculpatory or impeachment material. The Government should be required to respond substantively to these Requests.[17]

Moreover, for Request 40 (which seeks information responsive to Requests 24-39 for non-witness declarants who statements may be offered into evidence), the law is clear that, where the government seeks to enter an out of court statement made by a co-conspirator in furtherance of the conspiracy, the defendant is entitled to *Giglio* material on the declarant. *See United States v. Shyne*, 617 F.3d 103, 105 (2d Cir. 2010) (government, pursuant to its obligations under *Brady* and *Giglio*, provided impeachment materials about individuals who made statements alleged to be in furtherance of the conspiracy where the government intended to introduce the statements at trial); *United States v. Hernandez*, No. 99 CR 73 (AGS), 2001 WL 674133, at *2, *5 (S.D.N.Y. June 15, 2001) (government must provide statements made by co-conspirators during the commission of the alleged crimes, or at any later time, to the extent they contain *Giglio* or Jencks Act material). To the extent the Government contends otherwise, *see* Gov. Br. at 20, it is incorrect and should be ordered to disclose any such statements.

## C. Request 5

In a case in which the Indictment is predicated on allegations that the defendants lied to and misled investors, the Government's contention that evidence of the defendants' truthfulness or good character is not *Brady*, *see* Gov. Br. at 18, is simply wrong. The Government provides no support for its position, and this evidence is plainly admissible at trial pursuant to Fed. R. Evid. 404(a).

---

[17] *Giglio* expands the scope of *Brady* to include "evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Perez*, No. 05 CR. 441 (PKL), 2005 WL 2709160, at *4 (S.D.N.Y. Oct. 20, 2005) (citation omitted). Such evidence "must be disclosed regardless of whether the material concerns a testifying witness or a hearsay declarant." *Id.* The test is not whether a declarant is testifying, but whether the declarant's credibility has been put at issue and is therefore susceptible to attack. *Id.*; *see also Leka*, 257 F.3d at 99-100 (finding that prosecutor had suppressed impeachment evidence from off-duty police officer that cast doubt on the testimony of two eyewitnesses presented by the prosecution at trial).

Indeed, Rule 404(a) "applies a lower threshold of relevancy to character evidence than that applicable to other evidence . . . [and] requires only that the proffered evidence of a character trait relate to some element at issue in the case." *United States v. Han*, 230 F.3d 560, 563-64 (2d Cir. 2000) (district court erred in excluding evidence of defendant's "reputation for uprightness and an unwillingness to exploit others" as it was relevant to issue of criminal intent). To the extent that the Government is aware that a declarant has made statements regarding a defendant's character for honesty, that information is clearly helpful to the defense and is *Brady*.

**D.      Request 6**

The Government's baseless assertion that evidence that the defendants did not mislead anyone by statement or omission only constitutes *Brady* if the individual is a "victim of one of the charged crimes," *see* Gov. Br. at 18, should be rejected by the Court. It cannot reasonably be disputed that evidence that the defendants did not mislead investors or prospective investors, or that the defendants were candid with investors or prospective investors concerning issues related to the Platinum funds, is evidence "favorable" to the defense and falls within the Government's "broad duty" to disclose. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999).[18]

**E.      Requests 8-17**

In its brief, the Government contends that it has not identified information "*establishing*" that any defendant was unaware that his co-conspirators had made false statements.[19] Gov. Br. at 19

---

[18] Request 6 clearly includes evidence that would be "inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense," and accordingly should be disclosed under the Government's own policies. *See* U.S. Attorney's Manual, 9-5.001(c)(1).

[19] The Government does not contest that evidence that the defendants were "unaware" of false statements made by other co-conspirators is not *Brady* – nor could it. *See United States v. Rittweger*, 524 F.3d 171, 181-82 (2d Cir. 2008) (holding that grand jury witness testimony that a defendant accused of making misrepresentations to investors believed the false statements he made to be true is Brady material); *United States v. Sainato*, 33 F. Supp. 2d 155, 162 (E.D.N.Y. 1998) (indicating that statements showing a defendant's lack of awareness of criminal activity was Brady material).

(emphasis added).  But this is not the standard.  Under *Brady* and its progeny, "if there [a]re questions about the reliability of the exculpatory information, it [i]s the prerogative of the defendant and his counsel – and not of the prosecution – to exercise judgment in determining whether the defendant should make use of it."  *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) (citations omitted).  The Government's response makes clear that it does not understand its obligations under *Brady*, and should be required to re-review its materials and identify any evidence that falls within these Requests that is ***potentially favorable*** to the defense.[20]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant their motion for a bill of particulars and disclosure of evidentiary materials (Dkt. No. 166).

Dated:  August 11, 2017             WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:      /s Michael S. Sommer
Michael S. Sommer
Morris J. Fodeman
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899
msommer@wsgr.com
mfodeman@wsgr.com

*Attorneys for Defendant David Levy*

---

[20] *See Strickler*, 527 U.S. at 281-82 (prosecution has a "broad duty" to disclose evidence "favorable to the accused").

-20-

QUINN EMANUEL URQUHART & SULLIVAN LLP

By:    /s William A. Burck
        William A. Burck
        Daniel Rickert Koffman
        777 Sixth Street N.W., 11th Floor
        Washington, D.C. 20001
        Telephone: (202) 538-8000
        Facsimile:  (202) 538-8100
        williamburck@quinnemanuel.com
        danielkoffmann@quinnemanuel.com

*Attorneys for Defendant Mark Nordlicht*


DEFEIS, O'CONNELL & ROSE, P.C.

By:    /s Gregory J. O'Connell
        Gregory J. O'Connell
        Peter J. Sluka, Jr.
        500 Fifth Avenue, Suite 2630
        New York, NY 10110
        Telephone:  (212) 768-1000
        Facsimile:  (212) 768-3511
        gjo@dorlaw.com
        pjs@dorlaw.com

*Attorneys for Defendant Uri Landesman*


FORD O'BRIEN LLP

By:    /s Kevin J. O'Brien
        Kevin J. O'Brien
        Adam Pollock
        575 Fifth Avenue, 17th Floor
        New York, NY 10017
        Telephone: (212) 858-0040
        Facsimile:  (646) 650-2219
        kobrien@fordobrien.com
        apollock@fordobrien.com

*Attorneys for Defendant Joseph SanFilippo*

-21-

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.

By:    /s Benjamin S. Fisher
       Benjamin S. Fisher
       Jonathan S. Sack
       565 Fifth Avenue
       New York, New York 10017
       Telephone: (212) 856-9494
       Facsimile:  (212) 856-9494
       bfischer@maglaw.com
       jsack@maglaw.com

*Attorneys for Defendant Joseph Mann*

LEVINE LEE LLP

By:    /s Seth L. Levine
       Seth L. Levine
       650 Fifth Avenue, 13th floor
       New York, NY 10019
       Telephone:  (212) 223-4400
       Facsimile:  (212) 223-4425
       slevine@levinelee.com

*Attorneys for Defendant Joseph Mann*

FERTITTA REYNAL LLP

By:    /s F. Andino Reynal
       F. Andino Reynal
       815 Walker Street, Suite 1553
       Houston, Texas 77002
       Telephone: (713) 228-5900
       Facsimile:  (713) 820-6981
       areynal@frlaw.us

*Attorneys for Defendant Jeffrey Shulse*