DCP/LHE/NMA
F. # 2016R00505

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                         Docket No. <u>16-CR-640 (BMC)</u>

DANIEL SMALL,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>THE GOVERNMENT'S OPPOSITION TO
THE DEFENDANT'S POST-TRIAL MOTIONS</u>

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

DAVID C. PITLUCK
LAUREN HOWARD ELBERT
NICK M. AXELROD
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

THE DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED ........................................... 4

I.   APPLICABLE LAW ..................................................................................................... 4

II.  THE TRIAL EVIDENCE ESTABLISHES SMALL'S CRIMINAL INTENT BEYOND A
     REASONABLE DOUBT ................................................................................................ 6

     A.   Applicable Law ................................................................................................ 6

     B.   Small's Emails Establish his Knowing Participation in the Scheme ................ 7

     C.   Small's Conduct Is Evidence of his Consciousness of Guilt ......................... 13

     D.   The Jury Heard Additional Circumstantial Evidence of Small's Motive and Fraudulent
          Intent ............................................................................................................. 14

     E.   There Is No Evidence in the Record that Small Believed Beechwood Was a "Friendly" 16

     F.   The Jury Has Already Rejected Small's Competing Inferences ..................... 27

III. SMALL'S LIES WERE MATERIAL .............................................................................. 29

     A.   Applicable Law .............................................................................................. 29

     B.   The Conspirators' Lies Were Material ........................................................... 29

IV.  THERE WAS SUFFICIENT EVIDENCE OF NORDLICHT'S CONTROL OF BEECHWOOD ............... 31

V.   SMALL'S CONVICTION DOES NOT VIOLATE THE DUE PROCESS CLAUSE ........................... 35

     A.   Applicable Law .............................................................................................. 35

     B.   The Securities Fraud Statutes Are Not Unconstitutionally Vague as Applied to Small .. 36

     C.   Vagueness Doctrine Applies to Statutes Not Private Contracts ..................... 40

     D.   Connolly Is Inapposite ................................................................................... 45

THE DEFENDANT'S RULE 33 MOTION SHOULD BE DENIED ........................................... 49

I.   APPLICABLE LAW ................................................................................................... 49

II.  THERE IS NO EVIDENCE OF GOVERNMENT MISCONDUCT ............................................. 50

     A.   Applicable Law .............................................................................................. 51

     B.   The Government's Arguments Did Not Mischaracterize the Record ............. 52

     C.   Small Suffered No Prejudice .......................................................................... 61

III. THE GOVERNMENT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT, NOR DID A
     VARIANCE OCCUR .................................................................................................. 65

     A.   Applicable Law .............................................................................................. 65

     B.   The "Core of Criminality" Alleged by the Government Did Not Change ....... 67

IV.  THE DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING REGARDING
     GOVERNMENT MISCONDUCT ............................................................................... 70

CONCLUSION................................................................................................................... 72

TABLE OF AUTHORITIES

PAGE(S)

CASES

Arriaga v. Mukasey,
   521 F.3d 219 (2d Cir. 2008) ................................................................. 36

Basic v. Levinson,
   485 U.S. 224 (1988)............................................................................ 29

Beckles v. United States,
137 S. Ct. 886 (2017) .............................................................................. 35

Curley v. United States,
   160 F.2d 229 (D.C. Cir. 1947) ............................................................ 6

Ganino v. Citizens Utils. Co.,
   228 F.3d 154 (2d Cir. 2000) ................................................................. 29

Gonzalez v. Sullivan,
   934 F.2d 419 (2d Cir. 1991) ................................................................. 51

Grayned v. City of Rockford,
   408 U.S. 104 (1972)............................................................................ 36

Herman & MacLean v. Huddleston,
   459 U.S. 375 (1983)............................................................................ 42

Hill v. Colorado,
   530 U.S. 703 (2000)............................................................................ 40

Holland v. United States,
   348 U.S. 121 (1954)............................................................................ 6

Jordan v. De George,
   341 U.S. 223 (1951)............................................................................ 36

Kolender v. Lawson,
   461 U.S. 352 (1983)........................................................................ 40, 43

Manning v. Caldwell,
   930 F.3d 264 (4th Cir. 2019) .............................................................. 44

McFadden v. United States,
   576 U.S. 186 (2015)............................................................................ 37

McNally v. United States,
   483 U.S. 350 (1987)............................................................................ 36

Salman v. United States,
   580 U.S. 39 (2016).............................................................................. 36

Shannon v. United States,
   512 U.S. 573 (1994)............................................................................ 65

Smith v. Goguen,
    415 U.S. 566 (1974)..................................................................................... 43

Stirone v. United States,
    361 U.S. 212 (1960)..................................................................................... 66

TSC Indus. Inc. v. Northway, Inc.,
    426 U.S. 438 (1976)..................................................................................... 29

United States v. Anderson,
    747 F.3d 51 (2d Cir. 2014) ......................................................................... 13

United States v. Archer,
    997 F.3d 181 (2d Cir. 2020) ....................................................................... 13

United States v. Autuori,
    212 F.3d 105 (2d Cir. 2000) ......................................................................... 5

United States v. Bagaric,
    706 F.2d 42 (2d Cir. 1983) ......................................................................... 64

United States v. Banki,
    685 F.3d 99 (2d Cir. 2011) ......................................................................... 51

United States v. Banki,
    733 F. Supp. 2d (E.D.N.Y. Jul. 30, 2010) ................................................. 51

United States v. Barret,
    No. 10-CR-809 (KAM), 2012 WL 3229291 (E.D.N.Y. Aug. 6, 2012)................................... 5

United States v. Bastian,
    770 F.3d 212 (2d Cir. 2014) ................................................................. 66, 69

United States v. Benussi,
    216 F. Supp. 2d 299 (S.D.N.Y. 2002) ................................................... 67, 70

United States v. Bilzerian,
    926 F.2d 1285 (2d Cir. 1991) ..................................................................... 29

United States v. Bryant,
    556 F. Supp. 2d 378 (D.N.J. 2008) ...................................................... 42, 43

United States v. Carpenter,
    791 F.2d 1024 (2d Cir. 1986) ..................................................................... 42

United States v. Concord Mgmt. & Consulting LLC,
    347 F. Supp. 3d 38 (D.D.C. 2018)............................................................... 37

United States v. Connolly,
    24 F.4th 821 (2d Cir. 2022) ..................................................... 41, 43, 45, 46

United States v. Connolly,
    No. 16-CR-370 (CM), 2018 WL 2411216 (S.D.N.Y. May 15, 2018) .................................... 41

United States v. Coplan,
    703 F.3d 46 (2d Cir. 2012) ................................................................... 51, 62

United States v. D'Amelio,
    683 F.3d 412 (2d Cir. 2012) ................................................................. 66

United States v. Doe,
    145 F. Supp. 3d 167 (E.D.N.Y. 2015) ................................................ 35

United States v. Dove,
    884 F.3d. 138 (2d Cir. 2018) ............................................................... 65

United States v. Dupre,
    462 F.3d 131 (2d Cir. 2006) ................................................................. 66

United States v. Elias,
    285 F.3d 183 (2d Cir. 2002) ................................................................. 51

United States v. Espinal,
    981 F.2d 664 (2d Cir.1992) .................................................................. 51

United States v. Farhane,
    634 F.3d 127 (2d Cir. 2011) ........................................................... 35, 36

United States v. Ferguson,
    246 F.3d 129 (2d Cir. 2001) ................................................................. 50

United States v. Florez,
    447 F.3d 145 (2d Cir. 2006) ............................................................. 5, 18

United States v. Frank,
    156 F.3d 332 (2d Cir. 1998) ................................................................. 67

United States v. Franklin-El,
    554 F.3d 903 (10th Cir. 2009) ........................................................ 37, 40

United States v. Gambino,
    59 F.3d 353 (2d Cir. 1995) ................................................................... 50

United States v. General Dynamics Corp.,
    644 F. Supp. 1497 (C.D. Cal. 1986) ................................................... 42

United States v. Gore,
    154 F.3d 34 (2d Cir. 1998) ................................................................... 26

United States v. Gosy,
    No. 16-CR-46, 2019 WL 948179 (W.D.N.Y. Feb. 27, 2019) ............... 41

United States v. Gross,
    No. 15-CR-769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) .... 66

United States v. Guadagna,
    183 F.3d 122 (2d Cir. 1999) ............................................................... 5, 6

United States v. Halloran,
    821 F.3d 321 (2d Cir. 2016) ................................................................. 41

United States v. Heimann,
    705 F.2d 662 (2d Cir. 1983) ................................................................. 66

United States v. Houtar,
    980 F.3d 268 (2d Cir. 2020) ................................................................. 36, 44

United States v. Huezo,
    546 F.3d 174 (2d Cir. 2008) ..................................................................... 5

United States v. Irving,
    452 F.3d 110 (2d Cir. 2006) ..................................................................... 6

United States v. Jackson,
    335 F.3d 170 (2d Cir. 2003) .................................................................. 5, 6

United States v. James,
    712 F.3d 79 (2d Cir. 2013) ..................................................................... 49

United States v. Janati,
    237 F. App'x 843 (4th Cir. 2007) ........................................................... 40

United States v. Kaiser,
    609 F.3d 556 (2d Cir. 2010) ..................................................................... 6

United States v. LaHue,
    261 F.3d 993 (10th Cir. 2001) ................................................................ 40

United States v. Landesman,
    17 F.4th 298 (2d Cir. 2021) ............................................................ passim

United States v. LaPorta,
    46 F.3d 152 (2d Cir. 1994) ..................................................................... 70

United States v. LaSpina,
    299 F.3d 165 (2d Cir 2002) ..................................................................... 66

United States v. Lebedev,
    930 F.3d 40 (2d Cir. 2019) ..................................................................... 70

United States v. LeRoy,
    687 F.2d 610 (2d Cir. 1982) ................................................................... 49

United States v. Lin Guang,
    511 F.3d 110 (2d Cir. 2007) ................................................................... 49

United States v. Litvak,
    808 F.3d 160 (2d Cir. 2015) ................................................................... 29

United States v. Locascio,
    6 F.3d 924 (2d Cir. 1993) ....................................................................... 50

United States v. Lorenzo,
    534 F.3d 153 (2d Cir. 2008) ..................................................................... 6

United States v. Margiotta,
    688 F.2d 108 (2d Cir. 1982) .............................................................. 37, 39

United States v. Mariani,
    725 F.2d 862 (2d Cir. 1984) ................................................................... 14

United States v. Martinez,
   54 F.3d 1040 (2d Cir. 1995) ........................................................................ 6

United States v. McCourty,
   562 F.3d 458 (2d Cir. 2009) ...................................................................... 49

United States v. McLean,
   715 F.3d 129 (4th Cir. 2013) ...................................................................... 37

United States v. Migliaccio,
   34 F.3d 1517 (10th Cir. 1994) .................................................................... 42

United States v. Millar,
   79 F.3d 338 (2d Cir. 1996) ........................................................................ 53

United States v. Mucciante,
   21 F.3d 1228 (2d Cir. 1994) ...................................................................... 67

United States v. Myerson,
   18 F.3d 153 (2d Cir. 1994) .................................................................. 61, 63

United States v. Ng,
   No. 18-CR-538 (MKB), 2022 WL 1062704 (E.D.N.Y. Apr. 8, 2022) ........................ 35, 36, 44

United States v. Nordlicht,
   No. 16-CR-640 (BMC), 2019 WL 4736957 (E.D.N.Y. Sept. 27, 2019) ........................ 30, 31

United States v. Patino,
   962 F.2d 263 (2d Cir. 1992) ...................................................................... 66

United States v. Pavloyianis,
   996 F.2d 1467 (2d Cir. 1993) .................................................................... 70

United States v. Puzzo,
   928 F.2d 1356 (2d Cir. 1991) ...................................................................... 6

United States v. Race,
   632 F.2d 1114 (4th Cir. 1980) .................................................................... 42

United States v. Ragen,
   314 U.S. 513 (1942) ............................................................................ 37, 39

United States v. Rahim,
   339 F. App'x 19 (2d Cir. 2009) ................................................................... 62

United States v. Rea,
   958 F.2d 1206 (2d Cir. 1992) ...................................................................... 5

United States v. Reifler,
   446 F.3d 65 (2d Cir. 2006) ........................................................................ 4

United States v. Reyes,
   18 F.3d 65 (2d Cir. 1994) ......................................................................... 61

United States v. Rodriguez,
   392 F.3d 539 (2d Cir. 2004) ....................................................................... 6

vii

United States v. Rosenthal,
   9 F.3d 1016 (2d Cir. 1993) ........................................................................ 4, 6

United States v. Rybicki,
   287 F.3d 257 (2d Cir. 2002) ......................................................................... 37, 39

United States v. Sachakov,
   812 F. Supp. 2d 198 (E.D.N.Y. 2011) ...................................................... 37, 40, 41

United States v. Salmonese,
   352 F.3d 608 (2d Cir. 2003) ....................................................................... 66, 67

United States v. Sanchez,
   969 F.2d 1409 (2d Cir. 1992) ........................................................................... 49

United States v. Sasso,
   59 F.3d 341 (2d Cir. 1995) .............................................................................. 50

United States v. Scully,
   No. 14-CR-208 (ADS), 2015 WL 5826493 (E.D.N.Y. Oct. 6, 2015) ..................... 22

United States v. Shareef,
   190 F.3d 71 (2d Cir. 1999) .............................................................................. 51

United States v. Shin,
   No. 19-CR-552 (JPC), 2022 WL 3274120 (S.D.N.Y. Aug. 11, 2022) .................... 41

United States v. Stewart,
   872 F.2d 957 (10th Cir. 1989) ......................................................................... 37

United States v. Stitsky,
   536 F. App'x 98 (2d Cir. 2013) ........................................................................ 66

United States v. Strauss,
   999 F.2d 692 (2d Cir. 1993) ............................................................................ 36

United States v. Thomas,
   377 F.3d 232 (2d Cir. 2004) ............................................................................ 51

United States v. Tocco,
   135 F.3d 116 (2d Cir. 1998) ............................................................................ 61

United States v. Vebeliunas,
   76 F.3d 1283 (2d Cir. 1996) ............................................................................ 65

United States v. Wallace,
   59 F.3d 333 (2d Cir. 1995) ......................................................................... 66, 67

United States v. Weiss,
   752 F.2d 777 (2d Cir. 1985) ............................................................................ 66

United States v. Wexler,
   522 F.3d 194 (2d Cir. 2008) ............................................................................ 26

United States v. White,
   673 F.2d 299 (10th Cir. 1982) .......................................................................... 5

United States v. Young,
    470 U.S. 1 (1985)..............................................................................................51

United States v. Zaslavskiy,
    No. 17-CR-647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018)...................36

Wilson v. Merrill Lynch & Co., Inc.,
    671 F.3d 120 (2d Cir. 2011) ................................................................................29

Zafiro v. United States,
    506 U.S. 534 (1993)............................................................................................61

STATUTES

15 U.S.C. § 78j(b) ..................................................................................................36

18 U.S.C. § 1001 ...................................................................................................42

18 U.S.C. § 1347(a) ..............................................................................................37


RULES

FED. R. CRIM. P. 29 ..................................................................................................4

REGULATIONS

17 C.F.R. § 240.10b-5............................................................................................36

PRELIMINARY STATEMENT

Daniel Small was convicted of securities fraud and securities fraud conspiracy following a nearly-two-week trial before the Court in August 2022.  Before the Court are Small's post-trial motions for a judgment of acquittal, or, in the alternative, for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33.  ECF Dkt. No. 967 ("Mot.").  As set forth in further detail below, the defendant's motions are meritless, and they should be denied by the Court.

In reaching a guilty verdict, the jury rejected each of the arguments the defendant now presents to the Court.  The defendant's arguments about "friendlies," co-defendant Mark Nordlicht's control over Beechwood, Small's knowledge of the same, and his intent were all argued to the jury and each of those arguments was rejected.  The jury's findings are supported by the evidence and they are consistent with the verdict in the 2019 trial of Small's co-defendants and the Second Circuit's decision in Landesman.  Two federal juries and a unanimous panel of the Second Circuit have now found substantially the same evidence to be sufficient to convict the defendant and his co-conspirators.

Small was at the heart of the fraud.  Email correspondence shows that Small tracked approximately $98.6 million Black Elk bonds held by Platinum and Beechwood entities while concealing all but approximately $18.3 million of these bondholdings from Black Elk's lawyers.  The emails show that Small knew how these bonds would vote and knew that those votes were controlled by his colleague, co-defendant David Levy, and their boss, Nordlicht.  They also show Small's understanding of the so-called "affiliate rule"—the provisions of the Black Elk indenture that prohibited voting by bonds held by "affiliates" of Black Elk (and Platinum)—and Small's effort to conceal Platinum's control of these bonds from Black Elk's lawyers.  These emails establish Small's knowledge and his consciousness of guilt.

