UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
                - against -                           :   **ORDER ON LOSS CALCULATION**
                                                            :
MARK NORDLICHT,                                             :   16-cr-00640 (BMC)
DAVID LEVY, and DANIEL SMALL                                :
                                                            :
                Defendants.                           :
                                                            :
----------------------------------------------------------- X

**COGAN,** District Judge.

      Having received briefing from the parties, the Court held a hearing on the parties' different theories of the amount of loss, if any, properly attributable to defendants' conduct under United States Sentencing Guideline § 2B1.1. The facts relevant to the case have been set forth in several prior decisions of this Court and the Second Circuit and familiarity is therefore assumed. The Court's findings are as follows:

      1.      After providing a base offense level in subsection § 2B1.1(a) for fraud offenses, the Guidelines set out in subsection (b)(1) a loss table that prescribes offense-level increases pegged to the amount of loss. The Guidelines provide that a defendant's offense level is to be calculated based in part on the amount of loss the offense of conviction either caused or was intended to cause, whichever is greater. See U.S.S.G. § 2B1.1, cmt. n.3(A) ("[L]oss is the greater of actual loss or intended loss.").

      2.      "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. at n.3(A)(i). "Intended loss" "means the pecuniary harm that the defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance

fraud in which the claim exceeded the insured value).” Id. at n.3(A)(ii). The Court "need only make a reasonable estimate of the loss.” Id. at n.3(C).

3. Unsurprisingly, none of the parties has relied on a theory of intended loss. "When calculating intended loss, the appropriate inquiry is what the loss would have been if the defendant had not been caught.” United States v. Frisch, 704 F.3d 541, 544 (8th Cir. 2013). Here, actual loss and intended loss are the same because it was defendants' intention that the indenture amendments pass so they could pay off debt, and they succeeded. Defendants are, therefore, responsible for any loss resulting from those events. Thus, the loss calculation inquiry demands that I look at the actual loss caused by defendants' actions.

4. Because the fraud occurred via a manipulated consent solicitation vote, I must determine how, if at all, the defendants' manipulation of that vote caused Black Elk bondholders to suffer an actual loss. See United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006) ("[T]he loss must be the result of the fraud."). The Court is only concerned with the loss suffered by non-affiliated bondholders who chose not to tender their bonds or vote in favor of the amendments. The bondholders who tendered are not victims because they got all their money back and had no interest in the outcome of the vote. The bondholders who did not tender but voted in favor of the amendments are not victims because they supported the effort to amend the indenture.

5. The Government called the same two witnesses at both trials to explain its theory of loss: Todd Pulvino, an investor at CNH Partners, and Dixon Yee, an investor at Phoenix Investment Adviser. Both were highly sophisticated investors who chose not to tender or vote in favor of the amendments.

2

6.      Based on their testimony, the Government and the Probation Department contend there was an actual loss suffered by the independent bondholders.  Both, however, view that loss as difficult to quantify and thus contend the Court should resort to using the defendants' "gain" as the measure of loss.[1]  Per Application Note 3(B), courts may use gain "as an alternative measure of loss <u>only if</u> there is a loss but it cannot reasonably be determined."  U.S.S.G. § 2B1.1, cmt. n.3(B) (emphasis added).  "Such a situation could arise, for example, where authorities are unable to identify any victims of a fraud offense and, therefore, cannot ascertain the losses they suffered."  <u>United States v. Abiodun</u>, 536 F.3d 162, 167 (2d Cir. 2008).

7.      I disagree that the loss in this case cannot reasonably be determined.  To the contrary, the loss calculation here is fairly straightforward and far less complex than in many civil securities fraud cases.  When a charged fraud involves a misrepresentation regarding a publicly traded security, loss is generally determined by looking at the change in the asset's price after the fraud is revealed to the public.  <u>See</u> <u>United States v. Rutkoske</u>, 506 F.3d 170, 179 (2d Cir. 2007) ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.") (quoting <u>United States v. Olis</u>, 429 F.3d 540, 545 (5th Cir. 2005)).  Given that "[m]any factors may cause a decline in [a bond] price," the Court must exclude deflations caused by "other factors, such as changed economic conditions," but this process "inevitably cannot be an exact science."  <u>Rutkoske</u>, 506

---

[1] The Government and Probation disagree on the proper measure of "gain" in this case, with the Government contending the figure is $70 million and Probation putting it at $9 million.  The Government's $70 million claim borders on frivolous.  The total value of the bonds owned by non-affiliated, non-tendering bondholders was less than $39 million.  Even if every non-affiliated bondholder lost 100% of their money in bankruptcy, the loss would not remotely approach $70 million.  Obviously, then, $70 million is not an appropriate proxy for "loss" in this case.  <u>See generally</u> <u>United States v. Bazantes</u>, 978 F.3d 1227, 1251 (11th Cir. 2020) ("We will not substitute gain as a proxy for loss where there is no means of determining whether the defendant's gain is a reasonable estimate of the victim's loss.") (quoting <u>United States v. Coscia</u>, 866 F.3d 782, 801 (7th Cir. 2017)).