1

The evidence at trial and common sense shows that Small's lies were material. Two Black Elk bondholders explained that Platinum's bondholdings were material to their decision on how to vote in the Black Elk consent solicitation because they understood that bonds held by Platinum would not be counted in the vote. Moreover, the consent solicitation changed critical features of the Black Elk indenture. These changes enabled Platinum friends and family to take a $70 million distribution from Black Elk while the company headed for bankruptcy.

The government established that Beechwood was an "affiliate" of Platinum through evidence that Nordlicht founded Beechwood, staffed the company with senior Platinum executives (including Levy, the Chief Investment Officer), maintained an office and email account at Beechwood, and actually exercised that power by directing a Beechwood trader to buy Black Elk bonds from Platinum in off-market transactions. As Nordlicht himself put it: "Beechwood is just a different office. Insurance mandate <u>we</u> have." GX-568 (emphasis added). The jury rejected Small's argument that he didn't know this. Small's emails with Nordlicht and Levy, including his knowledge of Beechwood positions, his working relationship with both men, his effort to bring transactions to Beechwood around the same time, and the evidence he concealed Beechwood's holdings from Black Elk's lawyers, all demonstrate that Small knew Nordlicht controlled Beechwood.

The defendant also asks the Court to hold, apparently for the first time, that the securities fraud statutes are unconstitutionally vague. This request, which rests on no legal precedent, breaks new ground in other ways as well—the defendant predicates the alleged vagueness on a private agreement, not a law or regulation. Vagueness doctrine concerns laws and regulations, not private contracts, and the securities fraud statutes are not a "trap for the unwary." These statutes (and the Court's jury instructions, which the defendant does not challenge) require

proof of fraudulent intent; proof the defendant knew what he was doing was wrong.   Good faith is a complete defense to these charges and the jury rejected Small's argument that he acted in good faith or made an innocent mistake.

The defendant's arguments about prosecutorial misconduct are equally baseless. The defendant's identification of four claimed errors in the rebuttal summation do not amount to prejudice so grave that the defendant was denied a fair trial.   The defendant is simply wrong about two of the four asserted errors—one was rejected by the Court at the time and the other is based on an error in the transcript that has since been corrected—and the other two asserted errors were fair argument based on evidence in the record.   But in any event, the Court gave detailed curative instructions at the defendant's request—even when the Court actually disagreed with the defendant—and there is no reason to believe the jury was incapable of following those instructions. These few alleged misstatements in a jury address are a far cry from the sort of misconduct that could render the trial as a whole unfair.

The remaining balance of the defendant's brief is a rehashing of arguments already raised and rejected by this Court.   The defendant gives no reason why the Court should reach a different conclusion today.   Daniel Small was not treated unfairly; he is simply guilty of fraud.

The defendant's motions should be denied.

ARGUMENT

THE DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED

The defendant raises various challenges to his convictions on Count Six and Count Eight.  These arguments rely on inferences in the defendant's favor that the jury has already rejected, cherry-picked testimony without context, and evidence that is not in the record.  As discussed below, the evidence that is in the record was more than sufficient to allow a reasonable jury to find him guilty beyond a reasonable doubt on both counts and the jury's verdict should stand.

I.    Applicable Law

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  See Fed. R. Crim. P. 29(a).  As the Second Circuit has observed, to upset a jury verdict, the defendant bears a heavy burden:

> In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden.  In considering such a challenge, we must credit every inference that could have been drawn in the government's favor and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt.  We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.  Pieces of evidence must be viewed not in isolation but in conjunction, and the conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

United States v. Reifler, 446 F.3d 65, 94–95 (2d Cir. 2006) (citations and quotation marks omitted); United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) ("It is well established that a defendant challenging the sufficiency of the evidence underlying a conviction bears a very heavy burden.") (internal citations and quotation marks omitted).  In assessing sufficiency, a court is

"obliged to view the evidence in its totality and in the light most favorable to the prosecution." United States v. Florez, 447 F.3d 145, 154 (2d Cir. 2006).

In resolving a Rule 29 motion, a court "must be careful to avoid usurping the role of the jury." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal citation and quotation marks omitted); see also Florez, 447 F.3d at 154–55 (in evaluating evidence in connection with a Rule 29 motion, courts must be "mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court"); United States v. Rea, 958 F.2d 1206, 1221–22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments."); United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 3229291, at *16 (E.D.N.Y. Aug. 6, 2012). The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).

In addition, as the Second Circuit has made clear, trial courts may grant a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant a Rule 29 motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the

court] must let the jury decide the matter.'" Guadagna, 183 F.3d at 129 (quoting Curley v. United States, 160 F.2d 229, 233 (D.C. Cir. 1947)).

        Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)); see also United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) ("A jury may convict on circumstantial evidence alone."); accord Jackson, 335 F.3d at 180; United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995).  When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); see also Rosenthal, 9 F.3d at 1024 ("The evidence need not eliminate every possible theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction."); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).

II.    The Trial Evidence Establishes Small's Criminal Intent Beyond a
        Reasonable Doubt

    A.    Applicable Law

        As the jury was correctly instructed in this case, in order to convict Small of securities fraud and securities fraud conspiracy, the jury was required to find that Small acted knowingly and willfully.  See Trial Tr. at 1769:19–23, 1778:17–20, 1787:23; United States v. Kaiser, 609 F.3d 556, 567–70 (2d Cir. 2010).  The evidence at trial amply supported the jury's finding.

6

B.     Small's Emails Establish his Knowing Participation in the Scheme

The circumstantial evidence of Small's knowing and willful participation in the Black Elk Bond scheme and his intent to defraud was abundant and more than sufficient to support the jury's verdict.

First, Small had a central role in the fraudulent scheme.  He was on the board of Black Elk and a portfolio manager at Platinum.  He participated in both the conversations with Nordlicht and Levy, on the Platinum side, about which of the various entities across Platinum and Beechwood held bonds and in what quantities, and in conversations with Black Elk's lawyers, about what information about Platinum's bondholdings was required to be disclosed.  See, e.g., GX-8, -584, -693, -731, -689, -692.  He was in control of the flow of information to Black Elk's lawyers and in a position to dictate what would be disclosed to Black Elk's bondholders.  See, e.g., GX-695, -726, -761.  His unique role in the scheme meant that he knew that the bondholders were be lied to, and that he knew the truth that was being withheld; this knowledge is powerful evidence of his intent to defraud.

Second, the email correspondence in evidence established both that Small knew that Nordlicht, through Platinum, controlled approximately $98.6 million in bonds and intentionally dictated that the bondholders would be told, falsely, that the Platinum entities only controlled approximately $18.3 million in bonds.  On July 3, 2014, Small sent an email to the lawyers at BakerHostetler, Brittany Sakowitz and Rob Shearer, copying Jeff Shulse, Black Elk's Chief Financial Officer, seeking to confirm his (correct) understanding of how the affiliate rule would apply to the consent solicitation transaction, asking them to "please confirm that under the TIA if $5MM of the bonds were owned by an affiliate then in order for the consent to be approved a majority of $145MM (greater than $72.5MM) would need to consent rather than greater than $75MM."  GX-689.  This email shows Small's thorough understanding of how the affiliate rule

applied to the transaction, namely that it would result in the bonds held by affiliates being excluded from the vote.  The lawyers then wrote back confirming Small's understanding, and included the definition of "affiliate," namely "any person directly or indirectly controlling or controlled by or under direct or indirect common control with," the obligor.  Id.  Small then forwarded this email on to his co-conspirators at Platinum, Nordlicht and Levy, putting them all on notice both on the restriction against affiliates voting and how the vote would be calculated.  Id.  This email is important in view of the subsequent documentary evidence, which shows Small to not only be focused on how to get the vote to succeed, but also on how the conspirators would ensure that the bonds held secretly by Platinum entities would be counted by avoiding their disclosure as bonds held by affiliates.

For example, on July 7, 2014, nine days before the vote started on the consent solicitation, Small forwarded a draft of the consent solicitation document to his co-conspirators Nordlicht and Levy and wrote "[t]he company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority . . . let's discuss ASAP." GX-692.  On July 8, 2014, one day later, the conspirators requested and obtained an updated list of the Black Elk bond holdings across the Platinum and Beechwood entities.  GX-693.  The following day, Small told Black Elk's lawyer that only the $18.3 million in Black Elk bonds held by PPVA should be disclosed and excluded from the consent solicitation vote.  GX-695.  This sequence of emails supports the reasonable inference that each of the conspirators, but specifically Small, as the author of the critical messages: (1) was aware of the prohibition on affiliate voting and why the number of bonds identified as being held by affiliates mattered; (2) was aware of the actual number of bonds controlled by Nordlicht across the Platinum/Beechwood entities, which

they knew would consent to the amendments; and (3) collectively decided to instead provide a false number in order to make it easier for the vote to pass.

        This inference is further supported by another message from later in the month, on July 29, 2014, in which Small sent a spreadsheet to Nordlicht and Levy that not only detailed the number of bonds held by the Platinum and Beechwood entities, but actually did the math to calculate how the vote would play out and showing that the outcome was guaranteed.  GX-731. This email shows that Small knew that Platinum and Beechwood controlled the vote because their votes were guaranteed, and that by concealing the bonds held by the entities other than PPVA the conspirators could guarantee the outcome.  While this email was sent by Small, it was expressly relied upon by the Court of Appeals in affirming the guilty verdicts as to Small's co-conspirators. See United States v. Landesman, 17 F.4th 298, 326 (2d Cir. 2021) (observing that the spreadsheet "illustrates that Levy knew that Platinum and Beechwood controlled enough of the bonds to determine the outcome" and "supports an inference that Levy knew the PPCO-, PPLO-, and Beechwood-held bonds had been concealed from Shearer and the bondholders").  This email is more incriminating as to Small than his co-conspirators, because Small was the author.

        Yet another set of emails, which were exchanged following the close of the vote, further proved Small's knowing and intentional participation in the scheme.  On August 13, at around 6:00 p.m., right after the close of the vote, Shearer emailed Small and asked him (as he had before, to no avail) for a signed officer's certificate certifying the number of bonds held by Platinum and its affiliates.  GX-26.  Upon receipt of that email, Small forwarded it to Shulse and requested from Shulse the "latest activity report from the trustee," i.e. the report reflecting the number of bonds that decided to tender and consent.  Id.  This information was not necessary to complete the officers' certificate as to Platinum's bondholdings, which requested only information

as to what bonds Platinum held.  But it <u>was</u> necessary in order for Small to determine which of Platinum's bondholdings needed to remain secret in order to guarantee a successful outcome to the vote, because the number of bonds that voted "no" and remained outstanding would need to be less than half the total of the tendering bonds and the consenting bonds, excluding any disclosed affiliated bonds.  Upon receipt of the number of tendering bonds from Levy, who had been cc'd, and just 20 minutes after Shearer's initial request, Small emailed his co-conspirators, Nordlicht and Levy, and provided them with a chart detailing the outcome of the vote and Platinum's bondholdings.[1]  GX-760.

**From:** Daniel Small
**Sent:** Wednesday, August 13, 2014 6:24 PM
**To:** Mark Nordlicht; David Levy
**Subject:** Officer Certificate

See attached wording and let me know if you are ok. Below is a table that shows under all three scenarios there is 50% approval.

| Tender Analysis | Total | PPVA & Aff | PPVA and Possible Affil |
|---|---|---|---|
| Bonds Outstanding | 150,000,000 | 131,679,000 | 88,386,000 |
| Total Consents | 98,631,000 | 80,310,000 | 37,017,000 |
| Total Tenders | 11,400,000 | 11,400,000 | 11,400,000 |
| Total | 110,031,000 | 91,710,000 | 48,417,000 |
| Percent | 73% | 70% | 55% |

This chart showed that whether the count included the PPVA bonds, excluded the PPVA bonds, or excluded a third category of bonds, labeled "possible affil." (which were the bonds held by PPCO and PPLO), the vote passed.  Then, the next morning on August 14, Small emailed Shearer another version of this chart referring to that third category as bonds held by parties "not deemed

---

[1]    Notably, Levy did not send Small the requested "activity report."  GX-26.  He sent him only the number of tendering bonds.  But as GX-670 demonstrates, that was all the information Small needed, and Levy, his co-conspirator, knew that.  Small already was aware of the total number of consenting bonds because he was already aware that the bonds held by the Platinum and Beechwood entities had voted to consent.

affiliates," and attached a version of the officers' certificate that referred to this category of bonds in which Platinum "disclaimed beneficial ownership."  GX-761.

| From: | Daniel Small <dsmall@platinumlp.com> |
|---|---|
| Sent: | 8/14/2014 12:36:23 PM -0400 |
| To: | "Shearer, Rob" <rshearer@bakerlaw.com> |
| CC: | Jeff Shulse <jeffs@blackelkenergy.com> |
| Subject: | Officer's Certificate |
| Attachments: | Platinum Officer_s Certificate Re_ Tender Offer and Consent Solicitation.docx; Consent Tender Analysis.xlsx; Black Elk ACTIVITY REPORT 12 .xlsm |

Rob, see attached officer's certificate and below analysis which is also set forth on the attached spreadsheet. Let me know if you have any comments and we will have executed. Thanks, Dan

|  | Total | PPVA & Affil | PPVA & Not Deemed Affil |
|---|---|---|---|
| Bonds Outstanding For Calculation of Vote | 150,000,000 | 131,679,000 | 88,386,000 |
| PPVA & Affiliates | 18,321,000 | 0 | 0 |
| Not Deemed Affiliates | 43,293,000 | 43,293,000 | 0 |
| Other | 37,618,000 | 37,618,000 | 37,618,000 |

GOVERNMENT
EXHIBIT
761
16 CR 640 (BMC)

| | | | |
|---|---|---|---|
| Total Consents | 99,232,000 | 80,911,000 | 37,618,000 |
| Total Tenders | 11,433,000 | 11,433,000 | 11,433,000 |
| Total Consents and Tenders | 110,665,000 | 92,344,000 | 49,051,000 |
| Percent | 74% | 70% | 55% |

Here, Small waited until the vote was closed, and it was clear that the vote had passed, to disclose for the first time to Black Elk's lawyers that there existed another category of bonds that could possibly be deemed affiliates.  A jury could reasonably infer from this that Small "understood that PPCO and PPLO would likely be deemed affiliates and chose not to disclose them," until the vote was over.  Landesman, 17 F.4th at 338 (finding such an inference reasonable as to Nordlicht).  Indeed, even defense counsel conceded that PPCO and PPLO are plainly Platinum affiliates.  See Trial Tr. at 1635:17–18.  Small nonetheless did not include the PPCO and PPLO bonds in the number of bonds held by Platinum and its affiliates in the consent solicitation documentation and he directed Platinum employees to vote the PPCO and PPLO bond several weeks before he disclosed them to Shearer.  See GX-294, -719.  Small personally directed the vote of these bonds despite knowing that Platinum's control (his control) of these bonds had not been disclosed to investors and without asking Shearer or the other lawyers involved in the transaction for advice about their status.

Taken together, the evidence establishes that Small, like his co-conspirators, acted knowingly and willfully in causing the consent solicitation to falsely state the number of bonds controlled by Platinum and its affiliates.

C.    Small's Conduct Is Evidence of his Consciousness of Guilt

The jury could reasonably infer from Small's conduct in concealing the truth from Black Elk's lawyers that he was conscious that what he was doing was wrong and violated the law, providing another basis for the jury's finding of intent.  United States v. Archer, 997 F.3d 181, 194 (2d Cir. 2020) ("Acts that exhibit a consciousness of guilt . . . tend to prove knowledge and intent of a conspiracy's purpose." (quoting United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014))). For example, the string of emails described above in which Small revealed, after the vote had closed, the existence of the bonds held by parties "not deemed affiliates"—which were the bonds held by PPCO and PPLO, undoubtedly affiliates of PPVA—could be interpreted as an effort to cover his and his co-conspirators' tracks, reflecting his consciousness of guilt.  As described above, prior to providing Shearer with the officer's certificate signed by Nordlicht and the table depicting Platinum's bondholdings (but, critically, not Beechwood's bondholdings) Small first requested an updated activity report, so that he knew exactly how many "yes" votes he had, and thus how many affiliated bonds could be excluded from the vote without affecting the outcome.   The only motivation he could have had to disclose, at this late date, the existence of the potentially-affiliated bonds was to insulate the fraudulent transaction by disclosing as much as he could without risking undoing the vote.  But even then, Small did not disclose the Beechwood bonds, hiding them instead under a category called "other."  See Landesman, 17 F.4th at 338 ("Nordlicht was aware of how many Black Elk bonds PPCO and PPLO owned, and Small's email disclosure of the PPCO- and PPLO-owned bonds to Shearer only after the Consent Solicitation had passed – when they knew they had enough votes to secure the passage of the amendments based on the Beechwood-held bonds – supports an inference that Nordlicht understood that PPCO and PPLO would likely be deemed affiliates and chose not to disclose them.").  Critically, while Small was aware from all of the email correspondence he sent and received throughout the spring and summer of 2014 that the

13

Beechwood entities held Black Elk bonds, that bonds had been moved from Platinum to Beechwood, and that Beechwood was going to vote the way Nordlicht dictated, he never revealed to Shearer the existence of the Beechwood bonds.  Small also never asked Shearer for advice regarding whether the Beechwood, PPCO, or PPLO were affiliates, despite his other communications with Shearer related to the affiliate rule.  See Landesman, 17 F.4th at 328 ("Notwithstanding this legal advice, we are not aware of any evidence in the record that Levy, Nordlicht, or Small disclosed the PPLO-, PPCO-, or Beechwood-owned bonds to Shearer prior to the dissemination of the Consent Solicitation, or sought Shearer's – or any other attorney's – advice regarding whether PPCO, PPLO, or Beechwood qualified as affiliates and should therefore be excluded from the consent calculation.").