F.3d at 179.  In other words, here, the "loss" is any drop in the market value of the bonds caused by defendants' misrepresentation.

8.      Most "loss" cases in the securities fraud context involve defendants whose fraudulent conduct spanned several years and involved illegally propping up stock prices through unlawful sales and trading tactics or by using fraudulent accounting to hide cash flow problems. See, e.g., Rutkoske 506 F.3d at 170; Ebbers, 458 F.3d at 110; Olis, 429 F.3d 540.  Our case is unusual in that defendants did not commit a long-term and secret fraud to prop up an asset's price; rather, the consequences of rigging the consent solicitation – amending the indenture, selling assets, and retiring preferred equity – were immediately known to the market, although the fraudulent act was still hidden.  In other words, the result of defendants' fraud was the very public change in the terms of Black Elk's bond indenture.  Given the open and singular nature of the modified rights here, any negative market reaction or impact on value should be easy to show.  The Government just needs to point to a subsequent drop in bond price sufficient to demonstrate a link between defendants' fraud and the supposed loss.

9.      The Government built its entire case on the premise that the indenture amendment – permitting Black Elk to use the proceeds of the Renaissance sale to retire preferred stock – substantially devalued the bonds, such that, had investors known the amendment was going to pass, they might have tendered their bonds.  If this was true, then the market for these bonds should have tanked the moment the Black Elk press release went out on August 14, 2014 informing bondholders that the vote had passed.

10.     But the opposite happened.  After the consent solicitation passed, and with the market fully aware of the indenture amendments, the price of Black Elk bonds was stable and then rose to above par:

4



These facts, coupled with the historically high price of oil, support defendants' narrative that the company's bonds were seen as more secure after the amendments passed because Black Elk was able to retire some of its most burdensome debt.  Notably, after Black Elk used the Renaissance proceeds to buy back its preferred equity (between August 18 and August 21), the price of Black Elk's bonds rose above par.  Prioritizing the repurchase of a tranche of securities that required Black Elk to pay 20% interest – rather than the bonds that demanded 13.75% interest – was a reasonable decision that would successfully offload the firm's heaviest debt burden.  The Government does not refute or address the possibility that the decision to buy back the 20% preferred equity may have caused Black Elk's bond's value to rise.

  11. And despite the victim-witnesses' claimed "shock" at the seemingly irrational result of the indenture vote, their subsequent behavior demonstrates that their long-term loss was not tied to the consent solicitation's outcome or defendants' actions.  On August 14, 2014, Black Elk issued a press release that informed all Black Elk bondholders, including Yee and Pulvino,

5

of all the material facts – i.e., that the indenture amendments passed, and the Renaissance proceeds were going to be used to retire preferred equity. But even after the bondholders' rights were supposedly diminished through fraud, Pulvino's firm, CNH, continued to hold Black Elk Bonds and Yee's firm, Phoenix, purchased 529,000 bonds on August 19 and 20, mere days after the vote was announced (and later bought an additional 11 million).[2] At this point, bondholders knew all material information and could have sold their bonds for a profit. That they declined to do so has nothing to do with defendants' misrepresentation regarding the number of affiliates voting on the indenture amendments.

12. What caused their loss was a massive and unforeseen collapse in the price of oil that rattled the entire energy market and forced Black Elk into bankruptcy. By January 2015, five months after the bond amendments passed, the price of oil had dropped by approximately 50%. This resulted in a drop in the value of Black Elk – a drop that was entirely consistent with that of Black Elk's peer firms. See [994] at 10; see also Rutkoske 506 F.3d at 179 (A "decline in shares of comparable companies would merit consideration."). "Losses from causes other than the fraud must be excluded from the loss calculation," Ebbers, 458 F.3d at 128, and to tie the loss caused by these extraneous events back to the passage of the consent solicitation would be pure speculation. The Government has not shown that any loss to bondholders was the result of defendants' misrepresentation, the amendments to the Black Elk bond indenture, or the subsequent payout of preferred equity.

13. To the extent that investors lost money on their Black Elk bonds, those investors made strategic choices based on their understanding of the market, Black Elk's finances, and

---

[2] Yee testified that Phoenix purchased half a million more bonds after the consent solicitation in order to "establish a market value for the bonds." This position makes no sense; if Phoenix wanted to get rid of the bonds, a market for these bonds could be found just as easily by setting a high sales price and seeing if anyone would bite. Nor does this explain the additional 11 million bonds that Phoenix bought in the following months.

with full knowledge of the bond indenture's amended terms.  If they were right, their decisions could have produced substantial returns, and this case would never have been brought.  But these sophisticated actors misjudged.  Their loss cannot be attributed to defendants' behavior.  <u>Cf. Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005) (Securities fraud "statutes make [private] actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that the misrepresentations actually cause.").

14. Accordingly, I find that the amount of loss pursuant to Guideline § 2B1.1 is zero. The parties are directed to confer and propose dates to proceed to sentencing.

**SO ORDERED.**

*Brian M. Cogan*

U.S.D.J.

Dated: Brooklyn, New York
 July 17, 2023

7