Together with all of the other evidence of Small's knowledge, this supports an inference that he knew that what he and his co-conspirators were committing fraud by concealing the Beechwood bonds, and that he acted to minimize the risk that the fraud would be uncovered in the wake of the scheme's success.  See Landesman, 17 F.4th at 320 ("seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general." (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984))).

     D.    The Jury Heard Additional Circumstantial Evidence of Small's
             Motive and Fraudulent Intent

Also relevant to the jury's consideration of Small's state of mind is the circumstantial evidence demonstrating the significance of this transaction to Nordlicht, who was Small's boss and the principal of Small's employer.  The desperation and insistence that Nordlicht conveyed to Small supports an inference that Small might have been motivated to knowingly participate in a fraudulent scheme in order to satisfy Nordlicht, and therefore supports the jury's verdict.

For example, the jury was presented with abundant evidence demonstrating that Black Elk, one of Platinum's largest investments, was struggling. The testimony of Art Garza informed the jury that Black Elk was considering filing for bankruptcy following the explosion of one of its drilling platforms in the Gulf of Mexico. Trial Tr. at 80:11–82:1. This testimony was buttressed by internal emails in evidence reflecting the co-conspirators' awareness that Black Elk might enter bankruptcy and lacked sufficient cash to pay its bills. For example, on January 22, 2014, Nordlicht emailed Hoffman, Shulse, Small and Levy and described Black Elk as moving from "crisis to crisis" and "moving towards a litigation," observing that "there is not enough value after all your sales to pay everyone off." GX-507. Similarly, later in January, Shulse emailed Levy, Small and Nordlicht and "put the over under on a notice of involuntary bankruptcy filing at February 19th." GX-513.

Against that backdrop, other exhibits showed Nordlicht's desperation to extract some remaining value from Black Elk, specifically the proceeds of its asset sales. In GX-649, Nordlicht exchanged emails with Uri Landesman and described the situation at Platinum as "code red" and explained that "it can't go on like this." This informed the jury of the desperate state at Platinum during this time when Black Elk was circling the drain. Other emails showed that Nordlicht was desperate to pay off the holders of the Black Elk preferred equity. For example, on March 16, 2014, Nordlicht emailed Small and wrote "[t]his is also the week I need to figure out how to restructure and raise money to pay back 110 million of preferred which if unsuccessful, wd be the end of the fund." GX-552. This email supports a reasonable inference that Small felt under pressure from Nordlicht, given the crisis at Platinum, to find a way to pay the preferred. On June 23, 2014, Nordlicht emailed Levy, Small and Black Elk's counsel David Ottensosser about the upcoming asset sale to Renaissance, stating that Black Elk will "want to pay payables, WE NEED

TO RESIST THIS.  Get preferred paid off as quickly as possible . . . Let's get the mechanism done ASAP in terms of how we pay off bonds and get preferred paid. . . . I need liquidity ASAP."  This email further provides circumstantial support for a conclusion that Small and the co-conspirators acted with fraudulent intent, because they were motivated to get liquidity from the Renaissance transaction to the preferred as quickly as possible, and stooped to criminal conduct in order to do so.

      E.      <u>There Is No Evidence in the Record that Small Believed<br>Beechwood Was a "Friendly"</u>

Small devotes much of his brief to arguing that the government "failed to present evidence sufficient to demonstrate that Mr. Small viewed Beechwood as anything more than a 'friendly' bondholder."  Mot. at 12.  To the contrary, the record is bereft of any evidence that Small had any thought of the notion of a "friendly," in contrast to the evidence that Small was aware of Beechwood's affiliate status.

The only evidence in the original trial record showing that the concept of a "friendly" was ever discussed with Small is a single email dated March 3, 2014, in which Nordlicht wrote to Black Elk's in-house counsel, John Hoffman, along with Shulse, Levy and Small, "Hold for a little.  We have friendly buying 20 million."  DX-1-533.  This email has no bearing on Small's state of mind as to Beechwood's affiliate status.  First, it is entirely unclear what Nordlicht even intended by the use of the term "friendly" in this context.  Second, this communication was sent in March of 2014—more than three months prior to the launch of the public consent solicitation process—and did not include Shearer.  <u>See</u> <u>Landesman</u>, 17 F.4th at 338 (discounting similar reliance on "friendlies" emails by Nordlicht because it "related solely to the private consent solicitation process and occurred three months prior to the public consent solicitation process" and did not occur "in the course of a discussion with Shearer about the Affiliate rule").  Moreover, the

document does not refer to Beechwood, nor is it clear what "friendly" party Nordlicht was referring to. This two-line email from March of 2014, having nothing to do with the consent solicitation, and making no reference to Beechwood, is the <u>only</u> basis for the defendant's argument that he viewed Beechwood as a "friendly." Small cites a number of other emails from Nordlicht in which Nordlicht makes reference to friendlies; however, Small is not copied on any of them. Def. Mot. at 11.

Following the government's rebuttal, the Court re-opened the record and admitted DX-6799, a March 11, 2014 email from Nordlicht to Shulse, Hoffman, Small, and Levy—which was not previously offered by the defendant in his defense case—in which Nordlicht writes "we are likely to have friendlies buy the bonds as of tomorrow." As with DX-1-533, it is entirely unclear what Nordlicht meant by "friendlies" in the email, and there is no mention of Beechwood. DX-6799 also pre-dates the public consent solicitation process by three months and referred to an entirely different transaction, namely Black Elk's sale of assets to Fieldwood. As a result, neither of these documents can support the weight of Small's motion.

More importantly there is no evidence whatsoever of Small, or even Nordlicht, being told or otherwise having the understanding that Beechwood, PPCO, or PPLO were "friendlies" and not affiliates for the purposes of the Black Elk bond indenture. It is impossible that the defendant, a sophisticated financial professional and lawyer, thought PPCO and PPLO— Platinum funds managed by the defendant's employer and controlled by his boss—were mere "friendlies" and not affiliates. Yet he concealed their bondholdings from Shearer just as he did Beechwood's and he instructed Platinum's traders to vote the PPCO and PPLO bonds <u>before</u> Shearer was even aware of them. <u>See</u> GX-294, -719. Small never asked Shearer for advice as to PPCO, PPLO or Beechwood's affiliate status. This supports a reasonable inference that Small

knew all of these parties were affiliates, and chose not to disclose any of them in order to rig the vote.   For substantially the same reasons, the Second Circuit rejected this argument when it was made by Nordlicht and Levy:  "we are not aware of any evidence in the record that Levy, Nordlicht, or Small disclosed the PPLO-, PPCO-, or Beechwood-owned bonds to Shearer prior to the dissemination of the Consent Solicitation, or sought Shearer's—or any other attorney's—advice regarding whether PPCO, PPLO, or Beechwood qualified as affiliates and should therefore be excluded from the consent calculation."   Landesman, 17 F.4th at 328.   It should likewise be rejected here.

Small further argues that the government failed to demonstrate that Small viewed Beechwood as "anything more than a friendly," but the entire concept of "friendlies" was injected into the case by defense argument and rests on pure conjecture, not evidence.  For example, Small argues that certain witnesses such as Hoffman, Mark Feuer or Scott Taylor would, had they testified, have supported the conclusion that Small thought Beechwood was a friendly.  See Small Mot. at 12.  But none of that testimony is in the record—none of those witnesses were called by the government, or, by the defendant.  And on a motion under Rule 29, the only question is whether the jury verdict was sufficiently supported by the evidence in the case.  Florez, 447 F.3d at 154 (in assessing sufficiency, a court is "obliged to view the evidence in its totality and in the light most favorable to the prosecution").  Speculation as to what uncalled witnesses would have testified to had they been called to the stand by either party is not evidence.  Here, the evidence actually presented shows that Beechwood was an affiliate of Platinum's and that Small knew it.

Prior to and during the public consent solicitation process, which began in June 2014, Shearer told both Small and Shulse, repeatedly, that affiliate votes could not be counted in connection with determining whether the consent solicitation passed.  See, e.g., GX-1896 (June 3,

2014 email from Shearer attaching draft consent solicitation); GX-1899 (July 3, 2014 email from Sakowitz conveying legal advice that affiliate bonds cannot be counted); GX-1903 (request for officer's certificate relating to Platinum's bondholdings); Trial Tr. at 455:9–10 (Shearer "I do recall that I told them we wouldn't count the affiliate bonds"), 457:1–4 ("I told [Jeff Shulse] that we could not count affiliate's bonds in the public process."), 487:18 ("We had talked about the affiliate rule [with Small].").  Small understood the application of this rule; see GX-690 (July 3, 2014 email from Small to Shearer, Brittany Sakowitz and Shulse asking Shearer or Sakowitz to "confirm that under the TIA[,] if $5 million of the bonds were owned by an affiliate[,] then in order for the consent to be approved[,] a majority of 145 million (greater than 72.5 million) would need to consent."); GX-695 (July 9, 2014 email from Small to Sakowitz, Shearer and other BakerHostetler attorneys stating "$18,321,000 bonds are controlled by PPVA and should be disclosed and excluded from the calculation"); GX-726 (July 28, 2014 email from Small again seeking to confirm how the exclusion of affiliate bonds would affect the determination of the outcome).  Small never, not once, expressed confusion about what constitutes an affiliate, or asked Shearer for any guidance at distinguishing between a friendly and an affiliate.  Trial Tr. at 659:23–25.  While Small points out that Shearer "provided no testimony about Beechwood at all," that is obviously because, as he testified and as all the other evidence in the case showed, Small and his co-conspirators concealed the role of Beechwood in the consent solicitation from Shearer.  Trial Tr. at 305:14–16 ("Q: Did anyone ever tell you whether or not the company called Beechwood held Black Elk bonds? A: No, I don't recall hearing that information, no.").

        While Shearer accepted defense counsel's assertion that there exists a vernacular distinction between a "friendly" and an "affiliate," this testimony is irrelevant because Shearer was never asked to analyze or assess whether Beechwood, or any other company for that matter, was

an affiliate of PPVA's, or ever discussed with Small the distinction between and affiliate and a friendly.  Trial Tr. at 659:23–660:3 ("Q: Did Mr. Small ever ask you to explain the difference between a friendly bondholder and an affiliate bondholder?" A: No.").  Shearer may have acknowledged that "affiliate" and "friendly" are two different terms, Trial Tr. at 364:15–21, but at no point did he offer any opinions as to Beechwood's affiliate status (nor could he).  Because they never discussed it, Shearer also did not (and could not) offer any testimony regarding Small's understanding of the distinction between a "friendly" and an "affiliate" or Beechwood's status.  By contrast, his testimony reflected that he was intentionally kept in the dark by Small and his co-conspirators on this exact issue.

Small also suggests that Shearer, John Hoffman and Marizza Piche should have detected the defendants' fraudulent scheme and that their failure to do so exonerates Small, but this case is not about comparative fault, and allegations of negligence on the part of third parties do not bear on Small's guilt.  Specifically, Small contends that Shearer should have noticed when Small "repeatedly disclosed a number of affiliated bonds significantly lower" than the number of bonds Shearer was informed Platinum had held earlier in the year.  Mot at 18.  However, Shearer's failure to suspect Small of fraud does not exculpate Small.  By this logic, if Shearer "should have noticed" the discrepancy, then Small certainly should have noticed it, and explained to Shearer which bonds he had decided to include as affiliates and which he determined were not.  But of course, Small did not do so, because concealing the true state of Platinum and Beechwood's bondholdings was how the fraud scheme would succeed.  Likewise, Small argues that Shearer's testimony about the July 2014 memorandum prepared by Shearer's partners at BakerHostetler (the "BakerHostetler Memo," which was marked for identification as DX-6163 but not admitted into evidence), that referred to the true number of Platinum's bondholdings and Nordlicht's supposed

20

intent to use friendlies to vote in the consent, somehow represents an "acknowledge[ment] [of] the extent of his understanding about the proposed use of friendlies during the Consent Solicitation." Mot. at 18–19. This is disingenuous. Shearer was making no such acknowledgment—he testified truthfully that the BakerHostetler Memo shows only that other attorneys at his firm, BakerHostetler, "w[ere] contacted on or about 26 of June 2014 for advice on Platinum's use of friendly bondholders." Id. This is apparent from the face of the memo, but has no bearing on Shearer's state of mind at the time of the consent solicitation because Shearer was not aware of the memo in July 2014; in fact, he did not learn of its existence until he was shown the document years later during a civil deposition. See Trial Tr. at 576:23–577:10 (Shearer testifying that he did not see the BakerHostetler memo or learn its contents at the time). More importantly, the BakerHostetler Memo has no bearing on Small's state of mind either, as there is no evidence Small had anything to do with preparing the memo, received it, or even was aware of it at the time of the consent solicitation. There is also no evidence in the record that Small had any involvement in telling Piche and Hoffman about a supposed plan to use "friendlies," or even that Small was aware that Piche and Hoffman believed that to be the plan. See Landesman, 17 F.4th at 338 (rejecting Nordlicht's reliance on the same argument because there is "no evidence in the record that Nordlicht provided the information that formed the basis for this memo, that this memo was completed at Nordlicht's request, or that the memo opined on the affiliate status of any of the Platinum-related entities"); id. at 338–39 ("It is unclear how a memo unrelated to Nordlicht, undisclosed (at the time) to Shearer and sent to lawyers who were not working on the public consent solicitation process negates Nordlicht's intent to conceal the PPCO- and PPLO-owned bonds, particularly where, as here, Nordlicht affirmatively concealed information related to PPCO, PPLO, and Beechwood in response to Shearer's inquiries related to the Affiliate Rule.").

The fact that Shearer issued a legal opinion signing off on the transaction likewise has no exculpatory value to Small.  Mot. at 17.  Small did not present an advice-of-counsel defense, but, even if he did, it would have failed, because Small would not have been able to establish any of its elements, including most importantly that he "fully and honestly laid all of the pertinent facts before his counsel," United States v. Scully, No. 14-CR-208 (ADS), 2015 WL 5826493, at *4 (E.D.N.Y. Oct. 6, 2015).  Small did not fully or honestly provide Shearer with the relevant facts, which would have required him to merely forward to Shearer one of the many bond tracking charts he was exchanging with Nordlicht and Levy and requesting Shearer's advice as to which of those entities' bonds should be disclosed and excluded—he concealed them, intentionally, in order to rig the vote and defraud the bondholders.

Likewise, Hoffman and Piche's failure to thwart the fraudulent scheme perpetrated by Small, despite "receiv[ing] the same emails regarding friendlies that Shearer did," Mot. at 20–21, does not exculpate Small.  Hoffman and Piche did not provide the fraudulent number of affiliated bonds to disclose in the consent solicitation—Small did.

In contrast to the misleading conjecture and argument presented by the defendant, the actual evidence showed that Small had knowledge and understanding of Beechwood's affiliate status.  First, the evidence established that Small worked closely with Levy, and that they had shared an office while Levy was an employee at Platinum.  Trial Tr. at 793:7–12.  Levy and Small, together, continued managing the Black Elk position after Levy left to become the Chief Investment Officer at Beechwood, still under the direction of Nordlicht.  Trial Tr. at 1342:4–10. For example, in GX-657, on June 22, 2014, right around the time the public consent process started, Nordlicht emailed Levy and Small together to discuss management of Black Elk generally and their work on the consent solicitation process.  The fact that Levy, as Chief Investment

Officer—a top executive—at Beechwood, was working simultaneously on Black Elk on behalf of Platinum, at the direction of Nordlicht, who also founded Beechwood and ran Platinum, was sufficient evidence, standing alone, to support an inference that Small was aware of Beechwood and Platinum's affiliate status. See Landesman, 17 F.4th at 329 (explaining that levy's role as CIO at Beechwood while simultaneously managing Platinum's Black Elk position was itself evidence of Levy's awareness that Beechwood was an affiliate). Levy was in a position to make investment decisions on behalf of Beechwood and was simultaneously working for Nordlicht—together with Small, who was himself simultaneously engineering the consent solicitation that relied on Beechwood's consent votes being counted.

The evidence also showed that Small, together with Levy, Nordlicht and Shulse, was engaged, starting in April 2014, in tracking the ownership of the Black Elk bonds across Platinum and Beechwood entities. See, e.g., GX-584, -8, -693, -731. The evidence shows more than merely knowledge that Beechwood held bonds, it supports an inference that the conspirators were aware that the Platinum entities and the Beechwood entities were affiliated. See Landesman, 17 F.4th at 325 (explaining that Levy's receipt of the same charts was circumstantial evidence Levy was aware "that Platinum controlled a sufficient number of bonds to ensure that the amendments would pass"). Among other things, information about who is the beneficial owner of a given number of bonds is not publicly available; the very fact that the conspirators had access to real-time information about the status of Beechwood's books is circumstantial evidence of their relationship. Moreover, the series of emails makes clear that the bonds were merely being moved around across the various entities, the overall total did not materially change. And, it is clear from the documents that the conspirators were all aware of how Beechwood would vote in the consent

23

solicitation—and the jury could reasonably infer that this awareness resulted from their knowledge that Nordlicht would dictate Beechwood's votes.  See GX-25.

Furthermore, in GX-731, the conspirators went beyond updating one another on the status of the overall holdings across Beechwood and Platinum.  In this document, Small included a calculation, adding all the bonds controlled by Platinum across the various Platinum and Beechwood entities, and subtracting the disclosed holdings of PPVA, and determined that they held sufficient bonds to dictate the outcome of the vote.  As the Court in Landesman found, this evidence does not merely show that the defendants knew Beechwood held bonds, but "the fact that the table only excludes the $18.3 million bonds held by PPVA supports an inference that Levy knew the PPCO-, PPLO- and Beechwood held bonds had been concealed from Shearer and the bondholders and were being voted to ensure the amendment would pass."  Landesman, 17 F.4th at 326.  Of course, if that inference applied to Levy it also applies to Small, who coordinated the voting of the PPCO and PPLO bonds in late July, and who sent the email containing the calculation.  See GX-294, -719.

Other circumstantial evidence also supports an inference that Small was aware of Beechwood's affiliate status.  Among other things, Small sent several emails during the consent solicitation process arranging various meetings with Nordlicht and Levy and a company called Delek, and proposed that the meetings take place at Platinum or Beechwood, GX-68, -69, and himself participated in meetings relating to joint investments across Platinum and Beechwood.  GX-73.  And, Small proposed himself, a Platinum employee, working as a portfolio manager on a Beechwood investment.  GX-34.  This reflects his awareness of the close relationship between the two companies and their common business dealings.

24

Finally, Small's surreptitious conduct in his dealings with Shearer supports an inference not only of his knowledge of Beechwood's affiliate relationship with PPVA, but further, his intent to conceal that relationship.   The evidence shows that Small never mentioned Beechwood's role in the consent solicitation vote to Shearer, despite tracking the bonds held by Beechwood for months, together with those held by the Platinum entities, and knowing, well in advance of the close of the consent, how Beechwood would vote.   Even more significantly, the evidence shows that, after the close of the consent solicitation vote, Small decided to notify Shearer as to some number of votes submitted by bondholders that could be deemed affiliates of PPVA— which we now know to reflect the bonds held by PPCO and PPLO.   See GX-761.   Small never revealed to Shearer the fact that PPCO and PPLO, doubtless affiliates, held bonds and voted in the consent solicitation until after it was over.   And then he disclosed them using obfuscating language, and most importantly, never mentioned Beechwood's holdings.   See GX-761.   This conduct supports an inference that, to minimize the conspirators' potential legal risk, Small half-disclosed PPCO and PPLO's holdings to Shearer only after the vote closed and it was determined that enough bondholders had tendered that those votes were not needed to pass the consent.   But he chose not to flag the holdings of Beechwood because the consent would not have passed without them.   See Landesman, 17 F.4th at 339 ("The jury was entitled to infer that Small's email – sent after the transaction closed and Platinum had secured a sufficient number of votes to ensure the amendments' passage – was simply an effort to cover their tracks, rather than an act in good faith.").   If it were true that Small thought Beechwood or PPCO and PPLO were "friendlies" or that for some other reason there was no prohibition on them voting, the fact that the consent was destined to succeed would have been openly discussed with Shearer.   See id. at 328 (finding the same fact to be evidence of Nordlicht's intent).   Instead, the contemporaneous email

correspondence shows the conspirators, on one side of the curtain, all openly tracking and discussing Beechwood and Platinum's bondholdings and ensuring they had sufficient bonds to succeed in the vote, and, on the other side of the curtain, telling Shearer only about PPVA. This conduct supports a reasonable inference of both knowledge and intent; crediting all reasonable inferences in favor of the government, as the law requires, results in the failure of Small's motion on this basis.

Small argues that the government failed to prove sufficiently that he understood what "control" meant for purposes of the indenture. That is incorrect. Knowledge and intent can be proven through circumstantial evidence, United States v. Wexler, 522 F.3d 194, 208 (2d Cir. 2008) ("[B]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." (quoting United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998))), and the government was not required to offer direct evidence of Small acknowledging his understanding of the concept of affiliate. His knowledge can be, and was, reasonably inferred from the surrounding circumstantial evidence, including his decision not to ask Shearer for advice about the meaning of affiliate, his concealment of all of Platinum and Beechwood's bondholdings, and his belated disclosure of some number of bonds held by parties "not deemed affiliates." Yee's mistaken testimony about the definition of "control" under the indenture is irrelevant to Small's state of mind. The evidence shows that Small's mind was focused not on answering the legal question of what was or was not an affiliate— he never sought such advice, and yet still saw fit to exclude PPCO and PPLO's bondholdings from the consent solicitation statement. His decisions were rather driven by his desire to further the scheme to rig the vote.

F.    The Jury Has Already Rejected Small's Competing Inferences

Small argues that available inferences from the evidence presented by the government established facts that showed his innocence, see, e.g., Mot. at 18 ("Shearer was repeatedly informed of Platinum's extensive Black Elk bond holdings."), 20 ("Shearer issued a clean legal opinion . . . [which] he could not have done if the transaction even potentially was unlawful."), 21 ("The evidence indicates that 'friendlies' remained on Mr. Hoffman and Ms. Piche's radar throughout the relevant period.").  Small presented each of these arguments to the jury, and the jury rejected all of them.  See Trial Tr. at 1587:24–1589:5 (arguing that Nordlicht disclosed a plan to use friendlies to Hoffman and Piche in March in connection with bond purchases from MSD), 1623:24–1624:23 (arguing that Shearer had "in his file" "certificates for 90 million plus bonds), 1636:4–16 (arguing Shearer issued a clean legal opinion), 1634:19–1635:8 (baselessly arguing to the jury that Shearer "knows there's friendlies"), id. (arguing to the jury that "Piche, Hoffman, BakerHostetler . . .  [t]hey've all said they're friendlies . . . .").  While Small might wish the jury had accepted his arguments, under the governing legal standards for this motion, all reasonable inferences must be drawn in favor of the government—not the defendant. So, while it is true that Shearer was copied on emails relating to Platinum's bondholdings, it was reasonable for the jury to infer that Shearer was trusting the information his clients provided him, and not reviewing all of their prior statements from months earlier in order to cross-examine their subsequent representations.  See Trial Tr. at 661:25–662:7  (Shearer testified that he assumed Small was telling him the truth throughout the consent solicitation process).  This is particularly the case where, as here, the bonds were freely tradeable and therefore Platinum's bondholdings were not frozen in time.

Likewise, it was reasonable for the jury to reject Small's reliance on Shearer's clean legal opinion, Trial Tr. at 1636:4–16, and conclude that Shearer issued a clean legal opinion not

27

because he made an independent assessment of the transaction with knowledge of all the facts, but because the evidence showed that the conspirators deprived him of the most relevant facts, including, critically, Beechwood's bondholdings.

Moreover, whether the issue of "friendlies" was or was not on Hoffman and Piche's "radar," Mot. at 21; Trial Tr. at 1587:24–1589:5, 1634:19–1635:8 (presenting the same argument to the jury), the evidence supports a clear inference that Small knowingly and willfully caused the bondholders to be lied to about the number of bonds Platinum controlled and the extent to which they controlled the vote, and that Hoffman and Piche's knowledge did not change their conclusion as to those facts.  Many of Small's arguments relating to the involvement of "friendlies" in bond transactions engineered by Nordlicht were based on emails from earlier in 2014, in connection with entirely different transactions, and did not even necessarily involve Beechwood.  See Mot. at 11 (referring to negotiations with bondholders represented by Milbank in early 2014); 1587:24–1589:5 (arguing that the Hoffman and Piche knew that Nordlicht "flipped bonds to Beechwood" based on emails from March 2014 that do not mention Beechwood at all).  See also Landesman, 17 F.4th at 337–38 (rejecting reliance on emails regarding "friendlies" from earlier in 2014). While Small urged the jury to conclude that those friendlies were, in fact, Beechwood and that therefore Small understood Beechwood to be a "friendly," it is also a reasonable inference for the jury to assume that those transactions had nothing to do with the consent solicitation vote and were in fact totally irrelevant, just as the Second Circuit explained in Landesman.  See id. at 338.  In sum, all of the inferences the defense urges were rejected by the jury in favor of reasonable inferences in favor of the government.  This Court is bound to do the same.

III.    Small's Lies Were Material

    A.    Applicable Law

        In reaching its verdict, the jury was required to find beyond a reasonable doubt that the misstatements and omissions made in furtherance of the Black Elk bond scheme misrepresented material facts.  As the jury was instructed, a "material fact is one that would have been significant to a reasonable investor's investment decision . . . [that] would have been viewed by [a] reasonable investor as having significantly altered the total mix of information available." Trial Tr. at 1775:15–22.  See also Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (citing Basic v. Levinson, 485 U.S. 224, 231 (1988)).   "Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'"  United States v. Litvak, 808 F.3d 160, 175 (2d Cir. 2015) (quoting United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976))).  Only "[w]here the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' [courts] may find the misstatements immaterial as a matter of law." Id. (quoting Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 131 (2d Cir. 2011)).

    B.    The Conspirators' Lies Were Material

        The jury's verdict reflects a reasonable conclusion that the lies told by the conspirators about Platinum's bondholdings and the extent to which Platinum controlled the consent solicitation vote were material.  As the Second Circuit concluded in affirming Nordlicht's and Levy's convictions, "[b]y misrepresenting the number of bonds held by affiliates under common control with Black Elk, the defendants misled the bondholders into thinking that the outcome of the public consent solicitation process would be a product of a legitimate vote when, in fact, it was predetermined based on the votes of the PPCO-, PPLO-, and Beechwood-held bonds,

29

over which Platinum exercised control.  The number of affiliated bonds was 'material to [the] bondholders because it altered the calculus of consent.'"  <u>Landesman</u>, 17 F.4th at 341 (quoting <u>United States v. Nordlicht</u>, No. 16-CR-640 (BMC), 2019 WL 4736957, at *12 (E.D.N.Y. Sept. 27, 2019)).

        This conclusion is buttressed by the testimony of the victim investors at the Small trial.  Investor Todd Pulvino explained that it would have mattered to him to know that the outcome of the consent solicitation was essentially pre-determined and also that the specific representation as to the amount of affiliated bonds was important to him, because it altered his calculus of how likely it was that the consent solicitation would pass.  <u>See</u> Trial Tr. at 697:11–17 ("We thought it would be unlikely that you could get $66 million worth of bonds to vote for these consents, that it was dispersed enough that that would be an unlikely event.  Q: So it wasn't just the fact that there were affiliated bonds, it was the number that was important to you?  A: Yes.").  Investor Dixon Yee similarly testified that it was important to him that affiliated bondholders would not be counted in the vote, Trial Tr. at 917:9–15, and that the specific number of affiliated bonds disclosed, <u>i.e.</u> 18.3 million, was important to him because it formed his basis of the analysis of whether the amendments to the indenture were "likely or unlikely" to pass.  <u>Id.</u> at 921:2–12; <u>see also</u> <u>Landesman</u>, 17 F.4th at 341 (explaining that the defendants' lies were material because "'[i]f the bondholders who opposed the amendment knew the amendment was more likely to pass, they would then be more likely to tender their bonds in the consent solicitation if they decided it would not be worth investing in Black Elk in light of the amended indenture.'" (quoting <u>Nordlicht</u>, 2019 WL 4736957, at *38)); <u>id.</u> at 341–42 (relying on substantially identical testimony from Pulvino and Yee to find the defendants' lies material).  While the materiality of the misrepresentations in this case is clear as a matter of common sense, the specific credible testimony of two victim

investor witnesses conclusively established this element beyond a reasonable doubt, and the jury was reasonable to credit it.

Small attempts to challenge the jury's conclusion as to materiality by pointing out to subsequent decisions made by the victim investors at issue, Mot. at 34, but that post hoc conduct is irrelevant to the question of whether or not the information in the consent solicitation was material to the investors at the time that they received it. See Trial Tr. at 929:6–13 (Yee explaining that, [months after the vote was over and the bonds had lost value due to the rigged vote], his company bought additional bonds to attempt to create a market for them so they could sell). Small also points to the relatively constant market price for Black Elk bonds following the consent, but this too has no bearing on the materiality of the fraudulent misstatements at issue. For one thing, as Yee testified, the market in Black Elk bonds at this point was fairly illiquid. For another, market prices for securities fluctuate for nearly infinite reasons, and the idea that a transaction enabling the controlling shareholder to divert $70 million out of a company on the precipice of bankruptcy was not material to the company's bondholders with a security interest in the company's assets is contrary to basic common sense. The misrepresentations in this case went to the very terms and security of the Black Elk bonds—they were material by any conceivable measure.

IV.   There Was Sufficient Evidence of Nordlicht's Control of Beechwood

Small also contends that the government failed to establish the defendant's guilt because the evidence did not show that Nordlicht was in fact in control of Beechwood. The evidence presented at this trial to show Nordlicht's control is in pertinent part identical to that which was presented at the 2019 trial, and which this Court and the Court of Appeals found sufficient to establish that Beechwood was under Nordlicht's control. See Nordlicht, 2019 WL 4736957, at *11 ("viewed in the light most favorable to the Government, the Government adduced

sufficient evidence for the jury to conclude that Beechwood was under common control with Platinum"); Landesman, 17 F.4th at 334–36.

The trial evidence showed that Nordlicht helped in founding Beechwood, GX-625, hired key personnel, Trial Tr. at 818:24–819:7, staffed Beechwood with multiple C-level executives who worked for him at Platinum while simultaneously working at Beechwood, id. at 797:18–802:19, GX-710, understood Beechwood to be under his control, GX-625, moved tens of millions of dollars of Black Elk Bonds from Platinum funds to Beechwood's books at his mere instruction, GX-9510, GX-678, GX-691, Trial Tr. at 838:17–839:7, and supported an inference that he dictated how they would vote in the consent solicitation, Trial Tr. at 867, 874:17–877:4; GX-727, -728.  No matter what definition of "control" Small puts forth, Nordlicht's ability to direct decisions on staffing, investments, and business transactions qualifies.  And, while Small argues that the government was required to prove that Nordlicht had control specifically over Beechwood's reinsurance business, that argument has no support.  The affiliate analysis for purposes of the indenture does not require that one party have control over each and every aspect of the other's business—by that logic it could be argued that Nordlicht lacked control of Beechwood because he did not oversee its janitorial staff.  Rather, the definition requires exactly what the language says: proof that one party had the power to "direct or cause the direction of the management or policies" of Beechwood.  The evidence presented showed unquestionably that Nordlicht had that power.  As the Second Circuit found, the evidence presented at the trial of Nordlicht and Levy in 2019, which is largely the same as to what was presented here, was sufficient to support a rational jury's finding that Beechwood and Platinum were affiliates—and nearly all of that evidence has been presented in this trial.  Landesman, 17 F.4th at 315, 322 (describing Beechwood as "Platinum-affiliated and controlled."), 329 ("[t]he email evidence supports an

inference that Levy understood the Platinum-controlled bonds, including those owned by PPCO, PPLO and Beechwood, likely qualified as affiliates"), 330 ("Viewing the evidence as a whole, a rational jury could have concluded . . . that Beechwood likely qualified as an affiliate for purposes of the Indenture.").   And there was additional evidence of Nordlicht's control over Beechwood presented at this trial that was not present at the prior trial, including testimony from Beechwood's and Platinum's IT director, Paul Poteat about the overlap between Beechwood and Platinum's IT systems, overlap in personnel, and Beechwood's early physical presence at Platinum.[2]

Israel Wallach, a Beechwood trader, provided key testimony about Nordlicht's control over Beechwood.  See Landesman, 17 F.4th at 335 & n.5 (relying on substantial similar direct testimony from Wallach in the 2019 trial as evidence of Nordlicht's control of Beechwood). Wallach's testimony established that Nordlicht and Levy were responsible for and made decisions regarding Beechwood, including its Black Elk bond holdings.  Specifically, Wallach testified that Nordlicht founded Beechwood, Trial Tr. at 818:24–25, was the one who hired Wallach as a trader, Trial Tr. at 819:1–2, told Wallach how much money Wallach would have to invest, Trial Tr. 823:10–20, and that Levy acted as Beechwood's CIO, Trial Tr. at 821:14–18.  Wallach's testimony also established that Nordlicht used Beechwood and Platinum email addresses interchangeably to discuss Beechwood business with Wallach.  Trial Tr. at 834:17–18, 836:13–15, 840:1–3.  Wallach also confirmed Poteat's testimony that numerous senior Platinum employees worked at both Platinum and Beechwood.  Trial Tr. 826:10–25.  With regard to the Black Elk bonds, Wallach testified that Nordlicht put the bonds on Wallach's profits and loss ("P&L") portfolio, and Wallach did not do any analysis on whether to purchase the bonds, did care about those bonds and followed

---

[2]      The fact that Poteat was not involved personally in the transaction, Mot. at 57, is beside the point; his personal dealings with Small are not why he was called as a witness.

Nordlicht's direction with respect to them.  See, e.g., Tr. at 827:19–828:24.  Wallach's emails corroborated his testimony and demonstrated that he took direction from Nordlicht with respect to all matters involving the Black Elk bonds and that Nordlicht had directed the transfer of more than $27 million of bonds from Platinum entities to Beechwood entities.  GX-9510.  When he became aware of the consent solicitation, Wallach sent contemporaneous emails to Nordlicht and Levy reflecting his expectation that they were handling the decision-making on how Beechwood's Black Elk bonds would vote in that process.   GX-1796, -1797.

The Court should also disregard the civil law decisions addressing "control" cited by Small.  As the Second Circuit explained, these decisions involve distinguishable facts and do not "involve a company, like Platinum, whose executives (here, Nordlicht and Levy) ran a core part of the alleged affiliate company's business, controlled the alleged affiliate company's investment decisions, and controlled the way in which the alleged affiliate company voted in connection with its investments."  17 F.4th at 336 n.6.  The evidence showed that Nordlicht's control of Beechwood went beyond just controlling this transaction, as it did at PPCO and PPLO for that matter, and was sufficient to establish the affiliate status of Beechwood and the Platinum entities for the purposes of the indenture.

Small argues that a 2015 letter from Beechwood's finance director, DX-2102-B undermines a conclusion that Platinum and Beechwood were affiliates.  Mot. at 30.  DX-2102-B is an April 2015 letter from Elliot Feit in response to an inquiry from CohnReznick in connection with their work auditing PPCO.  DX-2102-B does not support an argument that any of the conspirators believed that Beechwood and Platinum were not affiliates at the time of the consent solicitation.  As an initial matter, the letter, prepared by a fairly junior Beechwood employee, substantially post-dates the consent solicitation process, by which time certain of the defrauded

34

bondholders had begun asking questions about the legitimacy of the vote.  Trial Tr. at 931:23–932:25 (testimony of Dixon Yee).  Also, among other things, the Feit response is attached to a letter from Daniel Mandelbaum, CFO of PPCO, that shows over $100 million in transactions between Beechwood and a single Platinum entity, PPCO, during 2014.  Given that Small himself has argued that Beechwood's own customer agreements forbade related party transactions, Trial Tr. at 1246:5–1247:22, Beechwood's submission of such a letter should be viewed with skepticism (the jury apparently agreed) and certainly provides no basis to dismiss the prosecution.

V.    Small's Conviction Does Not Violate the Due Process Clause

Small argues that his convictions "cannot stand because they violate the fair warning requirement of the Due Process Clause of the Fifth Amendment," in that the "indenture's definition of 'affiliate,' . . . is too vague to serve as the basis for a criminal conviction, and because the government "failed to negate a reasonable interpretation of that definition that renders" Small's conduct lawful.  Mot. at 36.  For the reasons set forth below, this argument is unpersuasive on the facts of this case.

A.    Applicable Law

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  United States v. Ng, No. 18-CR-538 (MKB), 2022, WL 1062704, at *8 (E.D.N.Y. Apr. 8, 2022) (quoting Beckles v. United States, 580 U.S. —, —, 137 S. Ct. 886, 892 (Mar. 6, 2017) (additional citations omitted)).  "In reviewing an as-applied challenge, courts focus on the twin concerns of the void-for-vagueness doctrine—fair notice and arbitrary enforcement."  United States v. Doe, 145 F. Supp. 3d 167, 178 (E.D.N.Y. 2015) (citing United States v. Farhane, 634 F.3d 127, 139 (2d Cir. 2011)).  "On as-applied review of the 'notice' requirement of due process, courts ask whether the

35

challenged 'statute, as written, provides notice sufficient to alert 'ordinary people [as to] what conduct is prohibited.'" Farhane, 634 F.3d at 139 (quoting Arriaga v. Mukasey, 521 F.3d 219, 224 (2d Cir. 2008)) (additional citations omitted). "Statutes need not, however, achieve 'meticulous specificity,' which would come at the cost of 'flexibility and reasonable breadth.'" Arriaga, 521 F.3d at 224–25 (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972). "The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Id. (quoting Jordan v. De George, 341 U.S. 223, 231 (1951)). But, "[t]he vagueness issue on an as-applied challenge is not whether the statute's reach is clear in every application, but whether it is clear as applied to the defendant's conduct." Ng, 2022 WL 1062704, at *8 (quoting United States v. Houtar, 980 F.3d 268, 276 (2d Cir. 2020)). Thus "one whose conduct is clearly proscribed" by a law may not challenge the law on the ground of vagueness." United States v. Strauss, 999 F.2d 692, 698 (2d Cir. 1993).

B.   The Securities Fraud Statutes Are Not Unconstitutionally Vague as Applied to Small

The securities fraud statutes are not vague, and the Black Elk scheme is in the heartland of the frauds prohibited by these statutes. Like other anti-fraud prohibitions, the statute and operative regulations forbid schemes and artifices to defraud, "untrue statements of material fact," and practices that "operate as a fraud and deceit" upon securities holders. See 17 C.F.R. 240.10b-5; 15 U.S.C. § 78j(b). The Exchange Act and Rule 10b-5 are not unconstitutionally vague. See United States v. Zaslavskiy, No. 17-CR-647 (RJD), 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018); see also Salman v. United States, 580 U.S. 39, —, 137 S. Ct. 420, 428 (2016) (rejecting as-applied vagueness challenge to securities fraud statutes). The meaning of the prohibition on "schemes to defraud" is well established through decades of case law. Cf. McNally

v. United States, 483 U.S. 350, 358 (1987) (explaining the development of the "scheme or artifice to defraud" language found in the federal fraud statutes).

        In addition to proof of deceit, the securities fraud statutes require proof of intent to defraud; that is an intent to deceive and an absence of good faith.  The statute's intent requirement ensures that it does not become a "trap for those who act in good faith," United States v. Ragen, 314 U.S. 513, 524 (1942), the central concern of the fair notice doctrine.  It is precisely because of this intent requirement that the Second Circuit has repeatedly rejected vagueness attacks on the federal anti-fraud statutes.  See United States v. Rybicki, 287 F.3d 257, 263 (2d Cir. 2002); United States v. Margiotta, 688 F.2d 108, 129 (2d Cir. 1982); see also United States v. Sachakov, 812 F. Supp. 2d 198, 213 (E.D.N.Y. 2011) ("The statute's scienter requirement provides further protections for the defendant.  By requiring that the government prove that the defendant's conduct was knowing and willful, 18 U.S.C. § 1347(a), the statute avoids criminalizing innocent errors caused by a mistaken interpretation . . . ."); United States v. McLean, 715 F.3d 129, 137 (4th Cir. 2013) (Explaining that requirement of fraudulent intent in federal healthcare fraud statute "eliminates the fair notice concerns [the defendant] raises."); United States v. Franklin-El, 554 F.3d 903, 911 (10th Cir. 2009) ("Although a specific intent requirement does not necessarily validate a criminal statute against all vagueness challenges, it does eliminate the objection that the statute punishes the accused for an offense of which he was unaware." (quoting United States v. Stewart, 872 F.2d 957, 959 (10th Cir. 1989))); United States v. Concord Mgmt. & Consulting LLC, 347 F. Supp. 3d 38, 60 (D.D.C. 2018) ("First, the state of mind required—an intent to defraud the United States by impairing its lawful government functions— 'alleviates vagueness concerns, narrows the scope of [the statute's] prohibition, and limits prosecutorial discretion.'" (quoting McFadden v. United States, 576 U.S. 186, 197 (2015))).

Against this backdrop, the criminal conduct alleged here is a quintessential scheme to defraud.  Small and his co-conspirators were convicted of deceiving Black Elk bondholders in connection with the consent solicitation and tender offer to amend the Black Elk indenture.  The Black Elk bonds are indisputably securities.  The consent solicitation was in connection with a securities transaction because it involved an actual tender offer for the purchase of the Black Elk Bonds.[3]  The scheme itself also was not novel, but involved both material misstatements and deceitful conduct.  The lie, included in the consent solicitation at the defendant's direction, was that Platinum and its affiliates controlled only the $18.3 million Black Elk bonds held by PPVA, when in fact Platinum controlled many millions of additional bonds held by PPCO, PPLO, and Beechwood.  See GX-8406 ("Platinum Partners Value Arbitrage Fund L.P. and its affiliates . . . own approximately $18,321,000 principal amount of the outstanding Notes.  Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any Notes.");  see also GX-699 (Small provides this information to BakerHostetler), GX-695 (same).  This representation was false and material for the reasons described above, see supra at 29–35.  In addition, the defendant and his co-conspirators acted deceitfully by transferring approximately $37 million in Black Elk bonds to Beechwood, an entity Nordlicht controlled but which had not been disclosed to Shearer.  See Trial Tr. at 1771:18–21 (Explaining that, "[h]ere, the Government alleges that the defendant participated in a scheme to conceal from bond holders the number of

---

[3]      At trial, Small argued that inducing a holder not to sell securities is not "in connection with" a purchase or sale of securities, but the Court rejected this argument, see Trial Tr. at 1517:16–19, and Small does not contend here that the Court wrongly instructed the jury on this element.  Moreover, and as noted above, there is no disputing that the consent solicitation included an actual offer to purchase the Black Elk bonds.

Black Elk bonds held by affiliates and to vote those bonds in connection with the Black Elk consent solicitation.").

The jury was also instructed repeatedly that it must find that Small acted with intent to defraud, that he acted willfully, and that he did not act in good faith. See Trial Tr. at 1778:9–16 ("Intent to defraud means to act knowingly and with the intent to deceive. Next, willfully means to act with knowledge that one's conduct is unlawful and with the intent to do something that the law forbids; that is to say, with a bad purpose to disobey or disregard the law. A defendant's conduct was not willful if it was due to negligence, inadvertence or a mistake."); see also id. at 1779:2–14 ("No matter how misleading or deceptive an act may be, it is not fraudulent if it was devised or carried out in good faith. . . . If the defendant believed in good faith that he was acting lawfully, even if he was mistaken in that belief and even if others were harmed by his conduct, there would be no crime."). These instructions are in accordance with Rybicki, Margiotta, and the other Circuit authorities cited above, and they ensure that the securities fraud statutes did not, in this case, become a "trap for those who act in good faith," Ragen, 314 U.S. at 524.

In fact, the Court went further in this case than the general intent instructions described above. At the defendant's request and with the government's consent, the Court instructed the jury specifically that the defendant could not be convicted based on a mistaken, but good faith understanding of the definition of "affiliate" (and "control"), the very source of vagueness he claims here:

> To meet this standard the Government is required to prove beyond a reasonable doubt that the defendant knew that the rule governing which bonds were required to be disclosed to bond holders as affiliated and which bonds were permitted to vote in connection with the consent solicitation was violated. In making this determination, you should apply the definition of affiliate that I gave you previously.

Trial Tr. at 1780:1–7.  And the defendant repeatedly presented this intent defense to the jury, which rejected it.  See Trial Tr. at 31:12–20 (arguing in opening statement that "[n]ow, when it comes to this affiliate rule that was confusing to all the people that worked on this case, you may decide that Dan made some mistakes, that he misunderstood the rule, . . . Ladies and gentlemen, mistakes are not crimes"), 1647:17–20 (arguing on summation that "[w]e concede. He may have made a mistake. It's a mistake, okay? He should have said 63 million. He should have said 86. I don't know. But how can the man be guilty of a Federal crime when the lawyers count all the bonds?"), 1649:7–9 (arguing on summation that "I respectfully submit, is that Dan Small may have made a mistake on the 18 million, a mistake that was made at least trying to apply the rule.").    The jury rejected these arguments in finding the defendant guilty, concluding that he understood the indenture's definition of "affiliate"—as the jury instructions explicitly required—and acted with intent to defraud.

Accordingly, whatever potential for vagueness might exist in the securities fraud statutes, these laws plainly applied to the defendant who acted willfully, with intent to defraud, and made no mistake.  See Franklin-El, 554 F.3d at 910 ("one 'to whose conduct a statute clearly applies may not successfully challenge it for vagueness'" (quoting United States v. LaHue, 261 F.3d 993, 1005 (10th Cir. 2001))).

C.    Vagueness Doctrine Applies to Statutes Not Private Contracts

The void-for-vagueness doctrine applies to statutes, and not to regulations or private contracts.  See United States v. Janati, 237 F. App'x 843, 846 (4th Cir. 2007) ("The vagueness inquiry rests on whether the challenged *law* provides sufficient notice for people to conform their conduct to the law and to prevent arbitrary or discriminatory enforcement." (citing Hill v. Colorado, 530 U.S. 703, 732 (2000) and Kolender v. Lawson, 461 U.S. 352, 357 (1983))); Sachakov, 812 F. Supp. 2d at 213 ("The language of the statute is unambiguous on its face. Nor

40

does the statute, in its own terms, rely on or incorporate the MCP Manual or the CPT Manual to define the conduct it criminalizes. Any ambiguity in those manuals does not create ambiguity in an otherwise unambiguous statute. The meaning of fraud is clear."); United States v. Shin, No. 19-CR-552 (JPC), 2022 WL 3274120, at *6 (S.D.N.Y. Aug. 11, 2022) ("Here, Shin only claims that the SBA regulations, which do not create criminal liability, do not define 'financial interest.' That argument mistakes the inquiry. Shin does not argue that the statutes of conviction failed to put an ordinary person on notice.") (internal citation omitted); United States v. Connolly, No. 16-CR-370 (CM), 2018 WL 2411216, at *2 (S.D.N.Y. May 15, 2018) ("In any event, 'fair notice' requires a court to determine whether a 'statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.' The BBA's [British Banking Association's] rules and guidance are not statutes." (quoting United States v. Halloran, 821 F.3d 321, 338 (2d Cir. 2016))); United States v. Gosy, No. 16-CR-46, 2019 WL 948179, at *5 (W.D.N.Y. Feb. 27, 2019) (agreeing with Sachakov and explaining that "claims that these rules and regulations are 'confusing' and 'nonbinding' may function as a defense at trial" but does not render a statute "unconstitutionally vague").  For the reasons provided above, the securities fraud statutes that Small violated are not unconstitutionally vague.

The Black Elk indenture and its definition of "affiliate" is not a criminal statute with the force of law, and it is not subject to the same analysis.  Were the law otherwise, the application of the anti-fraud statutes would depend in an innumerable number of cases on the complexity of contracts drafted by third parties, without regard to whether the requirements of the fraud statutes—including intent to defraud—were satisfied.  Such a rule is fundamentally inconsistent with the Supreme Court's admonishment that "securities laws combatting fraud should be construed 'not technically and restrictively but flexibly.'"  United

States v. Carpenter, 791 F.2d 1024, 1029 (2d Cir. 1986) (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 386–87 (1983)).

In asking this Court to extend the vagueness doctrine to private contracts, the defendant relies on a single outlier case from another district, United States v. Bryant, 556 F. Supp. 2d 378 (D.N.J. 2008). The defendant has not cited any case adopting the reasoning in Bryant in the 14 years since that case was decided and for good reason. As relevant here, the defendant in Bryant was charged with honest services wire fraud based on a scheme to defraud a federally-funded medical school through illegitimate bonuses. Id. at 440. Whether the bonuses were illegitimate in turn depended on whether they were authorized in violation of the medical school's policies. Id. The Bryant court held that the school's policy was subject to challenge as unconstitutionally vague, but in reaching that decision it relied on inapposite cases addressing proof of falsity in false statements cases and a fraud case addressing whether the defendant's misstatements were actually false. United States v. Race and United States v. General Dynamics Corp. each consider whether a defendant's misstatement to the government could be false, in violation of 18 U.S.C. § 1001, if it was in response to an ambiguous contractual requirement. 632 F.2d 1114, 1117 (4th Cir. 1980); 644 F. Supp. 1497, 1501 (C.D. Cal. 1986). United States v. Migliaccio, a fraud case, addressed whether the government had proved a material misstatement and fraudulent intent if the defendant's statement was in response to an ambiguous regulation. 34 F.3d 1517, 1523, 1525 (10th Cir. 1994). These cases stand for the proposition that an ambiguity in a contract or regulation can bear on whether the government can prove key elements in a fraud or false statements prosecution—exactly what the defendant argued here—but they do not address whether the law was unconstitutionally vague. Moreover, the Bryant court went on to set up an inquiry, under the guise of vagueness, that addresses whether the government has proved a material

misrepresentation, not whether the law provides adequate notice.  The <u>Bryant</u> court inquired into whether under "a reasonable interpretation" of the policy at issue the defendant's conduct would not have violated the policy.  Since <u>Bryant</u>, the Second Circuit has explained that this inquiry actually goes to whether the government has proved falsity.  <u>See</u> <u>United States v. Connolly</u>, 24 F.4th 821, 834, 843 (2d Cir. 2022) (concluding that the government's evidence was insufficient to prove falsity because the government failed to negate a "reasonable interpretation" of policy under which the statements were responsive).[4]

In any event, even accepting the (incorrect) premise that the indenture was subject to a vagueness challenge, the definition of "affiliate" in the instrument is not so "standardless" that it is unconstitutionally vague.  <u>See</u> <u>Landesman</u>, 17 F.4th at 339 (rejecting argument that the government relied on "a version of the affiliate rule that was entirely unmoored from the applicable legal definition").  The indenture provides that an "affiliate" is any other "Person directly or indirectly controlling or controlled by or under direct or indirect common control" with another person.  And "control" is in turn defined as "the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise . . . ."  GX-9507 at 6.  This definition provides an additional level of detail and clarity beyond that found in the statutes cited by the defendant.  In <u>Kolender</u>, the statute hinged on whether identification was "credible and reliable" but gave no insight into what those terms meant.  <u>See</u> 461 U.S. at 358 ("as presently drafted and as construed by the state courts, [the statute] contains no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification").  The statute in <u>Smith v. Goguen</u>, applied to

---

[4]     As discussed further below, the Court correctly found that this case does not present the same issue as in <u>Connolly</u>.  <u>See</u> Trial Tr. 1517:11–15.

treating a flag "contemptuously", but did not define that word at all.  415 U.S. 566, 580 (1974).

Likewise, the statute at issue in Manning v. Caldwell, did not define either "habitual" or

"drunkard."  930 F.3d 264, 275 (4th Cir. 2019).  "Control" as used in the indenture is not similarly

undefined.  "Control" means the "power to direct" and that power must be with respect to the

"management" or "policies" of another person.  Additionally, "control", and its subsidiary

definitional components, do not incorporate pejorative, highly subjective concepts like "drunkard"

or "contemptuously."[5]

It is irrelevant that, as Small claims, the United States Securities and Exchange

Commission (the "SEC") has refused to opine on issues of "affiliate or control" status in advance.

See Mot. at 38–39, 44.  As Small concedes, the SEC has explained that this policy is because the

Commission's staff are not in a position to evaluate factual questions ex ante without an

investigation.  See Motion at 38.  As the SEC has explained it is "the company and its counsel,"

i.e. the defendant and his co-conspirators, who are in the best position to make these judgments.

The vagueness doctrine is not directed at standards that require knowledge of the facts and

circumstances—that is what trials are for—it is directed at standards that cannot be reliably applied

even when the facts and circumstances are known.  The definitions of "affiliate" and "control" in

the indenture are not such standards.

---

[5]     The cases cited by the defendant address the "arbitrary and discriminatory
enforcement" prong of the vagueness doctrine.  Such a claim is meritless in this case because, as
explained above, Small's conduct falls "within the core of the statute's prohibition, so that the
enforcement before the court was not the result of the unfettered latitude that law enforcement
officers and factfinders might have in other, hypothetical applications of the statute."  Ng, 2022
WL 1062704, at *8 (quoting Houtar, 980 F.3d at 277) (additional citations omitted).

D.      Connolly Is Inapposite

The defendant's reliance on United States v. Connolly is misplaced.  Connolly addresses what the government must prove to establish a material misstatement and scheme to defraud.  It does not address due process—an issue the Second Circuit expressly declined to decide in Connolly.  As the Court has already found, Connolly dealt with a standard that was less defined than the definition of "affiliate" and therefore required additional instruction from the Court.  See Trial Tr. at 1517:11–15 ("Now, first, I'm disagreeing with the defendants on Connolly. I think Connolly was a very special rule. Here we have definitions in the instrument itself, and we don't need the kind of detail that Connolly did need with a much more vague situation.").

In Connolly, the defendants were charged with wire fraud and bank fraud in connection with a scheme to manipulate LIBOR, an interbank interest rate, through materially false information provided to the British Banking Association (the "BBA") on behalf of Deutsche Bank.  24 F.4th 821, 824 (2d Cir. 2022).  The information provided to the BBA was provided in response to a prompt requesting "*the rate* at which it [the responding bank] *could borrow funds*, were it to do so *by asking for* and *then accepting* inter-bank offers *in reasonable market size* just prior to 1100."  Id. at 825.  The BBA provided no further information about the meaning of the prompt—it did not, for example, say that the banks were required to submit only rates that they *would* accept, nor did it define a process for how the responding banks were supposed to come up with their submissions.  The prompt was also intentionally hypothetical.  Id. at 835.  Instead of submitting the absolute lowest rate at which Deutsche Bank could borrow funds, at times, the defendants caused Deutsche Bank to submit rates that would benefit Deutsche Bank's trading positions.  Id. at 828.  The Second Circuit held that there was insufficient evidence that these "trader-influenced" submissions were actually false; in other words, the Circuit held that the government failed to prove that there was a material misrepresentation.  Id. at 842–43 ("The

government failed to produce any evidence that any DB LIBOR submissions that were influenced by the bank's derivatives traders were not rates at which DB could request, receive offers, and accept loans in DB's typical loan amounts; hence the government failed to show that any of the trader-influenced submissions were false, fraudulent, or misleading."). Having found that the government did not prove a material misrepresentation (or scheme to defraud), the Circuit expressly did not address the defendant's due process arguments. See id. at 843 ("In light of our conclusion that there was insufficient evidence to support defendants' convictions because of the government's failure to prove falsity, we need not reach defendants' alternative challenges to their convictions."), 832 ("Because we conclude, for the reasons that follow, that the evidence was insufficient to prove that defendants caused DB to make LIBOR submissions that were false or deceptive, *i.e.*, to prove that they engaged in conduct that was within the scope of § 1343, we reverse defendants' convictions. We thus need not reach defendants' other contentions . . . ."). Accordingly, Connolly does not support the defendant's due process argument.

The differences between Connolly and this case are also instructive. Unlike in Connolly, this case does not present an interpretative dispute which, if decided in the defendant's favor, would mean the government did not prove a material misrepresentation.[6] In Connolly, the parties disputed whether the text of the BBA's prompt prohibited trader-influenced submissions. There is no equivalent dispute in this case. The question presented to the jury was whether the

---

[6] As the Court in Connolly acknowledged, a material misrepresentation or "falsity" is not a requisite element of securities fraud or wire fraud. The statute is also satisfied by schemes that involve literally true but intentionally misleading statements, such as a "half-truths" and material omissions. See Connolly, 24 F.4th at 833–34. Apart from the misstatements in the consent solicitation, the defendants also engaged in a scheme or artifice to defraud by parking bonds at Beechwood and failing to disclose them when they did disclose other misleadingly limited information about their bondholdings.

Consent Solicitation contained materially false information because it did not disclose that Platinum controlled bonds held by PPCO, PPLO, and Beechwood.  At trial, Small argued that he misunderstood the definition of "control" and had failed to disclose the PPCO and PPLO bonds for that reason.  Trial Tr. at 1635:22–23 ("That's the mistake. The mistake is, Dan doesn't account for common control.").   The defendant did not argue there was some interpretation of the indenture's definition of "control" that would not include PPCO and PPLO.  Rather, he conceded that PPCO and PPLO were affiliates:  "The bonds are held by two other Platinum entities. These guys are affiliates, . . . ."  Trial Tr. at 1635:17–18.  With respect to Beechwood, Small juxtaposed mere "influence" and "control," and argued that Nordlicht had only "influence" over Beechwood.  See, e.g., Trial Tr. at 1639:1–13 (citing Shearer's testimony distinguish "influence" from "control" and arguing that it was unclear which Nordlicht had), 1643:6 ("There's a difference between influence and control.").  He also argued that Beechwood was a "friendly," which he defined as a third-party essentially willing to do Platinum a favor, rather than an entity under Platinum's "control."  See Trial Tr. at 1578:17 ("Beechwood is a friendly"), 1640:14–15 ("What's the answer? Affiliated or friendly.  I don't know.  You don't know.  They don't know."), 1643:7 ("There's a difference between friendlies and affiliates").  Neither of these arguments involves a dispute over the meaning or interpretation of "control."  The government did not take the position that being a "friendly" satisfies the definition of "control" or that having "influence" alone amounts to "control."  Rather, the issue at trial was over the fact question of whether Nordlicht had more than mere "influence" and whether Beechwood was more than a "friendly," i.e. whether Nordlicht had the "power to direct or cause the direction of the management or policies" of Beechwood, as the indenture requires.  The jury was squarely presented with this question by counsel, the jury instructions quoted above required the jury to answer this question, and the jury found that this

requirement was satisfied based on the evidence summarized above that Nordlicht's portfolio manager was Beechwood's CIO, that Beechwood and Platinum had overlapping leadership, that Nordlicht helped found Beechwood, and that Nordlicht in fact exercised control over Beechwood's position in Black Elk.

## THE DEFENDANT'S RULE 33 MOTION SHOULD BE DENIED

The defendant's alternative motion for a new trial pursuant to Rule 33 (the "Rule 33 Motion") should also be denied.  The defendant contends a new trial is necessary because the government engaged in misconduct so severe that the defendant was denied a fair trial and because the government's rebuttal summation amounted to a constructive amendment and a prejudicial variance from the Indictment.  These arguments are meritless—there was no misconduct and no constructive amendment or variance—and the defendant has failed to meet Rule 33's high bar for a new trial.  Indeed, as discussed in detail below, the defendant's arguments are grounded in baseless and inflammatory attacks on the government prosecutors, disregard the applicable legal framework, and reflect misplaced disagreement with the jury's weighing of the evidence and the Court's rulings.  None of the defendant's arguments demonstrate a  "manifest injustice," suggesting that the defendant was innocent, or otherwise support the Rule 33 Motion.

I.    Applicable Law

In deciding whether to grant a Rule 33 motion, "[t]he test is whether it would be a manifest injustice to let the guilty verdict stand."  E.g., United States v. James, 712 F.3d 79, 107 (2d Cir. 2013) (citing United States v. Lin Guang, 511 F.3d 110, 119 (2d Cir. 2007) (internal quotation marks omitted)). "For a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted."  James, 712 F.3d at 107 (internal quotation marks omitted); accord United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009). "It has long been our rule that trial courts 'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.' It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting United States v. LeRoy, 687 F.2d 610, 616 (2d Cir. 1982)).  A trial court therefore "must exercise the Rule 33 authority

49

sparingly and in the most extraordinary circumstances" and generally defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.  United States v. Ferguson, 246 F.3d 129, 131, 134 (2d Cir. 2001) (internal quotation marks omitted).  The defendants bear the burden of showing that a new trial is warranted.  E.g., United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).

Given the rigor of this stringent standard, Rule 33 motions "are disfavored in this Circuit," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and district courts have been instructed to exercise their discretion under Rule 33 "that discretion should be exercised sparingly and in the most extraordinary circumstances."  Landesman, 17 F.4th at 330 (citing Ferguson, 246 F.3d, at 134) (internal citations omitted); see also United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (A court's authority under Rule 33 should only be exercised "in the most extraordinary circumstances").  Accordingly, it is "only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  Ferguson, 246 F.3d at 134.

For the reasons set forth below, the defendant has failed to meet Rule 33's high standard for a new trial.[7]

II.    There Is No Evidence of Government Misconduct

Small alleges that the government engaged in prosecutorial misconduct, specifically in the context of its rebuttal summation, and that this conduct merits a new trial.  Mot.

_____

[7]    Small makes a passing attempt to claim that the evidence presented at trial "preponderates heavily against the guilty verdicts on Count 6 and Count 8."  Mot. at 49–50.  For the reasons set forth in detail above, the evidence provided at trial amply supports the jury's verdict, see infra at 6–35, and none of the issues the defendant raises, individually or collectively, constitute the "extraordinary circumstances" that would merit disregarding the jury's verdict.  See Landesman, 17 F.4th at 330.  Indeed, each of the arguments raised by the defendants were considered and rejected by the jury.

at 52–53.  The defendant's allegations fall far short of reaching the high bar for obtaining a new trial and the motion should be denied.

      A.    <u>Applicable Law</u>

      New trial motions predicated on prosecutorial misconduct are reserved only for extreme cases in which the misconduct caused the defendant "'substantial prejudice' by 'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'"  <u>See</u> <u>United States v. Shareef</u>, 190 F.3d 71, 78 (2d Cir. 1999) (internal citations omitted).  The Second Circuit has repeatedly held that a conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding." <u>Gonzalez v. Sullivan</u>, 934 F.2d 419, 424 (2d Cir. 1991) (quoting <u>United States v. Young</u>, 470 U.S. 1, 11 (1985)).  For that reason, a defendant seeking a new trial based on "a prosecutor's remarks . . . faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial."  <u>United States v. Coplan</u>, 703 F.3d 46, 86 (2d Cir. 2012) (citation and internal quotation marks omitted).  When a remark is found to be improper in summation, it still "must cause substantial prejudice to result in a new trial." <u>United States v. Banki</u>, 685 F.3d 99, 120 (2d Cir. 2011).

      When evaluating claims related to an improper summation, the court must evaluate substantial prejudice "in the context of the entire trial."  <u>United States v. Thomas</u>, 377 F.3d 232, 244 (2d Cir. 2004) (internal quotation marks omitted); <u>see also</u> <u>United States v. Espinal</u>, 981 F.2d 664, 666 (2d Cir.1992) (the court "must consider the objectionable remarks within the context of the entire trial.").  In determining whether the defendant has suffered substantial prejudice, the court must consider: (1) the severity of the misconduct; (2) measures taken to cure the misconduct; and (3) the certainty of conviction absent the misconduct.  United States v. <u>Banki</u>, 733 F. Supp. 2d at 411(E.D.N.Y. Jul. 30, 2010) (citing <u>United States v. Elias</u>, 285 F.3d 183, 190 (2d Cir. 2002)).

B.    The Government's Arguments Did Not Mischaracterize the Record

      1.    The Government's Arguments About Friendly Bondholders
            Were Accurate

The defendant first argues that the government "falsely told the jury that [defense counsel] had invented the concept of 'friendly' bondholders as a distraction." Mot. at 54. In fact, the government did no such thing. As set forth below, the government instead argued, accurately and based on the evidence, that defense counsel had tried to wrongly conflate communications about "friendly" bondholders in the private process with the concept of "affiliates" months later in the public process. Despite defense counsel's protestations, that argument was accurate and based on evidence in the record.

As an initial matter, contrary to the defendant's assertion, on rebuttal the government specifically recognized that there was evidence, in the record, including with the defendant, that discussed the concept of friendly bondholders. See Tr. 1665:21–25 ("Again, go to the record. What evidence is there that Dan Small had any understanding of a concept of friendlies? There is one, I submit to you, DX-1-533,[8] March 2014, in which Mark Nordlicht makes an off-handed comment about flipping bonds to friendlies. That's all it says."); see also Trial Tr. 1684:9–10 ("there are emails about friendlies early on, only one of which the defendant was on."). As those references demonstrate, the government accurately distinguished any vague discussions

_____

[8]    In response to Small's arguments about the government's rebuttal summation, the Court also re-opened the record and admitted DX-6799 subsequent to the rebuttal, which was a second email that contained the word "friendly" on which Small was copied. Trial Tr. at 1746:15–1748:12. As detailed infra, DX-6799 is an email from March 2014 from Nordlicht to Shulse, Hoffman, Small and Levy in which Nordlicht stated "[w]e are likely to have friendlies buy the bonds as of tomorrow. R we pretty much set to close fieldwood?" As with the other exhibits cited by the defense, this document is from March of 2014 and does not mention Beechwood.

about friendly bondholders that took place in March 2014, during the private process, from the lack of such discussions during the public process months later.  Indeed, the only email in the record at the time of the rebuttal summation, DX-1-533, was, as the government accurately represented, from March 2014, which predated the public process.  Moreover, the additional documents that the defendant now references in his motion, none of which are in the trial record, are either contemporaneous to that exhibit or even earlier.  Mot. at 54 (citing DX1-271 (February 2014); DX1-272 (February 2014); GX-519 (February 2014); GX-534 (March 2014); GX-544 (March 2014).[9]

What the defendant ignores is that the crux of the government's argument throughout trial and on summation (including the portion of the summation cited in the defendant's brief) was that there is no document among the co-conspirators in which they refer to the bonds that would vote "yes" in the public process consent solicitation as being held in friendlies, or in which they refer to Beechwood as a "friendly."  See Trial Tr. at 1666:5–7 ("There is no evidence, especially during the public process that Dan Small thought these were friendlies. It was all about affiliates.").  That statement was entirely accurate.  There remains no evidence that the defendant believed that Beechwood was a "friendly" bondholder at any point, described Beechwood as a "friendly," or sought advice regarding whether Beechwood was a "friendly," including in the public process.

It was also reasonable for the government to point out the lack of evidence actually admitted in support of defense counsel's claims on this point, particularly where, as here, defense

---

[9]    And since government summations are by rule limited to discussing to the evidence actually admitted at trial, the government appropriately limited its arguments to evidence in the record.  See United States v. Millar, 79 F.3d 338, 343 (2d Cir. 1996) (observing that it is improper for prosecutors to refer to materials not admitted).

counsel's argument went far beyond what the record actually supports.  See, e.g., Trial Tr. at 1598:3–6 ("Why does Mr. Small have dozens of emails, messages with non-coconspirators talking about the Beechwood bonds, tracking Beechwood bonds, asking for information about Beechwood bonds. Because he thinks they're a friendly."); id. at 1578:17–20 ("The word didn't come out of the prosecutor's mouth, didn't mention it even though Mr. Shearer and everyone else was talking about friendlies for the whole year."); id. at 1635:3–7  ("That other is mostly Beechwood with a little bit of other people who we don't know who they are voting. Why? Because they're a friendly. Everyone knows they're a friendly. Piche, Hoffman, BakerHostetler, Nordlicht. They've all said they're friendlies.").  For all the reasons discussed above, these representations were gross exaggerations not supported by evidence that is actually in the record.  The BakerHostetler Memo, which is not in the record, appears to describe Hoffman's and Piche's concerns about unspecified "friendlies"—with no mention whatsoever of Beechwood; Nordlicht's references to "friendlies" were earlier and made outside the context of the public consent solicitation process to amend the indenture to allow payment to the holders of Series E preferred shares, as discussed above; and Shearer, the BakerHostetler partner actually working on the consent solicitation did not see the BakerHostetler Memo relied on by the defendant until years later during subsequent litigation. Given these misleading representations, the government was permitted to point out what the evidence actually showed: that any evidence in the record about friendlies was separate from the public process and/or did not involve the defendant.

In the absence of record evidence to support his arguments, the defendant resorts to arguing that the BakerHostetler Memo—which was not admitted into evidence—"directly refutes" the government's arguments on summation about the timing of the defendant's discussions regarding friendlies.  Yet again, that argument is baseless.  The BakerHostetler Memo

says nothing about affiliates, about Beechwood, or about secretly parking bonds at Beechwood to control the vote.  All the BakerHostetler Memo said was that, as of July 1, 2014, Black Elk bonds were in the hands of friendly bondholders, including Platinum.  Which was, of course, technically true as Platinum owned tens of millions of dollars of Black Elk bonds.  See GX-9510. Furthermore, even if the BakerHostetler Memo had actually said anything about Beechwood or bonds secretly held at an affiliate, there is no evidence that the defendant, Nordlicht nor Shearer ever saw, reviewed or was even mentioned in the memorandum, further undercutting the limited evidentiary value of the contents of the memorandum.  As the Landesman court acknowledged with respect to Nordlicht, the BakerHostetler Memo says nothing about what the defendant knew about "friendlies" or "affiliates" during the public process and provides no support to the argument that the defendant ever thought friendless were affiliates at any point.  See Landesman, 17 F.4th at 338–39 ("It is unclear how a memo unrelated to Nordlicht, undisclosed (at the time) to Shearer and sent to lawyers who were not working on the public consent solicitation process negates Nordlicht's intent to conceal the PPCO- and PPLO-owned bonds.").  Accordingly, the BakerHostetler Memo does not provide any support for the defendant's baseless assertion that the government made misstatements during its rebuttal summation.

### 2.   The Government's Arguments About Eliot Feit Were Accurate

Next, the defendant claims that the government misled the jury about "critical exculpatory evidence."  Mot. at 55.  At bottom, the alleged critical exculpatory evidence is DX-2102-B, a certification made in 2015 by Beechwood's finance director, Eliot Feit.  Rather than rebut the voluminous evidence in the record that Nordlicht controlled Beechwood, including the testimony of Israel Wallach that he was hired by Nordlicht, Trial Tr. at 819:1–2, 833:2–839:11, emails wherein Nordlicht singlehandedly directed the trading of tens of millions of dollars of Black

Elk bonds from Platinum to Beechwood, GX-678, -691, and emails in which Nordlicht readily admitted that he controlled Beechwood, GX-568, -625, -730, defense counsel claimed that a later statement by an individual with no role in the public consent process is exculpatory evidence.

The government rebutted that argument at trial and the government's argument is supported by the evidence.  As noted above, Feit, who was a finance director in 2015, had no involvement in the consent solicitation, and his statement was made nearly a year after the operative events.  Each of those factual predicates are accurate.  The government is aware of no document or testimony at this trial involving Feit except for DX-2102-B.  Accordingly, it was proper for the government to argue that this representation is not exculpatory as to what the defendant and his co-conspirators knew in 2014, and, moreover, that Feit would have no basis to make a similar claim about Beechwood's status as of 2014 and that, indeed, such a claim would have been contradicted by the evidence introduced at trial.  And furthermore, it was proper for the government to argue that Beechwood, including Nordlicht, Feit and others, would have had had a motive to claim that Beechwood and Platinum were not affiliates.  As defense counsel argued, Beechwood was prohibited from having related party transactions which provided, as the government argued on rebuttal, an incentive to obfuscate the relationship between Platinum and Beechwood.[10]

---

[10]     The defendant contends, without any citations, that the government was obligated to interview Feit before discounting his representation.  There is no basis for this claim, and, as described above, the government's rebuttal fairly pointed out the limited relevance of Feit's statement and Beechwood's motive to disclaim that it was an affiliate of Platinum.  In any event, the jury was read a stipulation specifying that the government did not interview Feit, so that information was before the jury (for whatever it was worth).

Last, defense counsel claims the government improperly characterized Feit as a senior executive at Platinum and a founder of Beechwood.  Defense counsel should know better. Such a claim is inconsistent with the government's argument that Feit had limited relevant knowledge or experience, and the years of proceedings in this case, including two trials and an appeal.  And, unsurprisingly, the record is clear that the government did not characterize Feit in this way.  After reviewing the recording of the proceeding, the court reporter confirmed in a revised transcript that government counsel said that Huberfeld and <u>Bodner</u> were the founders of Beechwood with Nordlicht, not Feit.[11]

3.   <u>The Government's Arguments About the Defendants'<br>Motivation Were Accurate</u>

The defendant has asserted that the government's arguments in the rebuttal summation misled the jury about the defendants' motives for early 2014 purchases of Black Elk bonds.  Mot. at 58.  The government's arguments were accurate and supported by the evidence. In particular, in refuting the defendant's argument that these bond purchases were motivated by a good-hearted desire to payoff bondholders, the government argued that the conspirators' purchases were motivated in part by their concern that Black Elk's bondholders, the senior secured creditors, would have priority over preferred equity holders in a bankruptcy, making it less likely that the preferred equity holders would recover in full.  Trial Tr. at 1670:1–10.  This argument is supported

---

[11]   Defense counsel also misrepresents the government's statements to the Court on this issue.  The defendant contends that "the Government later acknowledged, outside the presence of the jury that it was '<u>an absolute misstatement</u>' to group Mr. Feit with Messrs Nordlicht and Huberfeld."  Mot. at 56 (emphasis in defendant's brief).  What the government attorney actually said was "Judge, <u>if</u> I said Feit that was an absolute, an absolute misstatement."  Trial Tr. 1727:12–13 (emphasis added).  As it turns out, the prosecutor did not make the statement about Feit grouping him with the founders of Beechwood, and the government's statement in rebuttal was accurate.

57

by several exhibits introduced into evidence at trial in which individuals involved with Black Elk, including the defendant, discussed the prospect that Black Elk was insolvent and that not all stakeholders would be paid.  See GX-769 (August 18, 2014 email from Shulse to the defendant and others stating that Black Elk's common equity is "worth zero"); DX-6105 (April 25, 2014 email from Shulse to Shearer discussing the risk of equitable subordination).  Yee also testified about the significant drop in the price of bonds following the bankruptcy filing, suggesting that the market thought there was a risk Black Elk's senior secured creditors would not be paid in full, meaning that creditors lower in priority would likely not be paid.  Trial Tr. at 935:13–18 ("What happened to the price of the Black Elk bonds following the bankruptcy–following the declaration of the bankruptcy? A: My recollection was that the bonds were trading around $0.20, and I believe after the filing, they dropped down to, know, pennies on the dollar.").

The government's argument was also responsive to evidence elicited by the defense during the trial.  For example, defense counsel elicited testimony, on cross-examination, from both Pulvino and Yee about how the order of priority in the capital structure operates during a bankruptcy.  See Trial Tr. at 736:9–15 (Pulvino: "Q: Because the issue is if things go wrong in the bankruptcy, if things go into bankruptcy, whether everybody else -- whoever gets paid, that's interesting and I'm sure you wish them well, but ultimately if there's enough money to pay your 7 and a half million dollars' worth of bonds, that is what your focus is in this situation. A: That's true."); Trial Tr. 966:13–21 (Yee: "Q: And the reason it's called a waterfall is that, at least in the finance world when there are distressed and there could be a bankruptcy, the idea is as the money flows you want to be on top of the waterfall instead of at the bottom; right?  A: Yes. Q: It's a little bit weird because water does get to the bottom of the waterfall, waterfalls, but in this kind of things sometimes there is no water; right? A: Yeah.").  Yee testified to essentially a liquidation scenario,

making it even less likely the preferred equity would have received value in a bankruptcy. The government's argument on rebuttal was responding to arguments raised by defense counsel based on evidence in the record, much of it elicited by defense counsel.[12]

Accordingly, there was an evidentiary basis to make the argument in response to defense arguments about the intent for purchasing bonds. That the Court disagreed with the government's argument does not make it false or untethered to the evidence. The Court never found that the argument was false or misleading and never precluded the government from making that argument. The government was free to argue an inference based on the evidence elicited at trial, including from the defendant, in order to rebut a claim specifically made by the defendant. Indeed, as the Court noted following the defendant's objection, "[t]here is some evidence that they wanted to be bondholders in a bankruptcy rather than preferred, because they thought it would be better, which it might or might not be. And because it goes to their intent, even if it's an incomplete statement of the bankruptcy code, then I don't think it's material." Trial Tr. 1729:9–14.

_____

[12]   Defense counsel's claim that Shulse "explained to Mr. Small and the other alleged co-conspirators that if their conduct led to Black Elk's bankruptcy, they were going to get subordinated anyway" is demonstrably false. See Mot. at. 59. Notably, counsel's citation in support of that assertion is to his own arguments to the Court; not any sort of evidence. In DX-6105, the only evidence that is arguably relevant to that claim, Shulse asked Shearer for advice on the possible risk of equitable subordination, which demonstrates that Shulse, a co-conspirator, was concerned about the risk of equitable subordination. There is no indication in that exhibit, or elsewhere, that Shulse told Small or anyone else that Platinum's claims would be subordinated in the event of a bankruptcy. And the fact that a co-conspirator was worried about equitable subordination actually confirms the government's argument that the defendants were worried about the priority of their claims in a bankruptcy. Even if the facts merited equitable subordination, as the Court indicated it believes, such an outcome would have required both that the defendants' fraud was uncovered and that the issue was litigated successfully. Both of those things were far from assured when Shulse asked about the risk of equitable subordination around the time of the consent solicitation in 2014.

4.     The Government's Arguments About the Value of Black
Elk Were Accurate

Finally, the defendant argues that the Government improperly argued that a valuation report submitted by Sterling (the "Sterling Report") regarding the value of Black Elk assets was not the proper measure of the company's financial condition, which he claims misled the jury by "unfairly casting doubt on the company's financial condition and ability to repay its outstanding debt . . . ."  Mot. at 59.

To the contrary, the government's arguments did no such thing.   The only statements that the government made about the Sterling Report were that it was prepared in January 2015, after the fraudulent conduct at issue, which took place in between June and September 2014, and that the valuation was based on the potential value (PV-10) of the company.  Trial Tr. 1677:8–13.  Nowhere in the government's rebuttal, which the defendant does not quote, did the government say the Sterling Report was false, inflated or unreliable.  The government was drawing an accurate distinction between potential value and available cash, i.e. the ability to exist as a going entity. See Trial Tr. 1677:8–13 (referencing testimony from Art Garza on the meaning of PV-10).  In fact, the government acknowledged that the Sterling Report may indicate some potential asset value in Black Elk but immediately contrasted the Sterling Report with the other voluminous evidence in the case which demonstrated that the participants in the scheme, including the defendant, understood that Black Elk was not paying vendors, was possibly going to be forced into involuntary bankruptcy (which it ultimately was), and was short on cash in the spring and summer of 2014.  Trial Tr. 1677:6–21; see also GX-682 (Shulse writes on July 2, 2014, "[w]e are officially out of money next week"), -1 (Small asks David Ottensoser on June 22, 2014 if he is available to discuss a Black Elk "RIF"), -513 (January 30, 2014 email from Shulse expressing concern about an involuntary bankruptcy filing in February 2014).  The government also accurately noted the

difference in time between when the Sterling Report was issued and when the defendant and his co-conspirators were discussing bankruptcy. These arguments contextualized the Sterling Report. They did not discredit it. These arguments were a fair response to the defendant's effort to minimize or ignore his and his co-conspirators' contemporaneous emails regarding Black Elk's financial condition and to instead suggest, based on the later Sterling Report, that Black Elk could not have been in financial distress. Trial Tr. 1575:19–25, 1576:1–3, 1577:1–5. The Court agreed with the government on the record that these arguments were fair. See Trial Tr. 1705: 9–13 ("Maybe that's a little bit of an overstatement, but it's not as if he's saying the Sterling Report is wrong. He's simply putting it into the context of the government's argument about these assets. So I'm not seeing a problem with that.").

C.    Small Suffered No Prejudice

For the reasons stated above, the defendant's claim of "material misstatements" by the government is meritless. Taken one at a time, as above, or viewed in light of the government's rebuttal as a whole, the government's arguments were accurate, and that alone forecloses a claim that the defendant was prejudiced. See United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) ("The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence" (citing United States v. Myerson, 18 F.3d 153, 163 (2d Cir. 1994) ("Indeed, this court has held that reversal on the basis of improper prosecutorial statements during summation is warranted only when the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial") (internal quotations omitted)).

But in any event, the Court made sure there was no prejudice by providing specific curative instructions even when the Court did not believe the government made a misstatement. The law presumes these curative instructions were effective, and there is no reason to doubt that they were. See Zafiro v. United States, 506 U.S. 534, 540–41 (1993); United States v. Reyes, 18

F.3d 65, 71 (2d Cir. 1994) ("Ordinarily we assume that juries will follow limiting and curative instructions."); United States v. Rahim, 339 F. App'x 19, 24 (2d Cir. 2009) (recognizing the power of "very specific" curative instructions).   In light of these curative instructions and the limited nature of the defendant's statements, the defendant cannot meet his "heavy burden" of showing prejudice so severe that it denied him the right to a fair trial.   Coplan, 703 F.3d at 87 (citation and internal quotation marks omitted).

Beginning with "friendlies", the Court gave the jury a clarifying disclosure regarding the existence of additional emails, then not in evidence, between the co-conspirators that referenced "friendlies" in March 2014 as part of the private process, and admitted an additional email that the defense requested.   The instruction read:

> [The prosecutor] could have been understood to be suggesting that the concept of friendlies was a recent contrivance that was just made to confuse the situation. If you look at the indictment, you will see that there is a lot -- there are a number of e-mails suggesting that the term "friendlies" was used between the alleged coconspirators. The government's point is that they didn't say to anybody they should have -- that Beechwood was the friendly, they just used the concept of friendlies. There is one exhibit I am going to admit late, Defense Exhibit 6799, which is an e-mail from Mr. Nordlicht to Mr. Shulse and to Mr. Hoffman and to Mr. Small and to Mr. Levy in which he notes that they will have friendlies back in March.  So to the extent [the government lawyer] was implying the coconspirators never talked among themselves, the alleged coconspirators, and discussed the concept of friendlies, there is an e-mail that says otherwise.

Trial Tr. 1746:21–1747:11.  That accurate instruction made plain, to the extent there was any basis for confusion, that there was evidence in the record where the defendant discussed friendly bondholders in March 2014 and removed any potential prejudice from the government's summation.

Next, with respect to Feit, the Court addressed the government's apparently accurate statements by informing the jury that: "Next, there was a reference to Eliot Feit, who sent

a letter to CohnReznick, the auditors, representing that Beechwood was not an affiliate. There is

no evidence in the record that Mr. Feit knew that was false or that he had been lied to by any of

the alleged coconspirators." Trial Tr. 1747:12–16.  To the extent that there was any prejudice

stemming from the government's arguments, which there was not, the Court's instruction made

plain what the government was not alleging and eliminated any confusion.

With respect to the risk of subordination, the Court informed the jury that: "But I

will tell you, as a matter of bankruptcy law, it is extremely unlikely that Platinum, as a bondholder

of Black Elk, would have been paid according to its level of priority.  That is because there is a

rule in bankruptcy that says insiders, people who control the company, which Platinum did, they

cannot -- they have to be subordinated to other creditors; they do not get paid first. So just so you

know that rule of bankruptcy law."  Trial Tr. 1747:23–1748:5.  Accordingly, if there was any

prejudice from the government's argument, the Court cured it with a detailed instruction to the

jury.

And last, regarding the Sterling Report, even where the Court expressly found that

the government's argument was accurate, Trial Tr. at 1705:1–13, the Court nonetheless gave the

following instruction:  "there was a reference to the Sterling Valuation reports. That is Defendant's

Exhibit 3215-E. I just want to point out to you that there is no evidence that the Sterling Valuation

report is in any way inaccurate and you should assume that to be the case."  Trial Tr. at 1746:15–

19.

The government's rebuttal was an evidence-based response to a series of improper

arguments in the defense summation that was filled with improprieties and misstatements of the

record (where the evidence relied on was even in the record at all).  See Myerson, 18 F.3d at 163

(citing United States v. Bagaric, 706 F.2d 42, 60 (2d Cir. 1983) ("This court has repeatedly held

that the Government is ordinarily permitted to respond to arguments impugning the integrity of its case, and to 'reply with rebutting language suitable to the occasion.'" (citations omitted)).  For example, defense counsel told the jury that "[t]he government hasn't presented you a single document that has [the] definition [of control], because there isn't one."  Trial Tr. at 1628:13–15. That is a flat misrepresentation of the record on a critical issue in this case, and it was not the only misstatement.  See, e.g. Trial Tr. at 1578:16–20 ("You all know what happened. Beechwood is a friendly. The word didn't come out of the prosecutor's mouth, didn't mention it even though Mr. Shearer and everyone else was talking about friendlies for the whole year."), 1635:3–7 ("That other is mostly Beechwood . . .   Why? Because they're a friendly.  Everyone knows they're a friendly.  Piche, Hoffman, BakerHostetler, Nordlicht.  They've all said they're friendlies."), 1591:18–19 ("they indicted this case under the Trust Indenture Act.").  The defense also alluded to the absence of an agreement regarding control of Beechwood.   See Trial Tr. 1638:20–22 ("What's the other part of the definition?  Agreement.  What agreement have you been presented on who controls Beechwood?  None.").  This argument disregards GX-476, which the government sought to introduce in evidence and is an agreement between Nordlicht's partner, Murray Huberfeld and Mark Feuer for the creation and operation of Beechwood.

The defense summation was also replete with inappropriate references to the defendant's punishment and ad hominem attacks on the government.  For instance:  "They indicted him.  They arrested him. They put him there. Because he made a mistake? They made a mistake. I don't see them getting arrested."  Trial Tr. at 1627:20–23.  And: "if you want to know are we mad, I'm beyond mad. And God forbid any of you have family members who have ever been treated like this. God forbid. But that's why, my friends, my fellow citizens, we don't trust anybody in this country to put people's liberty at risk other than strangers who are not part of the court

64

system. You all live in the city, you all know the world; there's good and there's bad. This is evil. This is evil stuff."  Trial Tr. at 1628:1–8.  The defense's repeated references to "condemning" the defendant and the defendant's "liberty" were an obvious reference to a potential custodial sentence, and they were highly improper.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is [] irrelevant to the jury's task.  Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.").

In short, in a transcript that stretches nearly 2,000 pages, the defendant has focused on four alleged misstatements in the government's rebuttal summation.  For the reasons above, each of the government's arguments was fair and based on evidence in the record.  The Court's prompt and specific curative instructions—even when the Court did not see a problem with the government's argument—remove any doubt that the defendant was not prejudiced and that he received a fair trial.

III.     The Government Did Not Constructively Amend the Indictment, Nor Did a Variance Occur

A.     Applicable Law

A constructive amendment to an indictment can arise when the government's proof at trial and the trial court's jury instructions "modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury."  United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996) (internal quotations omitted).  "A constructive amendment occurs either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered."  United States v. Dove, 884 F.3d. 138, 146 (2d Cir. 2018) (internal

citations omitted); see also United States v. Weiss, 752 F.2d 777, 787 (2d Cir. 1985) (finding that an impermissible alteration of the government's proof or the court's charge must affect an essential element of the offense); United States v. LaSpina, 299 F.3d 165, 181 (2d Cir 2002) (same).  There is no constructive amendment where "a generally framed indictment encompasses the specific legal theory or evidence used at trial."  United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003) (citing United States v. Wallace, 59 F.3d 333, 337 (2d Cir. 1995)); see also Stirone v. United States, 361 U.S. 212, 218 (1960) (noting that an indictment written in general terms may support conviction on alternative bases).

Because the evidence at trial is not required to be a precise replica of the charges contained in the Indictment, courts in this Circuit permit "significant flexibility" in the government's proof at trial, so long as the defendant was provided notice of the "'core of criminality' to be proven at trial."  See, e.g., United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992) (citing United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983)).  Furthermore, "[t]he core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."  United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012).  In the context of fraud, the "core of criminality" is the nature of the scheme.  See, e.g., United States v. Dupre, 462 F.3d 131, 140–41 (2d Cir. 2006) (no constructive amendment where evidence "concerned the same elaborate scheme to defraud"); United States v. Stitsky, 536 F. App'x 98, 102–03 (2d Cir. 2013) (summary order).  "To prove a constructive amendment, a defendant must show that the evidence and jury instructions at trial completely shifted the core of criminality—i.e. proved 'behavior entirely separate from that identified in the indictment.'" United States v. Gross, No. 15-CR-769 (AJN), 2017 WL 4685111, at *23 (S.D.N.Y. Oct. 18, 2017), (citing United States v. Bastian, 770 F.3d 212, 223 (2d Cir. 2014)).

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Frank, 156 F.3d 332, 337 n.5 (2d Cir. 1998).  As with a constructive amendment claim, a court reviewing a claim of variance must ask "whether the defendant was given notice of the 'core of criminality' to be proven at trial."  United States v. Benussi, 216 F. Supp. 2d 299, 322 (S.D.N.Y. 2002) (quoting Wallace, 59 F.3d at 338).  In contrast to a constructive amendment claim, however, "a defendant must show prejudice in order to prevail on a variance claim."  Frank, 156 F.3d at 337 n.5.  "A defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof 'substantially correspond, where the variance is not of a character that could have misled the defendant at trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'"  Salmonese, 352 F.3d at 621–22 (quoting United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994)).

B.     The "Core of Criminality" Alleged by the Government Did Not
       Change

The "core of criminality" proved by the government at trial matches the allegations in the Indictment.  As this Court explained in rejecting Levy's and Nordlicht's renewed Rule 29 and Rule 33 motions: "the government's theory of the case was, and continued to be, that defendants had unlawfully deceived other Black Elk bondholders by secretly voting affiliated bonds at the consent solicitation."  ECF Dkt. No. 894 at 13.  The arguments the defendant presents now do not go to this unchanged "core of criminality."  More fundamentally, these arguments fail because none of the defendant's proffered changes in the government's theory are accurate.

The defendant contends the government constructively amended the indictment by proceeding on an alternative theory of harm.  Mot. at 65.  The defendant cites no caselaw to suggest

that the government's "theory of harm" is an essential element of the crime—as it must be for there to be a constructive amendment; harm is not an element of securities fraud. He also does not cite any caselaw support for his argument that the government's "theory of harm" goes to the "core of criminality." The government's theory of intended harm did not change. At trial, the government argued that the defendant and his co-conspirators rigged the consent solicitation so that they could divert $70 million in proceeds of the Renaissance asset sale, which otherwise could not be paid to the holders of Series E preferred equity. See Trial Tr. 1531:2–7 (government summation: "When in reality the conspirators hid a bunch of bonds in their affiliate company, Beechwood, and voted them to ensure a consent would pass. And by doing this, they were able to steal the proceeds of the Renaissance sale of Black Elk's best assets and pay the Series E."); see also Trial Tr. 1657:13–19 ("He lied the number of bonds that Platinum and its affiliates owned to steal more than $70 million for PPV, for Platinum's investors…. They needed to get that money out. That was the last money coming out and they had to have it. So they lied."). That is the same theory charged in the Indictment. See ECF Dkt. No. 1 ¶¶ 85 ("To the surprise of the remaining Bondholders . . ., the trustee revealed that the holders of $110,565,000 or approximately 73.71 percent of the bonds had validly consented to the Consent Solicitation, thereby causing an amendment to the indenture agreement allowing the Preferred Equity to get paid from the proceeds of Black Elk's sale of assets to Company A."), 86 (alleging that following passage of the consent solicitation Small and Shulse authorized payment of $70 million to holders of the Series E preferred equity). And though the defendant claims the government "unfairly focused the jury on the alleged harm to vendors and employees, rather than on the bondholders," Mot. at 65, Black Elk's difficulty paying vendors and employees was always part of the government's case. See ECF Dkt. No. 1 ¶ 77; ECF Dkt. No. 912 ¶ 6 (permitting the government to introduce evidence of

Black Elk's inability to pay creditors because it "motivated Mr. Small and his coconspirators to loot Black Elk of its assets as quickly as possible"); see also Trial Tr. at 87:1–10 (instructing the jury that failing to pay vendors was not illegal).

Alternatively, the defendant argues the government constructively amended the indictment by shifting its theory of "friendlies."  The defendant does not explain how the government's arguments with respect to "friendlies" amount to a fundamental shift in the allegations in the indictment.  Indeed, the government argued at trial that after the defendants' efforts to amend the consent solicitation failed in the private process, the defendants proceeded to transfer bonds to Beechwood and amend the consent solicitation in the public process.  This mirrors the allegations in the indictment.  ECF Dkt. No. 1 ¶¶ 80–81.  Moreover, the government's arguments distinguishing "friendlies" and "affiliates" did not constitute a constructive amendment.  As noted above, it was a rebuttal to the defendant's unsupported argument that the defendant believed that Beechwood was a "friendly" in the public process and not an "affiliate" that was concealed from Shearer and the bondholders.  There is nothing inconsistent between the arguments at trial and the contents of the indictment.  As noted above, the central theory of the indictment is that the defendant and his co-conspirators hid Beechwood's control of Black Elk bonds in order to manipulate the vote on the Consent Solicitation.  ECF Dkt. No. 1 ¶¶ 81–87.  The government's arguments on rebuttal were entirely consistent with that core of criminality.  See Bastian, 770 F.3d at 223 ("to prove a constructive amendment, a defendant must show that the evidence and jury instructions at trial completely shifted the core of criminality—i.e. proved "behavior entirely separate from that identified in the indictment.").

Furthermore, for the same reasons discussed above, there was no variance in this case, because the arguments evidence presented at trial did not materially deviate from the

allegations in the Indictment.  The government's arguments at rebuttal were based on facts that were established at the defendant's trial and track the indictment.  United States v. Benussi, 216 F. Supp. 2d at 322 (variance occurs only where "evidence offered at trial proves facts materially different from those alleged in the indictment.").   Moreover, even if there were a variance, the defendant has failed entirely to show prejudice.  The defendant makes only a passing attempt to establish prejudice, claiming that because the arguments came at the end of trial, he could not address them.  Given that none of the facts underlying the argument were materially different than the evidence presented at the defendant's trial and were in response to the defendant's own arguments, his strained claims of surprise cannot establish variance.  See United States v. Lebedev, 930 F.3d 40, 54 (2d Cir. 2019) (finding no prejudice, for purposes of variance analysis, where defendant claimed "mid trial surprise" caused by evidence disclosed to him prior to trial).

IV.     The Defendant Is Not Entitled to an Evidentiary Hearing Regarding
        Government Misconduct

         There is no basis for the Court to order a hearing into the supposed government misconduct alleged by the defendant.  A hearing is not required any time a defendant alleges misconduct.  See United States v. LaPorta, 46 F.3d 152, 160 (2d Cir. 1994).  "No hearing is required where the relevant facts can be ascertained from the record."  ECF Dkt. No. 485 at 7 (quoting United States v. Pavloyianis, 996 F.2d 1467, 1475 (2d Cir. 1993)).  The Court has already addressed each of the defendant's allegations of misconduct, which, even if taken at face value do not come close to establishing a "pattern" of misconduct.  The defendant relies on a three-year old dispute regarding production of § 3500 material and discovery related to cooperating witnesses.  Mot. at 69.  The Court has rejected this argument in at least three occasions:  (1) in a January 2019 opinion concluding that any misconduct did not prejudice the defendant, ECF Dkt. No. 485, (2) in denying defendant's motion for reconsideration, ECF Dkt. No. 510, and, (3) most recently, in

denying Nordlicht's and Levy's renewed Rule 29 and Rule 33 motions, ECF Dkt. No. 894 at 24–25. Small also points to alleged misconduct with respect to "potential grand jury improprieties." Mot. at 69. The defendant has not explained how these alleged "improprieties" result from government misconduct, but regardless these claims too have been rejected by the Court. See ECF Dkt. No. 885. Last, the defendant points to his claim that there must be undisclosed, additional § 3500 material for Special Agent Amato.[13] The Court addressed this claim at trial, including by requesting a representation from the government that the government was not in possession of additional substantive email communications from Agent Amato. See Trial Tr. at 1338:24–1339:1 ("What do you expect me to do with that? Once you got the representation, I think you asked for it because that is all I can give you in the absence of evidence.").

The defendant has not provided any basis for the Court to change its resolution of these matters. He still has not explained what prejudice he could have sustained from purported misconduct that was resolved years before his trial. See ECF Dkt. 894 at 25 (rejecting the same argument when presented by Levy because "Mr. Levy's legal time had an extensive amount of time to review the material they claim was not provided on time . . . ."). The defendant also has not explained how an evidentiary hearing would further develop the record. In short, the evidentiary hearing requested by the defendant is nothing but an invitation to chase shadows. The Court should deny Small's last-ditch effort to avoid the consequences of his criminal conduct.

---

[13] The defendant inaccurately describes both Agent Amato's testimony at trial and the dispute with respect to her § 3500 material. Agent Amato did not testify "about law enforcement techniques"—she was called as a publication witness to introduce relevant documents. And the government did not claim that "'other than scheduling appointments, [the trial team has] not' communicated with SA Amato.'" Mot. at 70. The government explained that there were not undisclosed substantive emails between the trial team and Agent Amato.

CONCLUSION

For the foregoing reasons, the government respectfully submits that the Defendant's Rule 29 and Rule 33 motions should be denied in their entirety.


Dated:      Brooklyn, New York
            October 28, 2022

                              Respectfully submitted,


                              BREON PEACE
                              UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                        By:   _____/s/_____
                              David C. Pitluck
                              Lauren Howard Elbert
                              Nick M. Axelrod
                              Assistant United States Attorneys
                              (718) 254-7000

72